Mark John Geragos (Admitted Pro Hac Vice)
Benjamin Jared Meiselas (Admitted Pro Hac Vice)
**GERAGOS & GERAGOS, PC**
644 South Figueroa Street
Los Angeles, CA 90017
Telephone No. 213-625-3900
Facsimile No. 213-232-3255
Email:  mark@geragos.com
            meiselas@geragos.com

William A. Richards #013381
Leslie Ross #027207
David E. Wood #021403
**BASKIN RICHARDS PLC**
2901 N. Central Avenue, Suite 1150
Phoenix, Arizona 85012
Telephone No. 602-812-7979
Facsimile No. 602-595-7800
E-mail:  brichards@baskinrichards.com
            lross@baskinrichards.com
            dwood@baskinrichards.com
*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| LANEY SWEET, an individual, et al., | Case No. CV-17-00152-PHX-GMS **LEAD CASE** |
| Plaintiffs, | |
| v. | **CONSOLIDATED WITH:** Case No. CV-17-00715-PHX-GMS |
| CITY OF MESA, et al., | **PLAINTIFFS' RESPONSE TO DEFENDANT LANGLEY'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT AND JOINDER IN MOTION TO DISMISS FILED BY CITY OF MESA** |
| Defendants. | |
| GRADY SHAVER, et al., | |
| Plaintiffs, | |
| v. | |
| CITY OF MESA, et al., | |
| Defendants. | |

BASKIN RICHARDS PLC
2901 N. Central Avenue, Suite 1150
Phoenix, Arizona 85012
Telephone 602-812-7979
Facsimile 602-595-7800

On January 18, 2016, Defendant Langley led Mesa police officers in a severely botched and over-aggressive response to an ambiguous 911 call.  He chose not to investigate facts that would have quickly confirmed his militaristic assault on Daniel Shaver's hotel room was both excessive and unjustifiably dangerous.  Langley compounded the error by giving his team legally unjustifiable direction to shoot and kill Daniel if he made a single "mistake" in following the incomprehensible instructions Langley barked at the unarmed and submissive Daniel who was crying and begging for his life.  One of those officers honored Langley's unlawful order, shooting Daniel five times with his AR-15 rifle, and killing him, though Daniel posed no threat justifying lethal force.  Langley now "cherry picks" and re-characterizes the facts and claims Plaintiffs allege, asking the Court to use his incomplete and editorialized facts to find him entitled to qualified immunity as a matter of law and to find various other aspects of Plaintiffs' claims legally deficient.  He thus ignores the plausibility review that the Court must conduct under Federal Rule of Civil Procedure 12(b)(6). Also, Langley wrongly construes applicable Section 1983 law, as well as Fourth Amendment and Fourteenth Amendment doctrines. Finally, he ignores the actual harms already caused by his First Amendment violations.  The Complaint states valid and viable claims against Langley for both individual and supervisory liability. Therefore, the Motion to Dismiss should be denied.[1]

## I.   Langley's Motion Mischaracterizes the Facts Plead Against Him and Violates the Plausible Claim Standard of Rule 12(b)(6).

Langley's Motion repeatedly mischaracterizes or ignores the facts on which the claims against him rest.  That is a critical error because Rule 12(b)(6) does not allow a defendant discretion to parse the facts to their favor, or even to characterize the facts or claims most favorably to them.  Instead, Rule 12(b)(6) allows the Court only to test whether the complaint's allegations contain sufficient allegations to state plausible claims as they are actually plead, assuming all factual allegations as true, and rejecting the defendants' self-serving

---

[1] Defendant Langley incorporates by reference the arguments made by the Defendants City of Mesa and Officers Elmore, Doane, Cochran and Gomez (the "City Defendants"). Plaintiffs' Response to the City Defendants' Motion to Dismiss are incorporated herein. To avoid duplication, Plaintiffs further incorporate by reference their responses to co-Defendants' Motions to Dismiss where substantially similar to the other Defendants' arguments.

characterizations.  *See, e.g.*, *Ellertson v. City of Mesa*, No. CV-15-00765-PHX-GMS, 2016 U.S. Dist. LEXIS 2366, at *6 (D. Ariz. Jan. 8, 2016); *Arroyo v. Alva*, No. 14-CV-03958-LHK, 2015 U.S. Dist. LEXIS 16267, at *9 (N.D. Cal. Feb. 9, 2015).  And, where there exist alternative explanations for particular facts, the Court may only disregard the plaintiff's explanations where they are truly *implausible*.  *Starr v. Baca*, 652 F.3d 1202, 1216-17 (9th Cir. 2011).  The Court is not to test whether the facts or plaintiff's interpretations of them are probable or more than likely true.  *Id.*  Thus, the Court may not select Langley's interpretation and analysis of the facts plead.

