# Exhibit 17

Rebuttal of Rule 26 Report Submitted by Emanuel Kapelsohn, Dated January 17, 2019, in the Matter of *Shaver & Sweet v. City of Mesa et al.*

GENERAL STATEMENT REGARDING QUALIFICATIONS

To opine on a police officer's decision to use force, particular deadly force, the person offering their opinion must be learned in the complexities of human behavior. They must understand and be able to apply peer-reviewed academic research related to perception (including perceptual distortion), human reaction time (chronometry), psychophysiology, and the role of internal bias, among multiple other complex processes. Additionally, it requires a knowledge of police procedures, protocols, and standards of conduct and practice. Emanuel Kapelsohn lacks the necessary qualifications in both areas to render informed and scientifically-validated opinions. He is well known as an "expert" who will always side with the police; who will offer opinions well outside his area of expertise; and who will conduct and offer in support of his opinions purported "experiments" that barely rise to the level of even pseudoscience, and that are always designed to reach predetermined conclusions that always support the police.

In a recent deposition,[1] Kapelsohn was asked if he had ever had his testimony limited or excluded by a court. His answer was as follows:

> *"Limited many times over the years. A judge may decide he wants to hear opinions one, two, and three, but that number four is the province of the jury. Or that number four is no longer an issue in the case or whatever it might be. In terms of not allowing me to testify at all, because of qualifications rather than because he thought expert testimony wasn't appropriate in the case, that has happened once. And that was about a week and a half ago."*

Kapelsohn then blamed the defense in that case because they asked him not to write a report. The attorney then asked, "Is that the only case as you've indicated where your testimony has been excluded?" Kapelsohn responded:

> *"Yes. On what appears may be the basis of a judge thinking I'm not qualified to talk about firearms or shooting or any of those things. There was a case where a judge didn't let me testify. But it wasn't because he didn't think I was qualified. It was because he thought expert testimony wasn't appropriate on the subjects. "*

---

[1] Deposition of December 17, 2018. Siler et al. v. City of Kenosha, United States District Court, Eastern District of Wisconsin, case no. 17-CV-1324.

It doesn't take much searching using only Google to determine that Kapelsohn has greatly understated the extent to which his opinions and testimony have been excluded. Consider the following:

1.  Commonwealth of Pennsylvania v. John Torres, 1964 MDA 2016.

    In this case, Kapelsohn's testimony was excluded by the trial court based on his lack of qualifications. Torres appealed, and the Court found the following:

    *"Upon thorough review of Mr. Kapelsohn's expert report, this court finds that he appears qualified to testify in the area of firearms and crime scene reconstruction involving firearms. However, there is no indication from Mr. Kapelsohn's report that he possesses any knowledge, skill, experience, training, or education to afford him "specialized knowledge" on the subject of a trained police officer's physiological response to a perceived stress or life-threatening event. As such, this court found that Mr. Kapelsohn was prohibited from being qualified as an expert witness regarding physical and perceptual changes during life-threatening events. Accordingly, we find [Appellant's] claim holds no merit. We find no abuse of discretion stemming from the trial court's ruling. Appellant's fourth issue fails."*

2.  Schueller v. Brett Cordrey et al., C.A. no. N14C-10-201EMD.

    The Plaintiff in this matter, Keith M. Schueller, filed a Daubert motion. The Plaintiff's basis for the motion and the Court's decision were as follows:

    *"Mr. Schueller argues that Mr. Kapelsohn is not qualified to render the opinions in the report because he has no "formal, accredited education in police work; no evidence of attendance at or graduation from a police academy; no evidence of any full-time, or formal employment with a law enforcement agency; and no training courses lasting more than one week."*

    *The Court does not believe that Mr. Kapelsohn is qualified as a "force science analyst." The Court agrees with, and incorporates by reference, the District Court Decision that Mr. Kapelsohn is not qualified to offer opinions in the field of force science."*

3.  Linda Chatman et al. v. City of Chicago, United States District Court, Northern District of Illinois, 13-C-5697.

In this case, in which I was the Plaintiff's expert, Kapelsohn offered a lengthy argument justifying a Chicago Police officer shooting a young man in the back and killing him as he ran away from the officer. The young man, Cedrick Chatman, was armed only with an iPhone box. Kapelsohn attempted to employ, albeit improperly so, a number of psychological concepts to argue his position, including human perception, perceptual distortion, and reaction time. The motion argued that Kapelsohn misapplied research, misrepresented research, failed to offer supporting citations, and offered a number of unscientific conclusions.

