# Exhibit 18

Rebuttal of Rule 26 Report Submitted by Michael G. Schott, Dated November 12, 2018, in the Matter of *Shaver & Sweet v. City of Mesa et al.*

GENERAL STATEMENT ON TECHNOLOGY

Mr. Schott has provided expertise in this matter in the area of video technology and analysis. While such technology is of value in cases where recorded video must be enhanced or recreated after being damaged or contaminated, this is not one of those cases. The video recorded by Officer Brailsford's body cam provides a clear depiction of the entire shooting incident. For my part, no special technology was either required or used to view the video record and form my opinions. Nothing other than an iPhone was used to capture screen shots from the video, which calls into question the need for any special technology. While it does give the appearance of credible analysis, and in fact may even prejudice some to accept Mr. Schott's opinions without question, the fact is, his analysis, as discussed below, is quite irrelevant to the question of *reasonableness* in this matter. Further, he offers opinions that are beyond the scope of his stated credentials and expertise, and that have little to do with the technology in this matter. His report is indeed a red herring.

SPECIFIC POINTS OF REBUTTAL

Point no. 1 (page 5)

*"The report contains no information to indicate the source or authenticity of the video materials which were reviewed by Harmening. Media downloads and other types of data streaming may result in transcoded, degraded, or incomplete video files."*

> REBUTTAL: Aside from the fact that Schott fails to explain how a "transcoded, degraded, or incomplete video file" would somehow change the events that are clearly depicted on the video, the source of the video reviewed in this matter was the Defense pursuant to discovery. Schott fails to even explain what a "transcoded" video file is. I don't believe there is any disagreement in this case about what is viewed on the video, only how those events and circumstances are interpreted. No video technology is necessary for that task.

Point no. 2 (page 5)

*"Harmening's figure no. 1 shows a limited view of the region near Shaver's intergluteal cleft. Nowhere in the Brailsford or Doane body camera recordings are there any images which give a clear view of Shaver's front or side waistband areas prior to the shooting. Even when Shaver's*

1

*arms are extended fully vertically, the hem of his t-shirt failed to rise sufficiently to expose his waistband. In addition, Shaver's right forearm and hand were rising from his right side waist area in the moments before the shooting. The video evidence does not support the assertion that there "was obviously no gun present."*

> REBUTTAL: Here Schott is either misstating or misunderstanding my analysis. We are in agreement that Shaver's "intergluteal cleft" was visible. Schott does not explain what he means by limited view, however, he appears not to dispute my contention that the area was visible. From that point, Schott begins a discussion about the other areas of Shaver's waistband, something I do not do in this section. My statement that there was "obviously no gun present," refers to his rear waistband, the part that was clearly visible to Brailsford. I also point out in this section that Brailsford could clearly see that Shaver's gym shorts were not tied tightly around his waist. As he does in other areas of his report, instead of rebutting my use of the video technology—he is not offered in this case as a use-of-force or police practices expert—he is instead advocating on behalf of Brailsford and attempting to construct his defense.

Point no. 3 (page 6)

*"It should come as no surprise to anyone conversant in the domain of police patrol tactics and officer safety that there are indeed countless waistband holster designs as described above by Officer Brailsford. Such holsters, as shown below, go by various names including "corset holsters" and "belly band holsters." These types of holsters may be concealed by any loose-fitting upper body garment, such as a t-shirt, for example. Moreover, the functionality of such holsters is not affected by the type or position or the shorts or pants worn by the user."*

> REBUTTAL: First of all, Schott is outside the scope of his stated purpose and expertise. There is no connection between his criticism here and the video technology. Secondly, he is again acting as an advocate for Brailsford by offering alternatives supportive of his defense that even Brailsford never offered during his testimony. I am well aware of what a belly band holster is. He could also have included a picture of a deep-cover shoulder harness. But neither of those holsters, including the one shown in Schott's picture, is a waistband holster. Schott is purposely obfuscating the facts and my analysis. There was never an allegation that Shaver was reaching "underneath" his shirt and upward to draw a weapon from a belly band holster, which is a cumbersome maneuver, or even further upward toward a shoulder harness. Brailsford alleged that Shaver was reaching for his waistband, and I stated in my analysis that there is no known holster designed for the waistband of a pair of loose-fitting gym shorts.

This section of Schott's report is irrelevant and based on allegations and evidence that has never been offered.

Point no. 4 (page 7)

*"The Axon Flex model 73000 series body camera uses variable frame rate recording, up to an average of 30 frames per second. In particular, the frame rates of the Doane and Brailsford videos average about 29.49 frames per second. If the Brailsford video examined by Harmening actually contained 30 frames per second of video, then for every 100 seconds of video his frame counts would differ from the original evidence video by about 51 frames. Accordingly, his time calculations would be in error as well.*

*Not surprisingly, in Harmening's assertion above, both the time and frame counts are incorrect. As shown below, Shaver's right hand enters the camera view at sync-image 7690; the first shot is fired at sync-image 7695. This amounts to a difference of 5 frames during an interval of about 0.17 seconds."*

REBUTTAL: It is not easy to determine the relevance of Schott's brief analysis because he provides no specific information regarding if and where my analysis is improperly impacted by using the manufacturer's published recording rate rather than some average he calculated. He appears to have determined that Brailsford's camera recorded at "about" 29.49 frames per second rather than the 30 frames per second published by the manufacturer.[1] First of all, a camera cannot record a fraction of a frame. One frame equals one frame. It simply means that during Schott's calculation—no doubt completed by a piece of computer software—some seconds recorded at 30, while others recorded at 29. None recorded at "about" 29.49 frames per second. He inappropriately assumes then that each second of the shooting sequence was recorded at about 29.49 frames per second. The fact is, we don't know which seconds recorded at 30 and which recorded at 29. He admits as much when he says "If the Brailsford video examined by Harmening actually contained 30 frames per second of video…" He simply does not know for certain.

