1   Kathleen L. Wieneke, Bar #011139
    Christina Retts, Bar #023798
2   WIENEKE LAW GROUP PLC
    1095 West Rio Salado Parkway, Suite 209
3   Tempe, AZ 85281
    Telephone: (602) 715-1868
4   Fax: (602) 455-1109
    Email: kwieneke@wienekelawgroup.com
5   Email: cretts@wienekelawgroup.com

6   *Attorneys for Defendants City of Mesa, Brian*
    *Elmore, Christopher Doane, Bryan Cochran,*
7   *and Richard Gomez*

8

9
                    **UNITED STATES DISTRICT COURT**
10
                         **DISTRICT OF ARIZONA**
11

12  | Laney Sweet, an individual, et al., | NO. 2:17-cv-00152-GMS |

13  Laney Sweet, an individual, et al.,          NO. 2:17-cv-00152-GMS
                                                 **LEAD CASE**
                                    Plaintiffs,
13
                                                 **CONSOLIDATED WITH:**
14              v.                                NO. 2:17-cv-00715-GMS

    City of Mesa, et al.,                        **DEFENDANT CITY OF MESA,**
15                                               **BRIAN ELMORE, CHRISTOPHER**
                                                 **DOANE, BRYAN COCHRAN AND**
16                                  Defendants.  **RICHARD GOMEZ'S REPLY IN**
                                                 **SUPPORT OF MOTION FOR**
17                                               **SUMMARY JUDGMENT ON THE**
                                                 **SWEET PLAINTIFFS' COMPLAINT**
18

    Grady Shaver, et al.,
19
                                    Plaintiffs,
20
                v.
21
    City of Mesa, et al.,
22
                                    Defendants.
23

24          There is no material dispute of fact on any relevant issue to the City Defendants

25  liability based upon the existence of two separate videos. Plaintiffs instead try to create

26  one by arguing pre-tactical *Mendez* barred theories. Indeed, the core of their theories is

27  that the City Defendants should not have considered the 911 call as a potential active

28

1   shooter. Yet, whether this case involved an "active shooter," depends upon what Response
2   the Court is reading. The duplicity of the Sweet's position is apparent by comparing the
3   Response to the City Defendants' Motion for Summary Judgment ("MSJ") to the
4   Response to La Quinta's MSJ.  In the La Quinta Response, the Sweet Plaintiffs admit as
5   follows:

6   - "Among other testimony Mr. Bonnell will provide, he will confirm: After
    having alerted the police to a 'gun being pointed out of a hotel window,' hotel
7   personnel failed to activate any portion of what is commonly referred to as an
    'Active Shooter' emergency plan then common in the hotel industry." Doc.
8   309, p. 9.
    - "In the United States today, it is hardly unforeseeable that active shooter
9   situations can occur in a hotel such as La Quinta. The Sweet Plaintiffs' expert
    confirmed exactly this in his report: 'The foreseeability and predictability of an
10  active shooter situation occurring in a limited service, economy sector hotel is
    made apparent by the frequency and regularity with which these highly
11  publicized incidents occur.' [See SPCAF2 Ex. C, at PL SWEET005399]. The
    expert specifically noted that there had been recent, frequent incidents
12  involving the discharge of a firearm at La Quinta hotels. *Id*. Doc. 309, p. 14.

13      Yet, as it relates to the City Defendants, the Sweet Plaintiffs argue something
14  different claiming instead that officers should have used Rule 404 character evidence, of
15  which they were unaware, to disregard this "foreseeable" risk of active shooter harm.[1] It
16  cannot be both ways.

17      Plaintiffs readily admit that: gun ownership is booming with an estimated 110
18  million rifles, 86 million shotguns, and an average of one gun per person in the United
19  States; in Arizona, transfer of guns is loosely regulated meaning that criminals and
20  prohibited possessors have less trouble obtaining them; and Arizona has an "unmatched
21  shooting culture" making ideal for even "just shooting guns in the desert." Indeed, and
22  unfortunately, Arizona has been plagued with a history of irresponsible gun ownership
23  with serial shooters (Hausner), killer (Mark Goudeau), active shooters (2011 Tucson,
24  2013 lawyer Hummels), and freeway shootings (2015-16).  The idea that the prevalence
25  of gun ownership, in light of this history, should be deemed by officers to be routine,

26  ────────────
    [1] In responding to La Quinta's Statement of Fact, Plaintiffs admit that Officer
27  Gomez obtained information, which he relayed to Sgt. Langley, that the hotel employee
    confirmed by observation that there were three people inside the Room with a rifle. *See*
28  Doc. 301, p. 13, PSOF ¶ 36.

1   when they receive a 911 call about a man in an elevated position with a rifle, is not in
2   accord with the law, or reality of the dangerous situations faced by officers on a daily
3   basis.

4         Statistics released "just days before" the incident, from Twitter, allegedly reflecting
5   that there were "only" 115 homicides in <u>Phoenix</u> is also of little relevance as 113
6   homicides is still too many and this number is likely low because of law enforcement
7   responsiveness. As was demonstrated by the mass shooting in Las Vegas, it only takes one
8   person to drastically change such a number. And, following that terrible event, as with
9   many before them, the friends, neighbors, and acquaintances fail to identify any particular
10  deviant "red flag," giving generic statements about the individual being a "nice guy."
11  Friendly and nice people commit crimes and, before they commit those crimes, they take
12  preparatory actions.

13        Plaintiffs' Response does not address any of the factually similar cases cited by
14  Defendants and, instead contains sparse law from district courts and other jurisdictions,
15  which is not point. For example, Plaintiffs incorrectly argue that the Court need look no
16  further than *Graham* to deny qualified immunity, but this is not the direction given by the
17  Supreme Court. *See Kisela v. Hughes*, 138 S.Ct. 1148 (2018) (the general rules of Graham
18  and Garner are not sufficient to deny qualified immunity). There was no constitutional
19  violation perpetrated by the individual Defendants, they were not integral participants, did
20  not fail to intervene, and are entitled to qualified immunity.[2]

21  **I.**    **LAW AND ARGUMENT.**

22      **A.**  **Legal Arguments Common to the Sweet and Shaver Responses.**

---

23      [2] Plaintiffs spend many pages arguing for Brailsford's liability and
24  unconstitutionality of his actions: "As for the Section 1983 Fourth Amendment liability
    that arises just from the final inappropriate act of shooting Daniel, the matter cannot be
25  decided on summary judgment…" Doc. 303, p. 17.  Yet, whether Brailsford used
    excessive force is not at issue in this current Motion, because of the bankruptcy stay.
26  Instead, Defendants moved for Summary Judgment on the claims that Plaintiffs contended
    could be decided separately from the Brailsford issue—whether they used excessive force,
27  failed to intervene, or were integral participants. Brailsford has had no opportunity to
    participate in briefing on the issue of the shooting itself, yet Plaintiffs attempt to turn the
28  MSJ into a ruling that binds him, which is inappropriate at this junction.