Rather, the Court must consider all the facts plead against him, which includes especially those at Amended Complaint paragraphs 43, 44, 58, 60-65, 69-72, 74, 76, 77, 79, 82, 84, 85, 87-90, 92- 99, 101-103, 106, and 107.  In summary, those facts assert that Langley and his Mesa Police team responded to a 911 call reporting that someone was seen pointing a rifle out La Quinta hotel room window in Mesa, Arizona in January, 2016.   No threats, shots, or descriptions of any suspect were reported. [Am. Compl. ¶¶ 70-73.]  Defendant Langley had no reason to believe that an "active shooter" situation existed when he assumed command and directed a team of other officers to immediately take lethal positions in retrieving victim Daniel Shaver and another hotel guest from his room. [*Id.* ¶¶ 35, 43-44, 79.] Defendant Langley made the decision to not gather information from hotel staff about Daniel or his room, though hotel staff had just gone to check on Daniel, spoke with him, and observed an entirely different man holding a rifle in what hotel staff thought was just a gun sale transaction. [*Id.* ¶¶ 38-42, 44, 62.] When Daniel and a woman voluntarily exited his hotel room to the hallway in response to a phone call from a Mesa PD officer, Defendant Langley personally barked threats of death to a compliant and terrified Daniel and his police team. [*Id.* ¶¶ 87, 89, 92, 93.] Defendant Langley instructed Daniel and the other defendant officers that any "mistake" by Daniel in complying with Langley's personally issued instructions authorized any officer to shoot and kill Daniel. [*Id.*] Defendant Langley included thereafter alternating and hopelessly confusing instructions that Daniel move, then not move or else Daniel would be shot, then to crawl forward with legs crossed and hands in the air with the threat of death if Daniel placed his hands on the ground,

3

and then contradictory instructions to crawl instead with his hands on the ground with the threat of death if Daniel raised his hands. [*Id.* ¶¶ 94-103.]  Defendant Langley rebuffed every attempt by Daniel to simply explain himself with a "shut up" and ignored Daniel's cries and his express pleas not to be shot.  [*Id.* ¶¶ 93, 98-103.]  When Defendant Philip Brailsford, whom Defendant Langley personally designated as a lethal force officer, unjustifiably enacted Langley's orders and killed Daniel, Defendant Langley, like the other defendant officers, went into cover-up mode.  They falsified their incident reports by omitting many details to try and justify the wrongful murder of Daniel by Defendant Brailsford.[2]  [*Id.* ¶¶ 137-38.]

**II.     There Are No Duplicative Section 1983 Claims to Be Dismissed.**

Langley argues that claims plead against him under 42 U.S.C. § 1983 in his official capacity are duplicative of the claims against the City of Mesa, and thus must be dismissed. The Plaintiffs have addressed the identical argument in detail in response to Defendants Philip and Corrine Brailsford's Partial Motion to Dismiss Plaintiff Laney Sweet's First Amended Complaint and Joinder in Motion to Dismiss Filed by City of Mesa (Doc. 82 ("Brailsford's Motion to Dismiss").  [*See* Response of Plaintiffs Laney Sweet and Her Minor Children to Defendants Philip and Corrine Brailsford's Partial Motion to Dismiss Plaintiff Laney Sweet's First Amended Complaint and Joinder in Motion to Dismiss Filed by City of Mesa, at II]. Plaintiffs' analysis that there are no duplicative claims to dismiss applies identically to Langley's argument; so, Plaintiffs incorporate their responsive argument here.

**III.    Claims Arising Under the Fourteenth Amendment Are Appropriate and Viable.**

Langley suggests that Plaintiffs cannot in their Section 1983 claims assert any violations of rights guaranteed by the Fourteenth Amendment because ***all*** Plaintiffs' theories of actionable conduct against him must be construed only as claims of Fourth Amendment violations.  This is identical to the argument asserted at page 6 of Defendant Brailsford's Motion to Dismiss, and is adequately rebutted by the argument Plaintiffs have made in response to that motion at

---

[2] Plaintiffs still cannot provide this Court all details of any defendant officer's conduct as Defendant City of Mesa has never provided Plaintiff the full public record audio and video recordings of the incident, or even the transcript of the audio of the shooting incident.  [D.E. 53, ¶¶ 153-54, 158].

BASKIN RICHARDS PLC
2901 N. Central Avenue, Suite 1150
Phoenix, Arizona 85012
Telephone 602-812-7979
Facsimile 602-595-7800

Section III of their Response memorandum. The Plaintiffs incorporate those arguments here; the Fourteenth Amendment claims state plausibly viable causes of action.

## IV.   The Qualified Immunity Arguments are Premature, Mischaracterize the Claims, Ignore Key Facts, and Misapply the Relevant Law.

There are several independent reasons why this Court should reject Defendant Langley's request for a fact-based finding that he enjoys qualified immunity. First, the qualified immunity determination is premature in such a complex, fact-specific case involving the killing of an unarmed and fully compliant man after a botched and unjustifiably aggressive police assault. Second, Langley misstates the test for qualified immunity and inaccurately contends that the law was clearly established that he could place Daniel in imminent danger of being shot and instruct his officers to shoot Daniel upon a single additional "mistake" in following Langley's hopelessly confused directions. Third, Langley's argument demands the Court consider his role to be exclusively the muttering of "mere threats" and to ignore the vast additional allegations of how his specific actions, and his failure to act appropriately as a police supervisor, set in motion and encouraged the constitutional violations that would lead to Daniel Shaver's death.