The Court excluded Kapelsohn's entire report but for a single issue. He was allowed to offer an opinion on any similarities between an iPhone box and various types of guns.

4. Commonwealth of Virginia v. Adam Torres, Fairfax County

In this case, Officer Adam Torres from the Fairfax Co. Police Department was charged with improperly shooting John Geer through a screen door at a time when he was unarmed, with both arms raised, and talking calmly with a police negotiator. Even the other officers involved disputed Torres' claim that Geer was reaching for his waistband. True to form, only one individual, defense expert Emanuel Kapelsohn, argued that the shooting was reasonable and justified. The prosecutor in the case, Raymond Morrogh, argued that Kapelsohn's report read like a closing argument. Judge Smith excluded much of the report and ruled that Kapelsohn could not testify to the ultimate issue of objective reasonableness, how police officers are trained around the country, his personal anecdotes in other cases, the fact that different witnesses to an even can recall different things, or about the testimony of the other officers. Judge Smith even left open the possibility of a second hearing on the remainder of Kapelsohn's report after the defense submitted a proffer of Kapelsohn's testimony. The second hearing became unnecessary with Torres' guilty plea.

5. Estate of Angel Lopez v. San Diego, United States District Court, S.D. California, 3:13-cv-02240.

In this matter the Plaintiff moved to exclude Kapelsohn's testimony based on his reliance on questionable science and methods, particularly those of the Force Science Institute. The motion was granted in-part. Using Google alone, I was unable to determine which parts of his testimony were excluded.

3

It must be pointed out that Kapelsohn has no background or education in the behavioral sciences. He has an undergraduate literature degree, followed up with a law degree. He is simply not qualified to offer any opinion relating to human behavior, or even to evaluate my own opinions on those subjects. Further, he is not a certified police officer. He likes to hold himself out as a "special deputy" for various departments. It is a well-known practice in law enforcement that elected sheriffs will oftentimes hand out "special deputy" badges to friends, political allies, and in Kapelsohn's case, those who provide services to the department in a quid pro quo arrangement. There is no dispute that Kapelsohn is a firearms expert and likely well qualified to provide firearms training, even to police officers. But he is not a P.O.S.T. certified police officer, and is therefore not qualified to provide training or opine as an expert on matters related to police practices beyond firearms training.

Indeed, Kapelsohn has a long history and a short memory to have testified in a sworn deposition that he has never been disqualified on the basis of his qualifications, or lack of. It must be restated that the above cases were identified using only Google.

REBUTTAL OF SPECIFIC ISSUES

Kapelsohn appears to offer opinions and conclusions related to nine different issues, as follows:

1.  Standards applicable to a police officer's use of deadly force.

    The standards cited are not disputed, however the analysis is a legal review and argument on behalf of Brailsford. Kapelsohn appears to be acting as Brailsford's attorney rather than an independent expert. He fails to couch his analysis in an independent review of the evidence, and conveniently leaves out important pieces of the evidence, such as the fact that Shaver was shot after having reached behind his back two times before, and that his hand had returned to the front in view of the officers BEFORE Brailsford fired his weapon. Thus on this issue Kapelsohn has overstepped the scope of his review, and has been purposely selective in his review of the evidence. He is clearly acting as an advocate for Brailsford.

2.  Threats of imminent hard versus immediate harm.

    Here Kapelsohn includes a discussion of human reaction time. He is NOT qualified to render this opinion. Human reaction time is not consistent from one person to the next, nor from one situation to the next. To act as an expert in this area an individual must be prepared to discuss the psychological factors that impact reaction time. Furthermore, as

he typically does, Kapelsohn references in this section his own experiment. He states, *"I know from my own electronic timing tests and demonstrations, and it is confirmed by the published research of others."* Kapelsohn provides no data or methodology from those tests, nor does he cite the published research of "others" beyond the single study discussed.