Schott offers no mathematical calculations to support his criticism that using 30 frames per second somehow skewed my conclusions. I would suggest that he is likely unable to even complete such a calculation. Had he done so, he would have realized that his argument yields a result that is so insignificant that it becomes irrelevant. There is only one place in my analysis where I rely on a frame count to support my conclusions. On page 11, I point out that *"From*

---

[1] See Axon Flex Features Spec Sheet for model 73000. Available online at
https://www.scribd.com/document/251475221/Axon-Flex-Features-Spec-Sheet-rev052214

3

*the moment Shaver's hand again became visible till the moment Brailsford fired his first shot was 8 frames, or .27 seconds."* Apparently, Schott believes that I should have used 29.45 fps to calculate the time, rather than 30 fps. He calls the difference "significant" in his report, but fails to calculate the actual difference himself or offer an explanation of its significance. The actual calculation is as follows:

1. Using <u>30 fps</u>, 8 frames would equal 8/30ths of a second, or 26.66/100ths of a second (rounded to .27).

2. Using <u>29.49 fps</u>, 8 frames would equal 8/29.49ths of a second, or 27.13/100ths of a second (rounded to .27).

The time difference between the two calculations amounts to less than 1/100th of a second. Is it significant? The answer is an obvious no. Furthermore, with human perception falling in the .10 to .60 second range, Schott confirms my argument that Brailsford had sufficient time to perceive Shaver's hand returning to the front.

Point no. 5 (page 7)

*"From the video evidence, it is not certain that Brailsford perceived Shaver's right hand coming into camera view. It is widely recognized and understood that the structure or housing of a rifle's optics may occlude some portion of the user's field of vision. The Aimpoint CompM4 scope on Brailsford's rifle is no exception. In the demonstrative images which follow, we can see the extent to which the scope housing (or eye piece) may affect the ability of the user to perceive elements adjacent to and surrounding the ocular lens.*

*Furthermore, Harmening's opinions of reaction times, as measured by his video analysis, due to his unreliable calculations of frame counts and time elapsed. Even absent such significant errors, his conclusion that "Brailsford never truly expected a gun to be in Shaver's hand to begin with," amounts to little more than conjecture in the absence of logic."*

REBUTTAL: If there was any doubt that Schott is acting as an advocate on behalf of Brailsford, that doubt should be gone with this section. He is now acting as a firearms expert, and offering a defense that Brailsford never argued. He is offering a "just in case" defense. Just in case it can be argued with science that Brailsford had time to perceive Shaver's hand coming back to the front, then argue that he could not have seen it since his own rifle scope would have blocked his view. Schott then offers an absurd exhibit that is anything but scientific. In the exhibit he first shows the view through the scope when the rifle was lined up with the

4

body cam. This was before Shaver and Portillo exited the room. He then tries to argue that Brailsford had the same field of view when the shots were fired. First of all, he uses non-committal language like "it is not certain" and "may effect," which means he really does not offer a definitive opinion. But then he includes his exhibit arguing that the two fields of view are the same. It is improper to compare the two because in the first example Shaver is not yet in a firing position. The end of the scope is a significant distant out in front of him. In the second example, just before the shots are fired, you can no longer see the end of the scope because Brailsford is now in a shooting position with the scope much closer to his eye. Scott's error is in using the field of view from the first example at the time of the shooting.

Schott then argues that because of the frame count discussed above, my estimate of reaction time is unreliable. As also discussed above, my calculation based on 30 fps is only $1/100^{th}$ of a second different from his using 29.49 fps. It is an undetectable difference, which is evidenced by the fact that Schott provides the exact same image of the moment the first shot was fired as I do.

Point no. 6 (page 8)

*"According to the Mesa Police hallway diagram, Brailsford fired from a distance of about 13 feet rather than the 6 feet asserted by Harmening. The lengthy narrative in support of Harmening's belief that the first shot was likely to Shaver's chest is not supported by the video evidence, particularly with respect to the statement that at the time of the first shot, Shaver was upright with his chest exposed."*

REBUTTAL: The Mesa Police Department measured the distance from the hard corner next to Brailsford. Brailsford had actually moved forward of this corner. It must also be kept in mind that the muzzle of the rifle was another approximately two feet in front of that position. The fact is, it is irrelevant if either distance is less than exact. We cannot pinpoint precisely how far away Brailsford was. Brailsford himself testified that the distance was 6 feet, but even that would be an estimate. I think we can say with certainty that the distance was somewhere between 6 and 13 feet.

As for the second part of Schott's narrative, it defies logic and what is clearly seen on the video. All we need to know is that Shaver received a shot to the pectoral region of his body (chest) with a front to back trajectory, and that on the video we see Shaver immediately fall forward with his back to Brailsford. I would ask Mr. Schott to explain how he received a shot to the chest if his chest was not exposed, as he suggests.

5

CONCLUSION

Mr. Schott's expert report really is no expert report at all. It appears that his only independent analysis was to count the frames in the video, something I was able to do with an iPhone. He attempts to argue that an improper frame count somehow impacted my analysis, but provides no explanation as to how, or any calculations to support his position. By challenging my frame count, he is challenging the manufacturer's published recording speed of 30 fps. In the end, he actually supports my position that Brailsford had sufficient time to perceive Shaver's hand returning to the front of his body. Apart from this single issue, Schott offers an opinion related to rifle optics that is outside the scope of his stated credentials and expertise. He further offers an opinion relating to firearms holsters that is clearly designed to advocate on behalf of Brailsford by constructing an alterative defense that Brailsford never offered in his testimony.

William Harmening
02/08/2019