Several of the theories raised in the Shaver and Sweet Responses are overlapping. To avoid duplication of the same arguments, Defendants incorporate by reference arguments made in the Shaver Reply, Doc. 317, as identified below in separate sections. In each section, Defendants also address specific arguments in the Sweet Response that relate to each topic and that differ from the Shaver arguments.

### 1. Plaintiffs' Controverting Statement of Facts Violates the Rules, and Includes Improper and Lengthy Argument.

Defendants incorporate their Reply addressing the Shaver Claims, Section I (A)—"Plaintiffs' Statement of Facts ("PSOF," Doc. 287) is Improper Argument." Doc. 317. Like the Shaver Plaintiffs, the Sweet Plaintiffs Controverting Statement of Facts ("CSOF") includes approximately 84 pages of argument in response to the Defendants' Global Statement of Facts ("GSOF"), giving them a de facto extension to their already 47 pages long Response. Much of the argument is duplicative, irrelevant, immaterial, and seeks to interpret testimony and video footage. For example, Detective Sipe's testimony interpreting other evidence does not create an issue of fact, the relevant evidence is the video, and a third-party's interpretation does not create a material issue of fact. Similarly, Plaintiffs spent half a page arguing about the simple statement that there are two AXON videos. Simple facts—such as that the Defendants were on the opposite side of the hallway from Brailsford—are not admitted with Plaintiffs arguing about the distance in feet that the Defendants were apart from Brailsford. Similarly, in responding to GSOF¶ 95, rather than simply admit that a supervisor can never order deadly force, Plaintiffs launch into an irrelevant discussion about a hypothetical proposition of a supervisor ordering some other form of force, which did not occur in this case and has no relationship to the GSOF that addressed "deadly force." This approach makes it appear that facts are disputed, when they are not, and Plaintiffs are simply injecting unnecessary, immaterial, and irrelevant commentary into the pleadings.

Plaintiffs improperly dispute facts as "characterizations," such as GSOF ¶ 41, where Plaintiffs dispute the characterization of the radio call as a "hot tone," despite specific witness testimony that the call was broadcast in this manner. A "hot tone" is not a characterization, it is a term of art used to describe an audible sound on a radio call used

4

to alert officers about a specific call. *See Lee v. Fessler*, 2008 U.S. Dist. LEXIS 53980 (D. Ariz. 2008) (a "hot-tone" call is issued when a crime that threatens safety, health, or welfare of another person is believed to be in progress). This example is particularly troubling given Plaintiffs arguments about what officers should, or should not have done in this incident. If Plaintiffs do not even understand the basic nature of what a "hot-tone" means in law enforcement their arguments about officer conduct and training is suspect (particularly where there is no expert testimony addressing training, supervision, or hiring).

Likewise, Plaintiffs make inflammatory and unsupported statements that officers were "fingering the triggers" of their weapons, yet there is not a shred of evidence cited in support. Officers do not finger the triggers of their weapons.  They place their fingers on the frame until they decide that they are going to fire, which none of the individual Defendants did. These types of exaggerations with no evidentiary support do not create questions of fact.

Speculative theories about Shaver and Portillo's states of mind and subjective thoughts are also immaterial and irrelevant. And, information about activities Shaver engaged in and his contact with La Quinta personnel before the incident and unknown to officers is immaterial and is Rule 404 evidence which cannot be used to prove action in conformity therewith. *See* Doc. 297, CSOF ¶¶ 297-308, 310-316; *see Evans v. City of San Diego*, 913 F.Supp. 2d 986 (S.D.Cal. 2012) (evidence inadmissible to show that plaintiff must have been agitated and unruly because this type of character evidence is inadmissible under Rule 404). Plaintiffs argue on the one hand that Officer Cochran should have believed everything that Shaver said over the phone, but that officers should have discounted everything Shaver said about intoxication in their presence because sometimes suspects lie to officers. Yet, how officers are supposed to pick and chose between these two propositions is unknown. *See also Isayeva v. Sacramento Sheriff's Dep't,* 872 F,3d 938 (9th Cir. 2018) (recognizing that intoxication raises the risk and dangerousness of a police encounter with a suspect).

Plaintiffs also raise a litany of other immaterial and irrelevant issues in their

CSOF.[3] Plaintiffs generally argue about "National Police Standards," without citing to any such standards. Such standards do not set any constitutional standard of care. *See United States v. Rodella*, 2014 U.S. Dist. LEXIS 164773 (D.N.M. 2014) (collecting cases discussing the parameters of expert testimony and excluding testimony on nationally accepted standards as irrelevant to the constitutional inquiry particularly where it is not clear where the alleged "nationally accepted standards" come from).

Without any foundation, Plaintiffs also cite to the "Daniel Shaver Challenge," which is a re-enactment that should have been disclosed as an expert opinion. *See* Doc. 297, CSOF ¶ 323; *Raley v. Hyundai Motor Company, Ltd.*, 2010 WL 545860 (W.D.Ok. 2010) (animations were not demonstrative aids and instead were required, under Rule 26, to be disclosed at the time for expert disclosures); *Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534 (D.Md. 2007) (computer animations must be authenticated by testimony of a witness with personal knowledge of the content of the animation, upon a showing that it fairly and adequately portrays the facts and that it will help to illustrate the testimony given in the case). Not only was the foundation for it not disclosed, but Plaintiffs blocked Defendants attempt to gain access to information about who created it and what it was based upon. *See* Ex. 1, Request for Production and Meet and Confer correspondence. The Daniel Shaver Challenge is not evidence, cannot be used to contradict the AXON video, cannot create a question of fact, and Plaintiffs attempt to rely upon it now is a Rule 37