### A.   The Qualified Immunity Analysis is Premature; Factual Development and Analysis Will Be Required.

While a court may encourage qualified immunity to be addressed relatively early in the litigation process, as soon as relevant disputed issues of fact can be resolved, qualified immunity arguments are mostly premature and inappropriate as a basis for a motion to dismiss where police excessive force is alleged. The Ninth Circuit recognizes that "a motion to dismiss on qualified immunity grounds puts the court in the difficult position of deciding far-reaching constitutional questions on a non-existent factual record." *Kwai Fun Wong v. U.S.*, 373 F.3d 952, 957 (9th Cir. 2004). For those reasons, federal courts reject qualified immunity as a proper basis for a motion to dismiss in "the 'vast majority of cases.'" *Williams v. Papi*, 30 F. Supp. 3d 306, 314 (M.D. Pa. 2014) (rejecting qualified immunity defense in police shooting case and holding "[a]t this time, it appears that the present case is one of the 'vast majority of cases' in which a determination of qualified immunity is inappropriate at the pleading stage."); *Wilkins v. City of Oakland*, 350 F.3d 949, 956 (9th Cir. 2003) ("Where the officers' entitlement to

5

qualified immunity depends on the resolution of disputed issues of fact in their favor, and against the non-moving party, [even] summary judgment is not appropriate."); *Lolli v. Cty. of Orange*, 351 F.3d 410, 421 (9th Cir. 2003) (same); *Santos v. Gates*, 287 F.3d 846, 856 (9th Cir. 2002) (premature to decide the qualified immunity issue "because whether the officers may be said to have made a 'reasonable mistake' of fact or law may depend on the jury's resolution of disputed facts and the inferences it draws therefrom").

Qualified immunity is so rarely an appropriate basis for dismissal on the pleadings because the applicable standard requires the Court to possess a detailed factual understanding of the case and to apply a fact-specific analysis to an objective reasonableness standard.

> In § 1983 excessive force cases, a claim of qualified immunity is evaluated by inquiring: (1) whether "the facts, taken in the light most favorable to the plaintiff, show a constitutional violation," i.e., whether "the alleged use of excessive force was objectively reasonable," and (2) "whether the constitutional right was clearly established at the time of the constitutional violation," such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Cowan ex rel. Estate of Cooper v. Breen*, 352 F.3d 756, 761 (2d Cir. 2003) (internal quotation marks omitted). Because "[i]t is indisputable that freedom from the use of excessive force is a clearly established constitutional right," *Jeanty v. Cty. of Orange*, 379 F. Supp. 2d 533, 542 (S.D.N.Y. 2005); *see also Tracy*, 623 F.3d at 99 n.5 ("[I]t was well established at the time of the underlying altercation that the use of entirely gratuitous force is unreasonable and therefore excessive . . . ."), the issue here is whether it was objectively reasonable for [the officers] to believe that their acts did not violate Plaintiff's right to be free from the use of excessive force.

*Jones v. Westchester Cty.*, 182 F. Supp. 3d 134, 157 (S.D.N.Y. 2016). This analysis requires that the trier of fact review "the totality of the circumstances, which requires consideration of the specific facts in each case, including the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of others and whether he is actively resisting arrest." *Sullivan v. Gagnier*, 225 F.3d 161, 165 (2d Cir. 2000) (citing *Graham v. Connor*, 490 U.S. 386, 395-396 (1989)); *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (same). Such factually charged "questions of reasonableness are not well-suited to precise legal determination," *Santos*, 287 F.3d at 856 (quoting *Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir. 1994), nor are they subject to "'precise definition or mechanical application'", *Garcia v. Cty. of Spokane*, No. 10-CV-0349-TOR, 2014 U.S. Dist. LEXIS 176398, at *16 (E.D. Wash. Dec. 22, 2014) (quoting

BASKIN RICHARDS PLC
2901 N. Central Avenue, Suite 1150
Phoenix, Arizona 85012
Telephone 602-812-7979
Facsimile 602-595-7800

6

*Graham*, 490 U.S. at 395-96).  And, if there exists any reasonable dispute in the relevant facts about what sort of threat faced the defendant officers, the jury must be allowed "to assess whether the force used by the officers was excessive." *Id.*  Stated more succinctly, the qualified immunity defense in excessive force cases "necessarily involves a fact-specific inquiry, [thus,], [i]t is generally premature to address the defense of qualified immunity in a motion to dismiss . . . .'" *Maloney v. Cty. of Nassau*, 623 F. Supp. 2d 277, 291-92 (E.D.N.Y. 2007).

> The intensive fact-specific analysis is especially critical where police kill a citizen.
>
> It is well-established that in circumstances where the individual against whom the alleged excessive force was used is unable to testify because he has died, "the court may not simply accept what may be a self-serving account by the police officer." *Scott v. Henrich,* 39 F.3d 912, 915 (9th Cir. 1994). Rather, "[i]t must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably." *Id.* Thus, "[t]he judge must carefully examine all the evidence in the record, such as medical reports, contemporaneous statements by the officer and the available physical evidence, as well as any expert testimony proffered by the plaintiff, to determine whether the officer's story is internally consistent and consistent with other known facts." *Id.*

*Mathews v. City of Oakland Police Dep't*, No. 12-cv-03235-JCS, 2013 U.S. Dist. LEXIS 162502, at **29-30 (N.D. Cal. Nov. 14, 2013).  Moreover, just as the Court may not accept the self-serving characterizations of the facts offered by the police defendants, "[t]he "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Mattos*, 661 F.3d at 436; *see also* Graham, 490 U.S. at 397; *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)); *Brown v. City of New York*, 798 F.3d 94, 100 (2d Cir. 2015) (same).  Thus, the Court will have to know, from a fulsome review of eyewitness accounts, the as-yet unreleased body camera videos of the officers on scene [Doc. 53 (Am. Compl.) ¶¶ 153-54], and the investigatory reports that led to Officer Brailsford being charged with second-degree murder, what precise facts were facing Langley and the other police Defendants.  This critical analysis is not possible from the