3. The officer's "reasonable belief" is the applicable standard, and is the standard in which police are trained.

   Kapelsohn appears to be improperly mixing the standard by which police officers are trained and the standard by which we evaluate their use of force. When we evaluate their use of force, the standard is not their state of mind (i.e., belief), but that of the reasonable officer, which we determine from the totality of the circumstances. Furthermore, Kapelsohn is again being highly selective in his defense of Brailsford. He states, *"officers are also trained that, depending on the totality of the circumstances, if a suspect reaches into an area the officer cannot see—a so-called "furtive movement"—the officer may not only be justified in firing, but may, as a tactical reality, have to fire in order effectively to protect himself and others."* First of all, Kapelsohn's sentence sounds good, but it doesn't really mean anything when he bases his analysis on "<u>depending</u> on the totality of the circumstances…", "<u>if</u> a suspect reaches…," and "the officer <u>may</u> be justified…" Furthermore, throughout his analysis, Kapelsohn includes in his totality of the circumstances only the fact that Shaver reached back. What he doesn't include are the following:

   a. That the original call involved a long gun.
   b. That Shaver was attempting to comply with Langley's commands.
   c. That Shaver had reached behind his back at least twice before Brailsford fired, once with both hands.
   d. That the entire rear of Shaver's waistband was visible when he was on the floor.
   e. That he was wearing loose fitting gym shorts.
   f. That his empty hand had already returned to the front by the time Brailsford fired.

   Kapelsohn's selectivity in his review and consideration of the evidence makes his opinions unreliable. Purposely ignoring that evidence would make his opinions invalid. The totality of the circumstances means ALL the evidence. The extent to which Brailsford could perceive certain evidence based on reaction time and position can certainly be debated, but Kapelsohn is not qualified to participate in that debate without a behavioral sciences background.

5

4. Action vs. reaction.

I have read a number of Kapelsohn's reports, and he always includes this section. The concept of action versus reaction, or the "reactionary gap," serves as a *get out of jail free card* of sorts, and is intended to benefit any officer who uses deadly force in any situation before a weapon is seen, especially those situations where there is no weapon. Its effect is that it relieves the officer of their duty and obligation to properly evaluate a threat prior to firing their weapon.

First of all, Kapelsohn is NOT qualified to render an opinion on or with this issue. There is no dispute that some police officers are trained with the belief that action is always faster than reaction, and there is no dispute that Kapelsohn likely includes the concept in his training. But providing training is something much different than understanding the underlying concepts. By way of example, a pharmaceutical salesperson can educate a physician on the side effects of the drugs they are selling, but they are not qualified to act as an expert on the drug, or to provide medical opinions on why and how the drugs interact with the body to cause those side effects.

Furthermore, the science behind the reactionary gap is flawed, and fatally so. The study comes from a group of criminal justice professors (as opposed to behavioral scientists) at Texas State University.[2] In the study police officers progressed through a series of rooms in response to a "person with a gun" call. In each room was an actor, some holding a gun at their sides and pointed toward the floor, and others holding it to their head in a suicide stance. Twenty-percent of the suspects were told to obey the officer's commands to drop the gun, while the rest were directed to turn their gun on the officer and shoot. The study's objective was to determine if the suspects could ACT faster than the officers could REACT.

The study supports the argument that because action is quicker than reaction, the officer is always at a tactical disadvantage when the suspect is armed, near-armed, or only suspected of being armed. It also provides a reasonableness defense in some cases where an officer shoots a suspect in the back. The study bolsters the idea and necessity of an officer being more proactive in their use of deadly force. But The study lacks ecological validity. It is one thing to conduct experimental research in the area of perception and then apply it to the use of force, but it is an entirely different thing to try to research in an experimental setting the actual mechanics of force, as this study does. It is simply impossible to duplicate in an experimental setting the variables involved in a

---

[2] Blair, P. et al. (2011). Reasonableness and reaction time. *Police Quarterly*, vo. 14, issue 4, pgs 323-343.

police officer shooting and killing a suspect. Beyond the validity problem, the study is flawed methodology. The most obvious problem is that the suspects who were directed to shoot knew beforehand what their actions would be, while the officers did not. This advanced knowledge is a fatal flaw to any conclusions reached about a reactionary gap, conclusions that were sure to favor the suspects, and in the end argue for an expansion of the outer boundaries of the reasonable officer's decision-making.