---

[3] Rather than create additional filings, Defendants identify the following additional objections to Plaintiffs CSOF facts: (1) **Disputed and immaterial**: CSOF ¶¶ 220 (does not match exhibit), 221, 222 (does not match exhibit) 223-227, 229-234, 237 (does not match exhibit), 242 (Brailsford's AR-15 was not issued by the department), 245-247 (discrepancy between what exhibits say and what Plaintiffs report, Defendants do not dispute what exhibits say), 249, 252, 256-57 (characterization of video), 259 (foundation), 262, 267-268, 264-269 (confusing as to what exhibit referring to, does not match), 270 (characterization), 272 (does not match exhibit), 302-308 (foundation, hearsay, unknown to officers), 309 (exhibit does not match), 310-315 (hearsay, unknown to officers), 318-322, 323 (foundation, hearsay, no expert testimony), 317 (characterization not supported by attached exhibits), 324-325, 326-331 (hearsay, undisclosed, unknown to officers), 332, 333-334 (hearsay, unknown to officers), 336-338 (characterization see video), 339 (unknown to officers), 340 (characterization, immaterial), 341-344 (unknown to officers), 345 (characterization-training document speaks for itself), 346 (characterization, immaterial), 347 (irrelevant/immaterial/characterization), 348 (characterization, documents state what they state), 349 (inaccurate); (2) **undisputed but immaterial**: 228 (relates to different factual scenario), 235, 250, 253 and (3) **undisputed**: 236, 238-244, 248, 251, 254-55, 258-263, 271, 273-274, 316, 335.

violation.[4]

Plaintiffs also cite to various news articles, Twitter, and statistics, none of which were timely disclosed.  *See* Doc. 297, CSOF ¶¶ 323-331.  The first time these items were identified was in the Response, which is untimely.  Moreover, these sources are hearsay, unauthenticated, immaterial, and there is no evidence establishing the Defendants knowledge of these sources. *See Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002).

Plaintiffs also include argument and "facts" relating to Shaver's level of intoxication, but they did not hire any expert to address Shaver's intoxication level related to his ability to listen to instructions and follow commands—despite voicing to officers that he was not drunk and could comply. Many of these "facts" undercut their argument— such as the fact that Shaver was purportedly always intoxicated, and the hotel employees never saw him when he wasn't drunk, reflecting tolerance. *See* Doc. 297, CSOF ¶ 313-314. Yet, this information was not known to officers, including any blood testing conducted after the fact.

Like the Shavers, Plaintiffs also attempt to include new theories raised for the first time in summary judgment briefing.  For example, Plaintiffs now claim that the individual Defendants can be liable under state law based upon "conspiracy and aider and abettor," *See* Doc. 303, p. 39.  Yet, this is not a theory ever raised in the Notice of Claim, or the Amended Complaint. Attempting to amend now without Rule 16 good cause, is improper.[5] *Nichols v. Harris*, 17 F. Supp. 3d 989, 994 (C.D. Cal. 2014).  Plaintiffs also now allege a *Monell* and Fourteenth Amendment Familial association claim, which do not appear in their Amended Complaint.

### 2. Plaintiffs' *Mendez* Provocation Theories are Barred.

---

[4] As it relates to this Daniel Shaver challenge, the criminal court noted that if a member of the criminal jury had viewed this, it would have been grounds for a mistrial.

[5] This theory is also unsupported by the record, particularly where Plaintiffs' expert concedes that none of the officers knew that the shooting was going to occur. There is no evidence that the individual Defendants conspired with Brailsford, or provided any encouragement for him to use force. To the contrary, shortly before the shooting, multiple voices yelled "Don't, Don't!"

Defendants incorporate Section I (C), "Plaintiffs' Provocation Theories are Barred by *Mendez*," of the Shaver Reply. Doc. 317. In addition, Plaintiffs argument regarding the viability of pre-tactical decisions, in spite of *Mendez*, is unsupported and contrary to the portion of *Billington v. Smith*, 292 F.3d 1177 (9th Cir. 2002), remaining in-tact, where the Ninth Circuit found that a litany of "tactical errors," could not undermine the reasonableness of the force. *See Forrester v. City of San Diego*, 25 F.3d 804 (9th Cir. 1994) (police officers are not required to use the least intrusive degree of force possible).

Plaintiffs cite to the following cases that are not applicable to the Court's analysis: (1) *Young v. City of Providence*, 404 F.3d 4 (1st Cir. 2005) (pre-*Mendez*, contrary to it, and not in circuit); (2) *Hayes v. County of San Diego*, 57 Cal. 4th 622 (Cal. 2013) (addressing a state law negligence question, not a question under federal law and the corresponding Ninth Circuit decision is pre-*Mendez*); (3) *Brower v. County of Inyo*, 489 U.S. 593 (1989) (addressed only whether a police roadblock constituted a seizure, not whether pre-tactical decisions could support an excessive force claim); (4) *Abraham v. Raso*, 183 F.3d 279 (3rd Cir. 1999) (pre-*Mendez* and out of circuit).

Plaintiffs' *Mendez* barred theories require the Plaintiffs to speculate about what Shaver would have done if confronted with hypothetical scenarios and questions, none of which would have defeated probable cause to arrest him, and this runs contrary to the requirement that the Court address the facts known to officers at the time.[6] *See Hart v Parks*, 450 F.3d 1059 (9th Cir. 2006) (probable cause is not defeated by facts that give rise to a variety of "inferences.") There is no dispute that Shaver and Nunez handled the weapon, near the window, and that it made Portillo so uncomfortable that she pushed it away. It is irrelevant whether the screen was pushed aside, or open, as a flimsy screen will not stop a bullet, nor will window glass.  And, all of the various innocent "explanations" for gun ownership in Arizona, statistics about gun crimes unavailable at the time of this incident, and hearsay news articles are immaterial and not admissible evidence. Shaver was not a hunter inspecting and cleaning his weapon, nor was he planning on shooting in

---

[6] For example, Plaintiffs claim that additional investigation should have been completed that would have led officers to allegedly learn that the rifle wasn't pointed out of the window.

the desert. Thus, why the Defendants should have speculated that he was planning to do either is unknown. What Shaver did in the days before the incident, and how he previously interacted with staff, all changed when he took action to remove—what appeared to hotel staff, and guests—a rifle from its position of security in its case, where he should have kept it.

There are no cases standing for the proposition that officers could not deploy to the Fifth Floor, to arrest Shaver, given the facts known involving the potential for three suspects, with guns drawn. While Shaver and Portillo may have exited the room, an employee told Officer Gomez that there were three individuals, with no way to conclusively verify what other person and weapons (including the reported rifle) were in that room.