BASKIN RICHARDS PLC
2901 N. Central Avenue, Suite 1150
Phoenix, Arizona 85012
Telephone 602-812-7979
Facsimile 602-595-7800

BASKIN RICHARDS PLC
2901 N. Central Avenue, Suite 1150
Phoenix, Arizona 85012
Telephone 602-812-7979
Facsimile 602-595-7800

mere pleading allegations.   Thus, the qualified immunity argument must be rejected as premature.

Two examples of how premature Langley's arguments are should suffice.   Langley argues that his instructions to Daniel and his officers that Daniel should be shot if he made a single, additional "mistake" in strictly following Langley's confused directions were actually required by federal constitutional law. [Doc. 73, at 9]. However, it can hardly be argued definitively that in every factual circumstance a police supervisor's repeated, shouted commands that the subject be shot dead if he makes another "mistake" in following the supervisor's instructions are constitutionally required.

Where the facts in this case fall on such a spectrum of reasonableness can only be determined at this stage by applying the facts as plead by the Plaintiffs.  Those facts demonstrate Langley was ordering and authorizing officer Brailsford to shoot and kill Daniel Shaver even though Mr. Shaver was fully submissive and compliant, was obviously unarmed, was wearing just basketball shorts that were falling down his backside and a t-shirt, and was crying and begging not to be shot, all while he tried valiantly to comply with highly inconsistent and confusing directives from Langley that were bound, in such a stressful environment, to force a "mistake" from Daniel.  [Doc. 53 ¶¶ 43, 44, 58, 60, 61, 62, 63, 64, 65, 69, 70, 71, 72, 74, 76, 77, 79, 82, 84, 85, 87, 88, 89, 90, 92, 93, 94, 95, 96, 97, 98, 99, 101, 102, 103, 106, 107].  There is no case law cited by Langley, or available anywhere, that concludes that orders to shoot such an unarmed and compliant citizen for one mistake in following an unbelievably confusing set of orders would be reasonable.  The facts plead do not allow a finding of qualified immunity.

Additionally, one factor the Court will have to consider under the totality of the circumstances plead here is whether Langley and the other police defendants had available to them less drastic police measures for seizing Daniel.  *See Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005).  The facts plead show they most certainly did, but failed to apply them.

First, Defendant Langley led his squad through the hotel and up to Daniel's room nearly ten minutes after the 911 report. [Doc. 53 ¶ 89].  At that time, there had still been no report of any threat made or of any shots fired.  [*Id.*  ¶¶ 70, 73, 79, 84].  In fact, had Langley or the others

bothered to simply stop and ask the hotel staff what they knew about the report, they would have revealed that one staff member had felt so safe she had gone to Daniel's room personally after the report about a rifle to check on the situation and had found Daniel with guests and his door open, with no threats or mischief about.  [*Id.* ¶¶ 39-42].  Because the officers did not immediately respond to ongoing, dangerous criminal activity, the initial 911 report was of little materiality once Daniel exited his room prone, compliant and unarmed. *Id.* at 703 (finding that though reported violent offense was serious, it did not authorize force employed for visibly unarmed man in his pajamas after-the-fact).

When Langley and his team arrived outside Daniel's door, they found no action, no threats, and even elected to wait and send an officer from the team downstairs to call Daniel's room to tell him to come out.  [*Id.* ¶¶ 70, 73, 76, 79, 84, 87].  Yet, despite all these indications that no imminent threat existed, Defendant Langley directed a team of multiple other officers to immediately take lethal positions in seizing Daniel, which means that he omitted entirely assessment of facts about whether any "immediate threat" existed while yet more time passed from the initial report without incident.  The failure to assess such facts is a critical error that will help determine if qualified immunity can even apply.  *See Mattos*, 661 F.3d at 445 ("We reiterate that this [the threat] is the 'most important single element' of the governmental interests at stake.").  When Daniel voluntarily emerged from his hotel room, he had no weapon, presented no resistance at all, and instead spoke deferentially and ultimately expressed fear for his life, crying and begging not to be shot.  [*Id.* ¶¶ 87, 89, 90, 93, 98-102].  He was hardly an imminent threat to anyone.

Yet Defendant Langley would not relent.  He personally barked death threats to Daniel for any "mistake" in following his directions and therefore repeatedly signaled to his team that they could, with his approval, shoot Daniel to death if he made any mistakes in strictly following Langley's movement instructions.  [*Id.* ¶¶ 92-102].  And, while Daniel struggled to follow Defendant Langley's nonsensical orders/threats and it became more and more apparent to Langley and the others that no threat existed. Daniel cried and begged from a prone position on the ground and Defendant Langley authorized his officers to approach the female guest who