Another flaw of the study, and one that is seldom shared by defense experts in their analyses, is that the results of the study were either statistically insignificant or inconclusive. The researchers found that on average, the suspects were able to shoot in 0.38 seconds, while the officers were able to shoot in 0.39 seconds, on average. If you look only at the suspects who held the gun to their own heads, their average time was 0.40 seconds, slower than the average time for the officers. Furthermore, the researchers used marking bullets to test for accuracy. They found that the suspects scored a "hit" only about half the time, compared to 90% of the time for the officers. Also, the one variable missing, and the one that cannot be experimentally manipulated, is the stress felt in these encounters by both the suspect and the officer. Discussing these confounding variables that call into the question the validity of the study, or even being able to recognize them, is why any expert who choses either to use the study in defense of an officer's actions, or to argue against its use, must have a sufficient background in the behavioral sciences to do so.

5. Shooting to "stop the threat"; firing rapid, multiple shots at center mass.

Once again, Kapelsohn provides a lengthy discussion of human perception and reaction. He is NOT qualified to discuss either. And once again he is advocating for Brailsford and attempting to construct a defense rather than reach an informed opinion based on an analysis of the evidence. He could have, and in fact should have discussed the concept of "habituation," or the fact that an officer's perception will quicken the longer the officer attends to the target. He also continues to ignore the fact that Shaver's empty hand had returned to the front even before Brailsford pulled the trigger, a circumstance Brailsford had sufficient time to perceive. Also, Kapelsohn misstates the Lewinski article he cites on the time required to stop shooting. Although Lewinski's research has been widely attacked as "pseudoscience," in that particular study, he provides a range of .10-.60 seconds for an officer to stop firing, and further states that the more focused an officer is on a single stimulus—Brailsford testified that he was entirely focused on Shaver—the shorter the time required to cease firing. Finally, Kapelsohn provides

anecdotal evidence from other cases in this section, the very thing he has been previously excluded from doing in other cases.

6.   The principle of "cooperative disadvantage."

It is a bit confusing why Kapelsohn included this section. First of all, neither I nor Plaintiff's counsel have argued that because Shaver was crying he was not a threat, only that in the totality of circumstances, Shaver's emotional demeanor and obvious distress were factors to be considered by Brailsford before deciding to shoot and kill him. Although Kapelsohn's position is confusing, he seems to be making the argument that Shaver's distress was in fact disingenuous and designed to gain some advantage over the officers. An expert cannot testify to the subjective experience of anyone, only to their overt actions. And if they choose to opine on the meaning of those actions, then they must have sufficient training and education to do so. Kapelsohn falls way short of that requirement. And finally, his continued use of anecdotes from other cases has no bearing on this case. Again, he previously had his testimony excluded because of this (see above).

7.   Visual search for weapons.

Kapelsohn completely ignores the fact that Shaver's entire rear waistband was visible during the encounter, and makes no effort to refute that. He also misstates my report in which I said *"there is no known holster designed for the waistband of a pair of gym shorts."* He points out that you can carry a gun in the pocket of a pair of gym shorts, or under your shirt in a belly band, or even in a concealment t-shirt. But Brailsford never testified that he thought Shaver was reaching up and under his shirt or into his pocket. He testified that it appeared he was reaching for a gun on his waist. Confusingly, Kapelsohn then states what the MPD believes about visually searching a suspect rather than what he believes using the available evidence. He states that is improper to visually search a suspect from a distance. This is an absurd statement by a man who has never been a police officer. As a 37-year law enforcement officer who has been forced many times to visually search a suspect anyway possible, including from a distance, I would ask Mr. Kapelsohn what the alternative is? What about the officer who has no back-up and must deal with the situation alone? At what point do they do a visual search of the suspect. In his continued advocacy of Brailsford, Kapelsohn knows it is a problem that Shaver's waistband was exposed when he was on the floor. To facilitate Brailsford's defense, he apparently is arguing that Brailsford should have ignored Shaver's waistband rather than "view it from a distance" of 6-10 feet. And like his other points,

Kapelsohn sets aside the totality of the evidence and circumstances and ignores many variables here, none of which mitigate Brailsford's actions.