Additionally, conducting additional investigation by talking to the two hotel guests who witnessed the handling of the gun would not have had any impact on the outcome. As demonstrated by their testimony at the criminal trial, the guests confirmed what they reported to hotel staff providing even more detail about their fear that the rifle was being used to target human beings. This is not a situation where a witness later recanted, or admitted they did not see what they previously reported.

### 3.  Plaintiff has No Fourteenth Amendment Familial Association Claim.

In ruling on the Motion to Dismiss, this Court noted that Plaintiffs have no Fourteenth Amendment Familial Association claim in their Complaint. *See* Doc. 137. Dismissal is appropriate on this basis alone. Despite being aware of this Court's ruling on this claim, Plaintiffs never moved to amend to add such a claim. An attempt to do so is now untimely and Plaintiffs cannot establish good cause. Even if such a claim could be made, it still fails, based upon the analysis set forth in the Shaver Reply, Section I (D), "There was No Fourteenth Amendment Violation." Doc. 317.

### 4.  Integral Participation Does Not Apply to Spontaneous Events.

Defendants incorporate Section I (D)(1), "Integral Participation does Not Apply to Spontaneous Events," of the Shaver Reply.  Doc. 317. The Sweet Plaintiffs set forth the same arguments as the Shavers, with no reference to any additional case law, or attempt to

distinguish the on-point cases cited by Defendants.

### 5. There Was No Failure to Intervene.

Defendants incorporate Section I (D)(2), "Failure to Intervene," of the Shaver Reply, Doc. 317. In addition, the Sweet Plaintiffs add citation to cases from the 7th, 6th, and 10th Circuits, which do not clearly establish the law within the Ninth Circuit. Moreover, the cases cited—*Bruner v. Dunaway*, 684 F.2d 422 (6th Cir. 1982) (suspect asleep in vehicle, fled, struck with flashlight, validity questioned by later case law); *Byrd v. Brishke*, 466 F.3d 2 (7th Cir. 1972) (physical struggle, validity questioned by later case law); *Walton v. Gomez (In re Estate of Booker)*, 745 F.3d 405 (10t Cir. 2014) (struggle with a pretrial detainee in booking involving a Taser); *Mascorro v. Billings*, 656 F.3d 1198 (10th Cir. 2011) (son fled into house, parents and son sprayed with pepper spray); *Mick v. Brewer*, 75 F.3d 1127 (10th Cir. 1966) (old qualified immunity test, physical assault)—are cited for the general proposition that the law permits a failure to intervene theory, not because they are factually similar. The existence of a legal theory is not what makes the law clearly established. There must be a case, from the Supreme Court (or the Ninth Circuit at the very least) that factually defines the parameters.

### 6. The Defendants are Entitled to Qualified Immunity.

Defendants incorporate Section E, "The Individual Officers are Entitled to Qualified Immunity," of the Shaver Reply. Doc. 317.   In addition, qualified immunity is not defeated by dissimilar out of circuit and district court cases cited by the Sweet Plaintiffs. Nor can qualified immunity be defeated by law that did not exist at the time of the incident. Plaintiffs cite to the following non-binding dissimilar cases: *Alicea v. Thomas*, 815 F.3d 283 (7th Cir. 2016) (officer kicked, stomped on, and punched an already-subdued suspect who was in need of medical attention); *Joseph v. Doe*, 2019 U.S. Dist. LEXIS 947 (E.D.La. 2019) (2017 incident, mentally ill person with paranoid schizophrenia and bipolar disorder, standing in front of a school, who never reached for his waistband during an over eight minute struggle, was Tased, and received twenty-six blunt force impact injuries to his face, chest, back, extremities, scrotum, and testes); *Martin v. City of Broadview Heights*, 712 F. 3d 951 (6th Cir. 2013) (suspect wearing only jeans, physical

1   struggle, closed-fist punches, officer using all of his force to strike the suspect's face,
2   back, and ribs at least five times). None of these cases involved a shooting following a
3   report of a rifle in a hotel room, appearing to witnesses to be targeting people, or
4   potentially related to the ongoing freeway shootings at the time in Arizona.

5       Plaintiffs argue, contrary to the law, that "because each of the officer Defendants is
6   liable as an 'integral participant' in the shooting death of Daniel Shaver they can claim no
7   qualified immunity."   Doc. 303, p. 29, ln. 21-22. Yet, the Ninth Circuit granted the
8   officers qualified immunity in *Boyd*, even though it recognized integral participation
9   under the facts. And, this very precise argument was rejected in *Sjurset v. Button*, 810
10  F.3d 609 (9th Cir. 2015), where the Court also found qualified immunity.

11      The Plaintiffs also argue that *Blakenhorn v. City of Orange*, 485 F.3d 463 (9th Cir.
12  2007) clearly establishes the law, yet *Blankenhorn* is problematic because it includes a
13  provocation theory and its qualified immunity analysis—that Graham clearly establishes
14  the law—was later rejected in *Kisela*, 138 S.Ct. 1148. Blankenhorn involved a
15  misdemeanor trespassing suspect, who was not reported to have a rifle, who merely threw
16  his license to the ground and crossed his arms and was then "gang tackled" by officers,
17  one of whom "punched him several times." The officer who delivered multiple punches
18  while the suspect was on the ground, stated that he did so to get *Blankenhorn's* arms out
    from under him, but Blankenhorn disputed that he ever resisted.

19      Defendants dispute that integral participation can ever apply under these facts, but
20  even if it could, there are no cases involving similar facts where it was applied. Instead,
21  the cases cited by Defendants—*Ting*, *Fernandez*, *Burns*, and *Nelson*—are factually
22  similar.

            **7. The Punitive Damages Claim Should be Dismissed.**

23      Defendants incorporate Section F, of the Shaver Reply, Doc. 317.  In alleging
24  punitive damages under Section 1983, Plaintiffs bear the burden of proving the
25  availability of such damages, a burden they cannot meet. *Sar Pala Ra Anan v. Kimbrell*,
26  2006 U.S. Dist. LEXIS 8578 (E.D. Cal. 2006). The Sweet Plaintiffs do not dispute that
27  Brailsford did not interpret Sgt. Langley's commands as a "green light" to use force and
28

1   that he did not do so because of the same. Similarly, they admit that the individual officers
2   all did not interpret the commands the same way either.  Plaintiffs also do not dispute that
3   the individual Defendants' goal was to take Shaver into custody.  With these facts, no
4   reasonable jury could determine that the individual Defendants acted with malice knowing
5   that Shaver would be shot.