BASKIN RICHARDS PLC
2901 N. Central Avenue, Suite 1150
Phoenix, Arizona 85012
Telephone 602-812-7979
Facsimile 602-595-7800

was with Daniel, and to handcuff her and move her.  They did so with no incident, with no resistance or threats from Daniel, and even moved in the line of fire between Daniel and Defendant Braislford to do so.  [*Id.*  ¶¶ 103-04, 112].  It is clear from such facts that the officers had no reason to consider Daniel to be an imminent threat.   Langley was clearly capable of seeing that lethal force from an AR-15 was not necessary to subdue Daniel, and that Daniel presented to threat of harm but merely wanted protection and to comply politely.  Yet, Langley offered no similar protections to Daniel.  He did not move his men up to similarly handcuff the crying Daniel, but instead continued to berate him with threats of death and incomprehensible instructions.  He could easily have modulated his orders, de-escalated the situation, and worked with Daniel to calm and reassure him and the officers whom he had so highly agitated.  The Court has many facts in the Amended Complaint from which to find Langley's failure to de-escalate and protect Daniel, and his decision instead to reinforce his kill orders, reflect a knowing failure to apply reasonable, protective alternatives, and thus unreasonably and unlawfully endangered Daniel.

The foregoing discussion shows many factual details that would need to be fully assessed from the evidence before any defendants' qualified immunity defenses could be decided.  Given that the facts plead demonstrate the police acted unreasonably, that factual determination cannot be made at this stage.

**B.    As Plead, Langley's Conduct Was Not "Reasonable" as a Matter of Law Under Clearly Established Legal Precedent.**

There is also plenty of caselaw that establishes Langley's conduct, as alleged in the Amended Complaint, actually violates clearly established constitutional law and therefore cannot qualify for qualified immunity.[3]  Daniel Shaver's constitutional rights to not be subject

---

[3]  The dispositive inquiry for qualified immunity as currently framed is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). The Court must decide "(1) whether, [t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right; and, if a violation of a constitutional right is found, (2) whether the right was clearly established." *Id.* at 966 (internal citations omitted). A right will be clearly established if a reasonable officer would understand that his or her actions violated the law. *Hope v. Pelzer* 536 U.S. 730, 739 (2002).

to excessive force or unlawful search and/or seizure has been clearly established for decades and are a matter of common sense.  A citizen's liberty interest in his or her own bodily security is a cornerstone right protected by due process.  *See, e.g., Ingraham v. Wright*, 430 U.S. 651, 673-74 (1977); *Wood v. Ostrander*, 879 F.2d 583, 589 (9th Cir. 1989).  And because that right is so clearly established, the obligation of police officials to affirmatively protect that right from use of force, and particularly lethal force, is equally clear.

> "It is well settled, and should be second nature to police officers" that the Fourth Amendment mandates precautions be taken before using deadly force. *Paiva*, 939 F. Supp. at 1487. In *Tennessee v. Garner*, 471 U.S. 1, 11, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985), the Supreme Court stated unambiguously that "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead." Even when an individual does pose a potential safety threat, the law requires use of non-lethal alternatives and the issuance of a warning before deadly force may be used.

*Perrin v. Gentner*, 177 F. Supp. 2d 1115, 1122 (D. Nev. 2001) (citing *Brower*, 884 F.2d at 1318; *Jensen*, 145 F.3d at 1086).  The *Perrin* court found that "[a] reasonable officer in [the defendant's] situation would understand the contours of the well-established body of law governing use of deadly force." *Id.*  Thus, the Court can assume that Langley, as an experienced supervisory police official, would understand as "second nature" that he could not direct or allow his officers to shoot Daniel as a means of subduing him or taking him into custody, and that they could not shoot him where he presented no imminent lethal threat.  Perhaps the most clearly established constitutional standard is that police officers may not shoot to death an unarmed citizen who poses no immediate lethal threat to them or others.  *See, e.g., Williams*, 30 F. Supp. 3d at 314 ("Moreover, the protections of the Fourth Amendment are sufficiently clear that [the] Defendant [police officer] should have known that shooting [a citizen] to death violated those protections.").

Just as clearly established is the law that confirms a police supervisor may not instruct or direct his forces to shoot or kill such an unarmed, non-threatening citizen.  *See, e.g., Larez v. Los Angeles*, 946 F.2d 630, 645 (9th Cir. 1991).  Langley's contrary argument misconstrues the contours of supervisory liability for excessive force violations.  Langley asserts that a defendant is "liable only upon a showing of personal participation . . . ." [Mt. at 10].  But, direct

Baskin Richards PLC
2901 N. Central Avenue, Suite 1150
Phoenix, Arizona 85012
Telephone 602-812-7979
Facsimile 602-595-7800

11

BASKIN RICHARDS PLC
2901 N. Central Avenue, Suite 1150
Phoenix, Arizona 85012
Telephone 602-812-7979
Facsimile 602-595-7800

"personal participation is not the only predicate for section 1983 liability." *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978); *Gilbrook v. City of Westminster*, 177 F.3d 839, 854 (9th Cir. 1999); *Dahlia v. Rodriguez*, 735 F.3d 1060, 1078 n.22 (9th Cir. 2013).

> A supervisor will rarely be directly and personally involved in the same way as are the individual officers who are on the scene inflicting constitutional injury. Yet, this does not prevent a supervisor from being held liable in his individual capacity.