8. Why other officers didn't fire, and whether it matters.

This section amounts to nothing more than Kapelsohn anticipating a problem area for the defense and attempting to construct an argument on their behalf. No one, including me, argues that an officer can only fire if the other officers fire. Kapelsohn simply presents Langley's testimony without any analysis of his own. He points out that Langley could not fire because he would have hit Brailsford, yet he fails to point out (as a purported police practices expert) that armed officers never place themselves in the line of fire of another officer. Kapelsohn offers Langley's testimony that he was thinking "gun gun gun!" when Shaver reached to pull up his pants, but he fails to point out that trained police officers for the safety of those around them <u>yell</u>, rather than just <u>think</u>, "gun gun gun!" And finally, Kapelsohn points out that Langley testified that because of the way Shaver was reaching, he thought he was drawing a gun from the small of his back. For a truly independent expert, this would be significant in considering things like the possibility Shaver was wearing a belly band holster, a pocket holster, or a concealment t-shirt. Furthermore, the fact that the small of Shaver's back was exposed when he was flat on the floor and submitting to being handcuffed is also important to consider. Kapelsohn simply ignores it all.

9. Time analysis of the incident; what Officer Brailsford could and could not see.

The first half of this section is inappropriate because they are simply the thoughts and words of another expert in this case, Mr. Schott, whose analysis is not evidence in this case, only an interpretation of the evidence. Furthermore, as previously discussed, Kapelsohn is not qualified to discuss human reaction time. In the first half of this section he states, *"the time interval to react to a visually complex scenario and fire is more consistent with human abilities, and with an officer who is only going to fire if he is sure he is facing a deadly threat."* There are so many things that are wrong with this single statement, but the main ones are as follows:

a. Kapelsohn doesn't define "visually complex," nor is he qualified to without a background in cognitive psychology. The fact is, he has already made the point that Brailsford was experiencing tunnel vision. Furthermore, Brailsford testified that he was focused on Shaver. Kapelsohn has made no effort to explain how these factors

played into the complexity of Brailsford's visual field, or how his perception was impacted by them.

b.  Kapelsohn makes no effort to define "human abilities." It is confusing what he even means here.

c.  He is now overstepping his own abilities by testifying to the subjective experience of Brailsford by stating that he was sure he was facing a deadly threat. He doesn't offer this as Brailsford's testimony, but rather as his own conclusion based on a discipline (cognitive psychology) he is not qualified to discuss.

In the second half off this section he again attempts to bolster Schott's analysis, which is inappropriate for a supposed independent expert and outside his scope and purpose. He also disputes my contention that the first shot was to Shaver's chest, says it is not based on science, and then makes no effort to refute my position or offer any science of his own. To be clear, my position is based on the evidence that is clearly seen on the video, as follows:

a.  Shaver immediately fell forward and his chest was never again exposed.

b.  Shaver was shot in the chest, a shot that penetrated his heart.

c.  Police officers are trained to aim at center mass.

CONCLUSION

It is patently obvious from his report that Kapelsohn is acting as an advocate on behalf of Brailsford and the Mesa Police Department. He is attempting to anticipate the problem areas and offer any argument he can to head them off. As he indicated in his report, and as he has done in the past, Kapelsohn would like nothing more than to come before a jury wearing half a dozen concealed toy guns to demonstrate how fast he can pull them out. But such a demonstration would only be meaningful if I were allowed to stand in front of him with a toy AR-15 to see who can pull the trigger first. At the end of the day it would prove nothing, and would amount to nothing more than courtroom theatrics.

Emanuel Kapelsohn has had his testimony excluded many times in the past because he uses junk science and attempts at every turn to testify about issues he is not qualified to offer opinion on. Such is the case here.

William Harmening
02/08/2019

10