## 8.   There is No *Monell* Claim in the Sweet Amended Complaint.

6       The Sweet Plaintiffs do not have a *Monell* claim in their Amended Complaint, yet
7   now try to assert one for the first time in their Response. This is untimely.  To the extent
8   the Court does not reject this claim outright—because it is not included in the Amended
9   Complaint—Defendants also incorporate Section G and sub sections, "Plaintiffs' Monell
10  Claim Fails," in the Shaver Reply.  *See* Doc. 317.

11      Plaintiffs' purported *Monell* theory—related only to training and supervision—
12  misapprehends the nature of a such a claim. Monell liability cannot be premise upon this
13  incident alone, which is the sole basis for Plaintiffs' argument: "the facts show a
14  simultaneous failure of all six of the Defendant officers to even consider employing the
15  written Mesa standards…" *See* Doc. 303, p. 32. Thus, Plaintiffs allege that Mesa has
16  sufficient training, but that the individual Defendants supposedly violated it. This
17  allegation is insufficient on its face, but also not supported by the facts. The individual
18  Defendants did not use any force and thus did not escalate their force. And, the fact that
19  the only Defendant to use force was Brailsford supports the fact that the training was
20  sufficient. None of the individual Defendants could have used less force where they used
21  none, and multiple of the officers didn't even have firearms out, and Defendant Doane
22  transitioned to a Taser.[7]

23  ─────────────
    [7] *Lucas v. New York City*, 842 F.Supp. 101 (S.D.N.Y. 1994), cited by Plaintiffs, is
24  dissimilar as all defendants in that case used physical force and engaged in a brutal group
    beating. Here, none of the individual Defendants used force, did not issue commands, and
25  intervened by yelling "Don't, Don't!"  Plaintiffs claim that Officer Elmore should have
    shouted out that he saw Brailsford's hand as it moved up in the split second before the
26  shooting, but yelling this out was physically impossible.  Also, Plaintiffs cite to training
    materials about yelling "gun, gun," when a gun is visualized arguing that the individual
27  Defendants should have yelled the opposite.  But yelling "no gun" is a highly dangerous
    proposition that is likely to end badly.  "No gun" can easily be confused or misinterpreted
28  as "gun."

Next, Plaintiffs cannot support a ratification claim based upon a single failure to discipline. Plaintiffs attempt to claim that there was no discipline of Brailsford, but he was fired and referred for criminal prosecution. It was only after that acquittal, that the City entered into a settlement agreement with Brailsford, when he challenged that employment action. Plaintiffs cite to no case law standing for the proposition that the settlement of disputed claims can form the basis of *Monell* liability, or that it constitutes a "conscious, affirmative choice to ratify the conduct in question." Moreover, Plaintiffs do not address any of the issues surrounding the impact of the acquittal on this ratification claim. *See German v. Roberts*, 2017 U.S. Dist. LEXIS 211095 (W.D.Wa. 2017) (dismissing ratification claim where the Chief and review board determined not to discipline in a shooting); *see Edenfield*, 2006 U.S. Dist. LEXIS 20876, 2006 WL 1041724 at *17 (stating that "something more than the failure to reprimand is needed to survive a motion for summary judgment," for example, evidence that it is "nearly impossible for an officer to be disciplined," or that "a unit is allowed to investigate itself.") A criminal jury, hearing and viewing all of the evidence, acquitted Brailsford, which is far more than a review board determining not to institute discipline. Given this procedural posture, there can be no claim of improper ratification. *See also* A.R.S. § 13-413 (no person in this state shall be subject to civil liability for engaging in conduct otherwise justified pursuant to the provisions of this statute); *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 851 (5th Cir. 2009) (granting summary judgment for City and holding that twenty-seven alleged instances of excessive force over a four-year period were insufficient for the court to conclude that that "the City maintained an official policy of condoning excessive force."); *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (liability "may not be predicated on isolated or sporadic incidents"); *Meehan v. County of Los Angeles*, 856 F.2d 105 (proof of two unconstitutional assaults, including one directed at the plaintiff, were insufficient to support a *Monell* claim).

### 9. Plaintiffs Rule 56(d) Request Should be Denied.

Defendants incorporate Section I, "Plaintiffs' Rule 56(d) Request Should be Denied," from the Shaver Reply. Doc. 317. Like the Shavers, Plaintiffs Rule 56(d) request

is made after the close of discovery, but without any corresponding request under Rule 16 to modify the scheduling order for good cause.   Plaintiffs served multiple written discovery requests and received voluminous disclosures of policies and training materials. Thus, it is not accurate for Plaintiffs to contend that they have not had the ability to realistically pursue discovery.

The Sweets raise Defendant Brailsford's deposition as a basis for their requested relief, yet Brailsford is on a bankruptcy stay and the Sweets argued that the claims against the individual Defendants did not depend on his liability. The Sweets also argue that they need to complete *Monell* discovery, but they have no *Monell* claim in their Amended Complaint, a litany of training materials were produced to Plaintiffs during the course of discovery, and Plaintiffs cite to the training materials with approval arguing only that officers allegedly violated their training. None of the depositions of the officers, or La Quinta personnel, are relevant to establishing a *Monell* claim given that alleged violations by individual officers of training cannot state a claim. Likewise, the discovery that Plaintiffs envision taking does not relate to the issue of qualified immunity's prong of clearly established law and relates to pre-tactical *Mendez* and *Ryan* barred theories.