*Larez*, 946 F.2d at 645. Thus, a supervisor can be liable if he had any "personal involvement" in the constitutional loss or there was "a sufficient causal connection" between his misconduct and the injury. *Redman v. Cty. of San Diego,* 942 F.2d 1435, 1446 (9th Cir. 1991). Relatedly, supervisory liability also arises from any supervisory actions that set in motion the series of acts by others which the person knows or reasonably should know would cause others to inflict the deprivation of a constitutional right. *Watkins v. City of Oakland,* 145 F.3d 1087, 1093 (9th Cir. 1998); *Larez*, 946 F.2d at 645; *Johnson v. Duffy*, 588 F.2d at 743-44. And, just like the officers under his command, a police supervisor who observes fellow officers violating the constitution "can be held liable for failing to intercede" if they had an opportunity to intercede, but failed to do so. *Cunningham v. Gates,* 229 F.3d 1271, 1289 (9th Cir. 2000).

The foregoing standards affirm that the conduct of each officer need not fully constitute or separately cause the constitutional deprivation to impose Section 1983 individual liability. Rather, they need only be involved integrally in the violation of rights through such conduct as setting others' acts in motion, creating the conditions under which the offense became possible or likely, or failing to intercede and protect the victim of excessive force when they had an opportunity. *See, Boyd v. Benton Cty.*, 374 F.3d 773, 780 (9th Cir. 2004) (officers providing in-person backup in Fourth Amendment search through excessive force are "integral" to the search and resulting violation).

There is no requirement that Langley pull the trigger or directly order Defendant Brailsford to shoot Daniel Shaver for him to be held individually liable. The Amended Complaint confirms it was he who set the deadly events in motion by failing to investigate the facts when he arrived at the hotel, but having his team assume a highly lethal assault position

BASKIN RICHARDS PLC
2901 N. Central Avenue, Suite 1150
Phoenix, Arizona 85012
Telephone 602-812-7979
Facsimile 602-595-7800

despite having no facts demonstrating Daniel posed an imminent threat, by having his team maintain this posture even when Daniel's crying, prone and compliant appearance indicated he was not an imminent threat, by unduly escalating emotions and authorizing the killing of Daniel for any mere "mistake" in following Langley's movement directions, and by aggressively issuing highly confused directions under threat of death that guaranteed Daniel might be perceived as making just such a mistake and be shot for it.  Langley also failed in his obligation as the supervisor on the scene to intervene and ensure his officers were taking appropriate steps to accurately assess if Daniel presented a threat, to use the minimum force reasonably necessary, and to use all non-lethal alternatives reasonably available.  Langley's actions, as alleged in the Complaint, are the very epitome of "supervisory" participation generating individual Section 1983 liability.

Given these facts, Langley's reliance on decision like *Thacker v. City of Columbus*, 328 F.3d 244, 258 (6th Cir. 2003) for the proposition "threats alone cannot support a constitutional claim," are inapposite.[4]  The Amended Complaint ties Langley to Daniel's death and interference with the Plaintiffs' constitutionally protected intimate relationships with Daniel[5] in many ways beyond making mere threats.  Daniel and his family did not suffer mere threats.  They suffered Daniel's death, and Langley's violations of his constitutional duties as alleged in the Amended Complaint are fundamentally tied to that death.  Thus, Langley's self-serving characterization of his involvement as minor, or "mere threats", must be disregarded.

This is also why Langley is wrong to assert that the Court may not consider as relevant any actions (or failures to act) alleged against him prior to the shooting.  Moreover, that argument altogether misapprehends Fourth Amendment law, contending that no seizure had occurred before the shooting, hence Langley's actions were all pre-seizure and irrelevant.  Under the Fourth Amendment, a person is seized when they submit to a show of force by state

---

[4]  *Thacker* is also distinguishable because the claims there involved just threats of an arrest, *see id.*, not threats of death that were taken as commands by the threatening officer's subordinates.

[5]  The constitutional liberty interests the Plaintiffs enjoyed in their intimate relationship with their husband and father, respectively, is well established in federal precedent.  *See, e.g., Ovando v. City of Los Angeles*, 92 F. Supp. 2d 1011, 1018-1021 (C.D. Ca. 2000).

13

BASKIN RICHARDS PLC
2901 N. Central Avenue, Suite 1150
Phoenix, Arizona 85012
Telephone 602-812-7979
Facsimile 602-595-7800

agents sufficient to convey to a reasonable person that they are not free to leave. *U.S. v. Mendenhall*, 446 U.S. 544, 554 (1980); *Robinson v. Solano Cty.*, 278 F.3d 1007, 1013 (9th Cir. 2002). "A police officer may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission . . . ." *E.g.*, *Brendlin v. California*, 551 U.S. 249, 254 (2007). When Daniel exited his hotel room, he was met with directions shouted by Defendant Langley to submit made on pain of death with at least two AR-15 rifles and other weapons directed at him to force compliance. [Doc. 53 (Am. Compl.), ¶¶ 82, 89]. Daniel immediately did so. [*Id.*] He was at that point legally seized. Thus, even if Langley were correct that only post-seizure activities were relevant (they are clearly not under foregoing discussion), the facts alleged in the Complaint demonstrate a seizure as Daniel left the room and all Langley's actions and failures to act thereafter would be relevant.