The Sweets raise several additional bases they contend support discovery, which as demonstrated below, are not material to the Court's ability to decide the MSJ:

- "What the Defendants will admit knowing about their de-escalation duties and their department's own de-escalation policies and standards." Doc. 303, p. 4. **Defendants' Response**: The Defendants testimony is not relevant to whether the City has training and policies, which Plaintiffs establish through this admission that the City does.  The same applies for any claimed *Monell* theory (not appearing in Plaintiffs' Complaint).  The individual Defendants did not use any force and, thus, could not deescalate from force they didn't use.
- "What their experts will acknowledge about the duties American courts have long imposed on police…" Doc. 303, p. 4. **Defendants' Response:** This is not a proper subject of expert testimony, nor is such testimony admissible. This Court determines the law, not experts.
- "Discovery is critical to uncovering the relevant mental state of the individual Mesa Defendants during their interactions with Daniel Shaver and thereafter.." Doc. 303, p. 46. **Defendants' Response:** The subjective mental state of the individual Defendants is irrelevant because the standard is objective reasonableness. The Defendants testified about what they perceived and knew in the criminal trial, which Plaintiffs cite to in their statement of facts.  Plaintiffs do not identify any deficiencies relating to any material and relevant issues to

the Court's determinations. The Plaintiffs admit that the individual Defendants testified that their goal was to take Shaver into custody safely, which rebuts punitive damages.  There is no basis to speculate that the individual Defendants will testify contrary to this or admit that, in their inaction, they somehow hoped that Shaver would be injured. The officers' mental evaluations are also not "action" or "inaction" that can form the basis for any liability under *Ryan,* infra.

**B.  The Intentional Infliction of Emotional Distress Theories Fail.**

1.  *There is No Duty to Provide Next of Kin Notification*

The City owed <u>no duty</u> to Plaintiffs relating to the time or details of any next of kin notification. Plaintiffs only address *Guerra v. State*, 237 Ariz. 187 (2015), and not the other next of kin notification cases addressed by Defendants—*Morton v. Maricopa County*, 177 Ariz. 147 (App. 1993) and *Vasquez v. State*, 220 Ariz. 304 (App. 2008)— which addressed timeliness of notification and no duty under more egregious facts. Plaintiffs attempt to distinguish *Guerra* is contrary to the language of the case, not in line with *Morton* and *Vasquez*, and contradicted by *Hogue v. City of Phoenix*, 240 Ariz. 277 (App.Div. 1 2016) (undertaking investigation by conducting some DNA testing did not impose a duty).  Plaintiffs incorrectly contend that *Guerra* stands for the proposition that a law enforcement manual for next of kin notification can create a duty based upon an "undertaking argument," which was rejected by the majority. *See also Quiroz v. Alcoa Inc.*, 243 Ariz. 560 (2018).  And, Arizona has not adopted the Restatement 47(b) approach argued by Plaintiffs, which is contrary to the authority identified above. *Stair v. Maricopa Cty.*, 245 Ariz. 357 (2018).

Plaintiffs argument also fails to address the ongoing investigation and the fact that Ms. Sweet was not legally married to Shaver and contends, instead, that she was common law married. It was not the City's duty to sort through the details of that relationship, nor the City's duty to notify any specific next of kin within any specific time frame.  And, even if there was a duty, Plaintiffs do not dispute that the City did notify Shaver's parents, who were next of kin, and that the Shavers told the City that they would notify Sweet, and Sweet was in fact notified by the Shavers.  Thus, any duty owed was satisfied by the City making contact with the Shavers who agreed to and did notify Sweet, who already knew

about the death. As with the other IIED claims noted below, Plaintiffs also cite to no evidence establishing severe distress causally connected to this specific claim—medical records, psychological records, etc.

2.    *The Officers Owed Ms. Sweet No Duty in Preparing Their Reports.*

Plaintiffs do not address Defendants' argument regarding no duty and therefore have waived any arguments related to the same. Officers have no duty to prepare reports that are verbatim accounts of the entirety of the interaction, particularly when they refer to the evidence on an AXON video (including audio) and they were aware, and expected, that they will be interviewed by homicide investigators who were also investigating the incident. *See Hogue v. City of Phoenix*, 240 Ariz. 277 (App.Div. 1 2016) (police officers have no duty to investigate in a particular way). Plaintiffs do not cite to any case that establishes that officers have a duty to transcribe police encounters, or have an obligation to do so when video evidence exists, following an incident that is later investigated by detectives. *See Adams v. Estrada*, No. 2 CA-CV 2013-0074, 2014 Ariz. App. Unpub. LEXIS 103, 2014 WL 265660, at *8 (Ariz. Ct. App. Jan. 23, 2014) (defendant's public false statements against a police officer and subsequent demonstrations in support of those false accusations were not outrageous and extreme); *Norton v. Arpaio*, 2019 U.S. Dist. LEXIS 53239 (D.Ariz. 2019) (false statements in support of a search warrant affidavit not sufficiently egregious for an IIED claim). Plaintiffs' "facts," relating to the officers all waiting to write their reports, does not establish a duty particularly where it was far from clear that they would need to write reports verses be verbally interviewed. None of the officers attempted to pretend that the video did not exist, nor did they deny anything that occurred on the video.

Plaintiffs now make a new claim, absent from their Amended Complaint, that the officers engaged in a conspiracy or aided and abetted, but it is far to late to amend the complaint to add such a claim.  And, conspiracy claims cannot exist between employees of the same agency. *See*, e.g., Robin Miller, Construction and Application of "Intracorporate Conspiracy Doctrine" as Applied to Corporation and its Employees - State

1    Cases, 2 A.L.R.6th 387, §§ 5 & 8 (2005). Nor did any of the officers act in concert,

2    pursuant to any kind of agreement. *See Salman v. City of Phoenix*, 2011 U.S. Dist. LEXIS

3    86984 (D.Ariz. 2011).[8] There is no evidence that any of the individual Defendants were

4    aware that Brailsford was going to use force until the moment it was used, or that they

5    acted pursuant to a plan to deprive Shaver of his rights. To the contrary, Plaintiffs admit

6    that the individual Defendants intended to try to take Shaver into custody without

7    incident. Moreover, there was probable cause to arrest him. Similarly, the individual

8    Defendants did not provide any encouragement to use force and did not aid and abet

9    Brailsford. Brailsford was interviewed by detectives following the shooting and his

10   AXON video taken as evidence. Nothing written in any report would change his decision

11   making, or what appeared on the video.  His decision to use force is to be judged on the

12   information known and perceived to him, at the time, not the perceptions of others.