Moreover, Langley and the other Defendants ignore the legal breaches and resulting harms of torturing Daniel for minutes thereafter with nonsensical, confusing orders made with continued threats of death should any "mistake" be made and refusals to allow Daniel to speak, even though his crying and begging persisted. These also violated Daniel's rights to be free of an unreasonable seizure. In sum, for multiple reasons Langley's actions and inactions, all detailed in the Amended Complaint, are relevant to his individual liability and the qualified immunity argument. Because the Amended Complaint states facts on which the trier of fact could determine that Defendant Langley sufficiently participated in the killing of Daniel Shaver, that the killing was not justified by any imminent threat, and that Defendant Langley consciously ignored both the assessment of risk and the many less lethal alternatives he and his team were constitutionally required to consider under clearly established law, the Amended Complaint raises claims that would not be subject to qualified immunity. And, the many factual determinations that Langley must overcome to prove that his personal involvement would be seen by an objective officer with knowledge of the law as reasonable and not violative of clearly established law require the Court to hold the qualified immunity issue at bay until appropriate discovery is completed.

Finally, the Amended Complaint confirms that Plaintiffs are handicapped by the City of

Mesa's refusal to allow them to review the actual full video and audio from the two officer body cameras that captured the events in the hallway and Daniel's killing.  [Doc. 53, ¶¶ 152-55]. Given that this evidence led in part to the County Attorney prosecuting Defendant Brailsford for second degree murder, it is likely to offer substantial new facts by which Plaintiffs can round out evidence of Langley's and the other Defendants' liability.  The Court should not ignore the very real possibility that the many details already sufficiently undermining a qualified immunity defense will be bolstered by this most compelling, but as yet undisclosed, evidence.  *See McGrath v. Scott*, 250 F. Supp. 2d 1218, 1227 (D. Ariz. 2003) ("This Court finds that it must apply pleading standards in a realistic, common-sense fashion that recognizes that at the pleading stage (i.e. prior to discovery occurring) a plaintiff frequently lacks the actual details concerning supervisors' interactions with employees accused of committing constitutional violations.").

The foregoing confirms why Langley's (and any other Defendants') qualified immunity arguments are premature and are not an appropriate basis for dismissal.[6]

## VI.    The State Tort Theories State Viable Claims Against Langley and the Other Defendants.

### A.    The Allegations Against Langley State a Breach of Individual Tort Duties.

---

[6]  Defendant Langley's use of the qualified immunity defense also begs the question that Justice Thomas has recently asserted the federal courts should finally answer – that being, what legal source exists for the qualified immunity doctrine in the first place.  *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1871 (2017) (Thomas, J., dissenting) ("Our qualified immunity precedents instead represent precisely the sort of 'freewheeling policy choice[s]' that we have previously disclaimed the power to make.").  The courts "do not have a license to establish immunities from § 1983 actions in the interests of what we judge to be sound public policy," *Tower v. Glover*, 467 U.S. 914, 922-23 (1984), and even the Supreme Court has never identified a viable historical or textual source for the qualified immunity doctrine.  It is not written in the applicable liability statute, 42 U.S.C. § 1983, and cannot logically be implied therein unless it preexisted enactment of Section 1983 in 1871.  *See, e.g.*, *Rehberg*, 566 U.S. 356, 361 (2012); *Tower*, 467 U.S. at 921-22.  Legal historians have demonstrated that any qualified immunity against tort liability did not exist at common law. *Ziglar*, 137 S. Ct. at 1871 (Thomas, J., dissenting); William Baude, Is Qualified Immunity Unlawful, 106 Cal. Law Review 101, 110-15 (forthcoming 2018).  These illusory underpinnings invite under these unique circumstances a serious examination of whether it can be applied at all to police shootings cases involving unarmed citizens who pose no threat of imminent lethal harm.

BASKIN RICHARDS PLC
2901 N. Central Avenue, Suite 1150
Phoenix, Arizona 85012
Telephone 602-812-7979
Facsimile 602-595-7800

BASKIN RICHARDS PLC
2901 N. Central Avenue, Suite 1150
Phoenix, Arizona 85012
Telephone 602-812-7979
Facsimile 602-595-7800

A person is subject to liability for tortious conduct of another if the person "orders or induces the conduct, if he knows or should know of circumstances that would make the conduct tortious if it were his own," or "controls, or has a duty to use care to control, the conduct of the other, who is likely to do harm if not controlled, and fails to exercise care in the control." Restatement 2d of Torts, § 877. Also, a person is subject to such liability when he "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself." *Gomez v. Hensley*, 145 Ariz. 176, 178 (Ct. App. 1984) (quoting Restatement 2d of Torts, § 876). If the assistance or encouragement is a substantial factor in causing the resulting tort, the one giving the assistance or encouragement "is himself a tortfeasor and is responsible for the consequences of the other's act." *Id*.

Here, Defendant Langley can be seen as either a control person or as an individual acting in concert with Defendant Brailsford and the other officers. Through orders given to Defendant Brailsford, Defendant Langley personally threatened death to an unarmed compliant man, and personally ordered or induced Brailsford to shoot Daniel in spite of the same. At the least, he had a duty to control Brailsford by ensuring that the facts of the alleged threat posed by Daniel were appropriately assessed throughout the Defendants' interactions at the hotel, that appropriate methods of force and de-escalation techniques were employed to protect Daniel from the risk of accidental shooting, and that he did not give instructions Brailsford interpreted as rules of engagement encouraging him to fire at the next "mistake" he thought Daniel made in complying with Langley's instructions.  Per the allegations plead in the Amended Complaint, Defendant Langley actually gave Defendant Brailsford substantial encouragement to harm Daniel unlawfully through his verbal assurance Daniel could be killed for any "mistakes". The complaint alleges this encouragement was a substantial factor in causing Brailsford to shoot Daniel because it laid out a course of action for Brailsford to follow that resulted in the killing of Mr. Shaver. Langley is thus liable for Brailsford's assault and battery regardless whether he personally committed each element of those torts. *Gomez*, 145 Ariz. at 178.