13                  3.    *The AXON Video Was Sealed by the Criminal Court Orders.*

14           Plaintiffs argument about the AXON video contains not a single reference to any

15   case, or the contours of the public records statute. It is pure attorney argument.[9]  Plaintiffs

16   admit that there were criminal court orders sealing the video, that she challenged these

17   orders—multiple times—and lost. Instead, she argues that the criminal court Order only

18   applied to the copies of the video in the possession of Maricopa County, but not to other

19   copies. This is troubling.  Under this interpretation, parties could make multiple copies of

20   evidence and then later claim that court orders only applied to a single copy, leaving the

21   free to create a work-around that was not a "technical" violation of an order. This is not

22   the point of court orders. The theory that Plaintiffs advocate for—that the copies were not

23

24           [88] Plaintiffs cite to *Woodcock v. City of Bowling Green*, 165 F.Supp. 32 (W.D. Ken.
25   2016), but this case did not involve a claim of conspiracy under state law. Instead, it
     involved federal law, is contrary to Arizona District Court decisions, and this Court
26   already dismissed the civil conspiracy claim under federal law.

27           [9] Plaintiffs do not address Defendants argument that qualified immunity should
     apply, under state law, as to discretionary decisions related to the AXON video and
28   therefore have waived any challenge to the same. *See Spooner v. City of Phoenix*, 435
     P.3d 462 (App.Div.1 2018).

1  sealed—renders superfluous all of the criminal court's discussion regarding the danger

2  inherent with release of the video to the sanctity of the trial process. Allowing for release

3  of another copy would have done exactly what the criminal court was trying to avoid—

4  infringing on due process of Brailsford, creating a potential media circus, tainting the jury

5  pool, and infringing on the privacy rights originally expressed by the Shavers. These

6  concerns apply to every copy of the AXON video, not just a singular copy, and meet the

7  standard of "violate rights of privacy or confidentiality, or be 'detrimental to the best

8  interests of the state,'" justifying withholding the same. *See A.H. Belo Corp. v. Mesa*

9  *Police Dep't,* 202 Ariz. 184 (Ariz.Ct.App. 2002).

10  Moreover, Plaintiffs have not established severe emotional distress from this

11  withholding apart from the emotional distress that would certainly result from watching

12  the video in the first instance. Plaintiffs do not attach any medical records, testimony, or

13  any evidence relating to proving this prong of an intentional infliction of emotional

14  distress claim.

15  **C. The Wrongful Death Claim Fails.**

16  **1. Plaintiffs Cannot Establish Wrongful Death Causation.**

17  Plaintiffs cannot establish causation by using a federal law theory of "integral

18  participation," which exists in the setting of joint and several liability and acts to abrogate

19  comparative fault principles existing under state law.[10] Arizona's wrongful death statute

20  also contains a strict requirement of causation that is inconsistent with the integral

21  participation theory. Integral participation does not apply to state law claims.

22  Nothing any of the individual Defendants did caused Brailsford to shoot. Plaintiffs

23  _____

24  [10] Before addressing the merits of this claim, the Court must determine whether
   Plaintiffs have standing. *Grumbles v. Ineos U.S.A.,* 2019 WL 2622339, at *1 (Tex.App.

25  2019) ("the trial court granted the appellees' motion for bifurcation; thus, before reaching
   liability and damages the case proceeded on the threshold issue of whether Grumbles was

26  Gutierrez's common-law spouse and thereby has standing to bring suit," with the jury
   finding no marriage where the parties had a joint bank account, but the parents testified

27  that they were not married). Plaintiffs did not identify any new arguments in their
   Response, instead only incorporating by reference the briefing on the Motion to Bifurcate,

28  which does not, by clear and convincing evidence, establish standing for Sweet or the
   minor child.

1    admit that Brailsford did not shoot because of the commands and did not interpret the

2    commands to shoot. In light of this, it is unknown how any of the individuals—who were

3    merely present and some of them were armed—caused or even contributed to the

4    shooting. There is no evidence that Brailsford fired because Officer Doane had his Taser

5    out, or Officers Cochran and Gomez were armed with handcuffs. Or that the presence of

6    Sgt. Langley and Officer Elmore with AR-15s somehow motivated Brailsford in any way

7    either.[11] None of the individual Defendants actions were a "substantial factor" in bringing

8    about the harm, or that their mere presence created a recognizable risk of an alleged

9    unjustified shooting. *See Barrett v. Harris*, 207 Ariz. 374 (App. 2004).[12]

10        Plaintiffs' citation to *Robertson v. Sixpense Inns of America*, 163 Ariz. 539 (1990)

11   is also unavailing. *Robertson* involved an officer injured because he failed to appreciate

12   the risks present by a third-party, who engaged in criminal conduct, injuring him when he

13   might have appreciated the risks if given more information by the plaintiff.  This case

14   would be factually similar if the officers arrived on scene, and were told by La Quinta that

15   Shaver was friendly and not a threat, and then they casually approached the door to his

16   room and were shot through the door by Shaver.

17        Instead, the more relevant case is *Ryan v. Napier*, 425 P.3d 230 (2018), which

18   involves police use of force. First, Plaintiffs fail to address *Ryan's* recognition of the bar

19   against using intentional conduct claims against the City on a *respondeat* superior claim

20   for Brailsford. *See also* A.R.S. § 12-020.05 (B). Plaintiffs instead cite pre-*Ryan* federal

21   cases that do not address the statute at issue.

22        Then, they argue against the language applying directly to this case for the

23

24        [11] Plaintiffs Section 1983 claims against these officers also fail for lack of
25   causation. Plaintiffs do not address the bar present in Arizona's survival statute for uses of
     force that do not cause death.  *See Fernandez v. Virgillo*, 651 Fed.Appx. 692 (9th Cir.
26   2016) (dismissing Taser use of force claim and applying Arizona's survival statute where
     the death was caused by the shooting and finding the same not inconsistent with the
27   objectives of federal law).

          [12] Plaintiffs new aiding and abetting and conspiracy allegations fail for the reasons
28   set forth above in relating to the officer police reports.

individual Defendants:

> We also disagree with the court of appeals and McDonald that negligence liability can result from a law enforcement officer's "evaluation" of whether to intentionally use force against another person. A negligence claim requires either "an act" or a failure to "act." See Restatement § 284; *see also Coburn v. City of Tucson*, 143 Ariz. 50, 52, 691 P.2d 1078 (1984) (citing Restatement § 284 with approval). An "act" is "an external manifestation of the actor's will." Restatement § 2. An actor's internal evaluation about whether to use force and the decision to do so are not "acts" and therefore cannot, by themselves, constitute negligence. Here, Klein's "act," and the sole cause of McDonald's injuries, was Klein's intentional release of Barry to bite and hold McDonald. Cf. id. cmt. c ("Thus, if the actor, having pointed a pistol at another, pulls the trigger, the act is the pulling of the trigger."). As previously explained, an intentional act cannot also constitute negligence. See supra ¶¶ 19-20. In short, Klein's internal evaluation [***13] of whether to release Barry and his decision to do so was part and parcel of his intent to inflict harmful or offensive contact on McDonald. *Cf. Latits v. Phillips*, 298 Mich. App. 109, 826 N.W.2d 190, 196 (Mich. Ct. App. 2012) ("[T]he claim that defendant failed to appreciate that [plaintiff] did not pose a risk of harm may have some bearing on whether defendant made the proper decision to shoot, but it does not alter the fact that it was an intentional decision to shoot."). We are further persuaded because permitting negligence liability to rest on an officer's internal evaluation of the need for intentionally inflicted force could permit plaintiffs to "plead around" statutory provisions that apply only to intentional tort claims.