**B.     The Amended Complaint Adequately Alleges Intentional Infliction of Emotional Distress.**

BASKIN RICHARDS PLC
2901 N. Central Avenue, Suite 1150
Phoenix, Arizona 85012
Telephone 602-812-7979
Facsimile 602-595-7800

The tort claims for intentional infliction of emotional distress against the individual police Defendants, including Langley, state viable state law claims.   Langley's argument duplicates the argument against the intentional infliction claim made by the Brailsford Defendants in their motion to dismiss.  The Plaintiffs' response to that argument establishes why the intentional infliction claim against the Defendants states facts involving extreme and outrageous conduct sufficient to establish an intentional infliction of emotional harm claim under state law.  The Plaintiffs incorporate their argument in their Response to the Brailsford's motion, at Section IV as its rebuttal to Langley's identical argument.  The Plaintiffs invite the Court to compare the inapposite facts in the two cases cited by Langley as support, *Rondelli v. Pima County*, 120 Ariz. 483, 490 (App 1970), or yelling at a suspect, *Keates v. City of Vancouver*, 869 P.2d 88, 92 (Wa. App. 1994), with the facts of the far more analogous decisions cited in Plaintiffs' argument in the Brailsford Response.  The type of facts alleged here meet the extreme and outrageous test for purposes of initial pleading, and dismissal is inappropriate.

**VII.    The Punitive Damages Request is Not Subject to a Motion to Dismiss.**

By its plain language, Rule 12(b)(6) allows defendants to challenge a  "claim." A request for punitive damages is a prayer for relief, not a claim.   Thus, courts routinely deny Rule 12(b)(6) challenges to punitive damages requests. "Because punitive damages are but a remedy, and thus neither constitutes a claim nor pertains to whether any claim has been stated, requests for punitive damages provide no basis for dismissal under Fed. R. Civ. P. 12(b)(6)." *Oppenheimer v. Sw. Airlines Co.*, No. 13-CV-260 - IEG (BGS), 2013 U.S. Dist. LEXIS 85633, at *10 (S.D. Cal. June 17, 2013) (collecting cases).  As for the requests for punitive damages under the state tort theories, the same reasoning applies.  The request for punitive damages for the state torts is pled as relief under the alternative state tort theories.  At the pleading stage, both the alternative theories and the relief available under them are appropriate.

**VIII.   Conclusion.**

Plaintiffs do agree to strike the reference to 42 U.S.C. § 1985 in Count V from paragraphs 255, 256, 257, 262, and 263 as not applicable to the allegations in this case.  However, the Court must otherwise deny Defendant Langley's Motion to Dismiss in its entirety.

RESPECTFULLY SUBMITTED this 16th day of October, 2017.

BASKIN RICHARDS PLC

/s/ William A. Richards
William A. Richards
David E. Wood
Leslie Ross
2901 N. Central Avenue, Suite 1150
Phoenix, AZ  85012

AND

GERAGOS & GERAGOS, PC
Mark Geragos
Benjamin Meiselas
644 S. Figueroa Street
Los Angeles, CA 90017

*Attorneys for Plaintiff Laney Sweet, an individual, on her own behalf and as guardian of Plaintiffs E.S. and N.S., and as representative of the Plaintiff Estate of Daniel Shaver*

1

**CERTIFICATE OF SERVICE**

2

3
I hereby certify that on October 16, 2017, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing to:

4

5
Kathleen L. Wieneke
Christina Retts

6
WIENEKE LAW GROUP, PLC
1095 W. Rio Salado Parkway, Suite 209

7
Tempe, AZ 85281
*Attorneys for Defendants City of Mesa,*

8
*Officer Brian Elmore, Officer Christopher Doane, Officer Richard Gomez, and Officer*

9
*Bryan Cochran*

10
Daniel O'Connor
Justin D. Holm

11
O'CONNOR & CAMPBELL, P.C.

12
7955 S. Priest Drive
Tempe, AZ 85284

13
*Attorneys for Defendants Philip Brailsford and Corrine Brailsford*

14

15
Mark Zukowski
David Potts

16
Jonathan Barnes
JONES, SKELTON & HOCHULI, P.L.C.

17
40 N. Central Avenue, Suite 2700

18
Phoenix, AZ 85004
*Attorneys for Defendant La Quinta Holdings*

19

20
James Belanger
J. BELANGER LAW PLLC

21
P.O. Box 447

22
Tempe, AZ 85280

23
Spencer Scharff
GODDARD LAW OFFICE PLC

24
502 W. Roosevelt Street

25
Phoenix, AZ 85003

26
*Attorneys for Defendant Charles Langley*

27

28
/s/ Cristina McDonald

BASKIN RICHARDS PLC
2901 N. Central Avenue, Suite 1150
Phoenix, Arizona 85012
Telephone 602-812-7979
Facsimile 602-595-7800