*Id.* at 61. Plaintiffs' claims against the individual Defendants are evaluation claims—they failed to mentally evaluate and use a threat assessment; or failed to mentally evaluate Shaver's actions differently and determine that he was not a threat, or was intoxicated; or failed to mentally evaluate Sgt. Langley's commands in a different manner, even though none of the individuals interpreted the commands as requiring deadly force; or should have mentally evaluated differently the information presented to them. Mental evaluation, per *Ryan*, is not an action or failure to act. None of these mental evaluations of the individual officers was a substantial factor in Brailsford's decision making. Moreover, many of the theories fall within a "failure to investigate" framework, which are foreclosed by *Hogue*, supra.

### 2. The Wrongful Death Claim Against the City of Mesa for Hiring; Training; and Supervision Fails.

Plaintiffs argument regarding training fails to address *Ryan's* recognition of presumptions existing under statute applicable to officers using force, including that an officer's employer is "presumed to have reasonably hired and trained" its officers to use physical force. *See* A.R.S. § 12-716 (A)(2). Instead, Plaintiffs argue that the officers

1    violated constitutional standards, but this is not the operative inquiry.  Plaintiffs do not

2    cite any specific statements of fact identifying the failure in training that was the alleged

3    cause of injury. Attorney argument regarding alleged insufficiencies, in the absence of

4    expert testimony, is also insufficient to permit any type of training claim to go forward to

5    a jury. *See Griggs v. Wash. Metro. Area Transit Auth.*, 2002 U.S. Dist. LEXIS 18413, *10

6    (D.D.C. 2002) (collecting cases finding expert testimony necessary for standard of care in

7    cases alleging negligent police operations, supervision, and training).  Law enforcement

8    training is not within the common experience of a lay person and Plaintiffs invite this

9    Court and a potential jury to speculate about what training should have been, without any

10   evidence supporting this mere argument.

11       Plaintiffs also, by citation to multiple training sources from the City, claim that the

12   officers allegedly violated the training, which is not a training claim. Violation of training

13   does not establish that any alleged training deficiency was the cause of any injury, but

14   instead that the alleged violation (which is also disputed) is the cause.

15       Similarly, Plaintiffs supervision and hiring argument is supported by two

16   references to the Shaver PSOF, which are not in accord with the evidence relating solely

17   to Sgt Langley and Brailsford. First, these two allegations have nothing to do with hiring.

18   Plaintiffs cite to no evidence relating to a hiring claim. Second, the only evidence relates

19   to two prior isolated <u>allegations</u> of excessive force. Sgt. Langely had no "extensive

20   history" of excessive force. To the contrary, he was alleged—on one occasion—to have

21   used a Taser against a fighting suspect in drive-stun mode. He was investigated—

22   establishing supervision—and the allegation was unfounded. Similarly, Plaintiffs identify

23   one prior non-shooting use of force by Brailsford, not involving similar facts, which

24   involved a physical struggle with resistive suspect. Neither incident establishes a negligent

25   supervision claim.  *See Williams v. City of Mesa*, 2011 U.S. Dist. LEXIS 24314 (D.Ariz.

26   2011) (claim that officer failed defensive tactics exam, involved in a police shooting in

27   2001, and was involved in a patrol accident, did not create a question of fact that the City

28   negligently trained or supervised the officer related to an excessive force claim where the

1   officer "badly fractured" the arm of an arrestee).

2   **II.      CONCLUSION.**

3           For the foregoing reasons, summary judgment should be granted on all of

4   Plaintiffs' claims.

5           DATED this 8th day of July, 2019.

6
                                        WIENEKE LAW GROUP, PLC
7
8                          By:    /s/ Christina G. Retts
                                  Kathleen L. Wieneke
9                                 Christina Retts
                                  1095 West Rio Salado Parkway, Suite 209
10                                Tempe, Arizona 85281
11                                *Attorneys for Defendant Defendants City of
                                  Mesa, Brian Elmore, Christopher Doane, Bryan
12                                Cochran, and Richard Gomez*

13                           **CERTIFICATE OF SERVICE**

14
15          I hereby certify that on 8th day of July, 2019, I electronically transmitted the
    attached document to the Clerk's Office using the CM/ECF System for filing and
16   transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

17  Mark D Zukowski:              mzukowski@jshfirm.com,
                                  klewis@jshfirm.com
18
19  James J Belanger:            jjb@jbelangerlaw.com,
                                  lmj@jbelangerlaw.com
20
21  Daniel J O'Connor            caseadmin@occlaw.com

22  William August Richards      brichards@baskinrichards.com,
                                  cmcdonald@baskinrichards.com
23
24  Alan S. Baskin               alan@baskinrichards.com

25
26  Jonathan Paul Barnes         jbarnes@jshfirm.com,
                                  gstahly@jshfirm.com
27
28

| | | |
|---|---|---|
| 1 | David Calvin Potts | dpotts@jshfirm.com, |
| 2 | | scoffey@jshfirm.com |
| 3 | Spencer Garrett Scharff | scharff@scharffplc.com |
| 4 | Sven Kortne Budge | sbudge@budgelawfirm.com |
| 5 | Mark John Geragos | mark@geragos.com, |
| 6 | | geragos@geragos.com |
| 7 | Benjamin Meiselas | ben@geragos.com, |
| 8 | | geragos@geragos.com |
| 9 | Gene Nicholas Chavez | gene@chavezlawoffices.com, |
| 10 | | chavezlawoffices@gmail.com |

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:   N/A.

By:   */s/ Lindsey Piasecki*