UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

Laney Sweet, et al.,        )
                            )
              Plaintiffs,   )        2:17-cv-0152-GMS
                            )
       vs.                  )        Phoenix, Arizona
                            )        August 6, 2021
City of Mesa, et al.,       )           1:10 p.m.
                            )
              Defendants.   )
_____)


BEFORE:   THE HONORABLE G. MURRAY SNOW, CHIEF JUDGE


REPORTER'S TRANSCRIPT OF PROCEEDINGS

IN-COURT HEARING


Official Court Reporter:
Charlotte A. Powers, RMR, FCRR, CRR, CSR, CMRS
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 40
Phoenix, Arizona  85003-2151
(602) 322-7250

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

```
 1                    A P P E A R A N C E S

 2    For the Plaintiffs:

 3               Richards & Moskowitz, PLC
                 By: WILLIAM AUGUST RICHARDS, ESQ.
 4               1850 N. Central Avenue, Suite 2010
                 Phoenix, AZ  85004
 5    and
                 Geragos & Geragos APC
 6               By:  BENJAMIN MEISELAS, ESQ.
                     MARK JOHN GERAGOS, ESQ.
 7               644 S. Figueroa Street
                 Los Angeles, CA  90017
 8

 9
      For the Defendants Brailsford:
10
                 O'Connor & Dyet, PC
11               By: DANIEL J. O'CONNOR, ESQ.
                     DANNY JOSEPH O'CONNOR, ESQ.
12               7955 S. Priest Drive
                 Tempe, AZ  85284
13

14    For the Defendants Cochran, Doane, Elmore, City of Mesa:

15               Wieneke Law Group PLC
                 By:  CHRISTINA GAIL RETTS, ESQ.
16                   KATHLEEN L. WIENEKE, ESQ.
                 1095 W. Rio Salado Pkwy., Suite 209
17               Tempe, AZ  85281

18

19    For the Defendant Gomez:

20               Jones Skelton & Hochuli PLC
                 By:  JOHN T. MASTERSON, ESQ.
21               40 N. Central Avenue, Suite 2700
                 Phoenix, AZ  85004
22

23    ///

24    ///

25    ///
```

1                      A P P E A R A N C E S (continued)

2


3    For the Defendants Langley:

4                    J. Belanger Law PLLC
                     By:  JAMES J. BELANGER, ESQ.
5                    PO Box 447
                     Tempe, AZ  85280
6


7    For the Defendant LQ Management:

8                    Jones Skelton & Hochuli PLC
                     By:  DAVID CALVIN POTTS
9                    40 N. Central Avenue, Suite 2700
                     Phoenix, AZ  85004
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

<u>INDEX OF WITNESSES</u>

| WITNESSES FOR THE DEFENDANTS: | <u>Direct</u> | <u>Cross</u> | <u>By The Court</u> |
|---|---|---|---|
| MARK GERAGOS | 22 | 42 | 39 |

<u>INDEX OF EXHIBITS</u>

| EXHIBIT NO.: | DESCRIPTION: | | <u>RECEIVED:</u> |
|---|---|---|---|
| (No Number Mentioned) | Promissory Notes in Docket 457 | | 26 |

UNITED STATES DISTRICT COURT

```
1                    (Proceedings resume at 1:10 p.m.)
2              THE COURT:  Please be seated.
3              COURTROOM DEPUTY:  This is CV17-152, Sweet v. City of
4    Mesa, on for in-court hearing.
5              Counsel, please announce your appearances.
6              MR. RICHARDS:  Good afternoon, Your Honor.
7              Bill Richards for the Sweet plaintiffs.
8              Also with me at counsel table is Mark Geragos, and
9    behind us, standing as well, Ben Meiselas.
10             MR. GERAGOS:  Good afternoon.
11             MR. MEISELAS:  Good afternoon.
12             THE COURT:  Good afternoon.
13             MR. BELANGER:  Jim Belanger on behalf of defendant
14   Charles Langley, Your Honor.
15             THE COURT:  Good afternoon.
16             MS. WIENEKE:  Good afternoon, Your Honor.
17             Kathleen Wieneke and Christina Retts on behalf of the
18   City of a Mesa, defendants Doane, Cochran, and Elmore.
19             THE COURT:  Good afternoon.
20             MR. O'CONNOR:  Good afternoon, Your Honor.
21             Daniel O'Connor and Danny O'Connor from the law firm
22   of O'Connor & Dyet on behalf of Officer Brailsford.
23             THE COURT:  Good afternoon.
24             MR. MASTERSON:  Good afternoon, Judge Snow.
25             John Masterson for Officer Richard Gomez.
```

1          THE COURT:  Good afternoon, Mr. Masterson.

2          MR. POTTS:  And David Potts for defendant LQ

3     Management, LLC.

4          THE COURT:  Mr. Belanger?

5          MR. BELANGER:  Thank you, Your Honor.

6          First of all, I'd like to invoke the rule of

7     exclusion, if we're going to be calling witnesses.  I'd like --

8     the only persons I expect to be able to call are Mr. Geragos

9     and Mr. Meiselas, so I'd like to invoke the rule of exclusion.

10         THE COURT:  Do you intend to call any witnesses,

11    Mr. Richards?

12         MR. RICHARDS:  We do not intend to call any witnesses.

13    If there's someone else that's calling a witness, Your Honor,

14    we may have our own examination questions for them.

15         I think there's two housekeeping issues, Your Honor:

16         Number one, everything preceding this, I believe, was

17    filed under seal, as I believe your order was.  I'm assuming

18    this is an under seal proceeding.  I recognize most of the

19    people in the courtroom, but not all of them, Judge, so I don't

20    know if we need to deal with that issue, as well.

21         There's a secondary issue, which is that I think what

22    Mr. -- this is a unique situation, and we'll go with your

23    preference, Judge.  Obviously he's seeking to exclude counsel,

24    who is also going to be a witness, which I know is a -- kind of

25    an odd situation.  But we'll follow your direction on that,

1    Judge.

2              THE COURT:  Well, do you seek to exclude either

3    Mr. Geragos or Mr. Meiselas?

4              MR. BELANGER:  Yes, Your Honor.  I'm going to call

5    Mr. Geragos first, and I would ask that Mr. Meiselas be

6    excused.

7              THE COURT:  Okay.

8              Do any other counsel intend to call any other

9    witnesses at all?

10             MS. WIENEKE:  None other than those two witnesses,

11   Your Honor.

12             MR. O'CONNOR:  No, Your Honor.

13             MR. MASTERSON:  No, Judge.

14             MR. POTTS:  No, Your Honor.

15             THE COURT:  Mr. Meiselas, can I get you to step out,

16   please?  And we'll call you as soon as we can bring you back

17   in.

18             MR. MEISELAS:  Sounds good.

19             THE COURT:  Thank you.

20             MR. BELANGER:  I also agree with Mr. Richards that

21   these proceedings have been under seal and, I believe, continue

22   to be under seal.  I don't know who all is in the courtroom,

23   but unless they're affiliated with the parties or with counsel,

24   I think this proceeding should remain under seal.

25             THE COURT:  And why should it remain under seal?

1        MR. BELANGER:  Well, to this point, Your Honor -- I

2  mean, obviously I'll defer to you -- but to this point

3  everything that we've done in this case has been under seal,

4  the pleadings that have been filed, and so --

5        THE COURT:  I guess -- I don't question that at all.

6  I just think it's occasionally worth reassessing.

7        Is what we're doing here going to need to be under

8  seal?

9        MR. BELANGER:  Well --

10        THE COURT:  I do want to be -- I will say that I want

11  to be protective to the extent that we should be of the

12  interests of Ms. Sweet's privacy interests.  I'm not really

13  nearly as -- I'm not sure how much that is relevant, but I do

14  have concerns about the extent to which the integrity of the

15  judicial process is at issue, I'm not sure that we should close

16  hearings.  So I guess --

17        MR. BELANGER:  Well --

18        THE COURT:  -- I would invite you to be heard on that,

19  and anybody else that wants to be heard on that.

20        MR. BELANGER:  Sure.

21        The only thing I would add -- add to that, Your Honor,

22  is one of the things that -- I think the reasons why these

23  pleadings were filed is because we felt that the conduct that

24  had been going on in this case was impacting a fair trial and a

25  fair resolution of this case.  It seemed that there was an

1    intentional solicitation of media attention regarding this

2    case, there was public broadcasts regarding specific facts of

3    this case, there were characterizations of witnesses and expert

4    witnesses in this case.  There's been little or no -- and I

5    understand the First Amendment concerns and I understand the

6    gag-order type concerns -- but there has been, it appears to

7    us -- and I'm sure that plaintiff's counsel would not agree --

8    but a concerted effort to generate media in this case in order

9    to benefit the plaintiffs.

10            THE COURT:  Well, Mr. Belanger, maybe we have

11   different notions of what this hearing is about, but I've

12   already ruled --

13            MR. BELANGER:  Understood.

14            THE COURT:  -- on all of the pretrial publicity

15   issues, have I not?

16            MR. BELANGER:  Yes, Your Honor.  But I also think that

17   your ruling did not address, for example, whether or not

18   Mr. Geragos and Mr. Meiselas, who have a proprietary interest

19   in podcasts that are still available to the public, whether

20   those can be, by them, brought out of the public realm.

21            And so, again, I -- I've read your ruling, Your Honor.

22   I understand --

23            THE COURT:  I do appreciate that, Mr. Belanger.

24            MR. BELANGER:  No, I have.  And I'm sure you've read

25   our pleadings.  At the same time, I don't know who is in the

1    courtroom, you don't know who's in the courtroom --

2            THE COURT:  Well, let me just tell you, Mr. Belanger,

3    that we're not going to be focusing in today's hearing on any

4    of the First Amendment or pretrial publicity issues.

5            MR. BELANGER:  Okay.

6            THE COURT:  If you want to focus on them and you feel

7    like I've not addressed them, that's fair game.  But it's not

8    going to be -- it's not going to be happening today.  And --

9    and I would appreciate as you evaluate those, I have no

10   interest in letting Mr. Geragos -- or Geragos -- I'm sorry, I

11   want to pronounce your name correctly -- or Mr. Meiselas

12   hijacking this hearing -- or hijacking this trial.  But as I

13   said before, we don't even have a trial date yet.

14           MR. BELANGER:  Understood.

15           THE COURT:  When we have a trial date, I'm going to be

16   willing to look at all of this much more intensely.  But I do

17   feel like there are First Amendment and other concerns, and I

18   just don't think the plaintiffs have been advised that that's

19   what this is about, and I don't think we ought to be raising it

20   today.  We have a limited amount of time.

21           I am concerned about some of the financial issues that

22   relate to the aid that has been going back and forth, and I

23   want to address those.  And I'm not sure -- again, it does, to

24   some extent, involve Ms. Sweet and her financial condition, but

25   I'm not sure that that is enough to overbalance the need to

1   have the public, if they want to hear this, about the -- as I

2   said, the integrity of the judiciary, I'm not sure that that

3   merits sealing.  So do you have a position on that?

4           MR. BELANGER:  I've made my position known, Your

5   Honor, and I -- I would request that it be sealed, but I

6   respect your -- your opinion on this.

7           THE COURT:  Okay.  Does anybody -- any other defense

8   counsel have anything that they want to be heard on the aspect

9   of whether or not we should hold these hearings under seal?

10          Seeing none.

11          Mr. Richards?

12          MR. RICHARDS:  Your Honor, I think we've put our

13  position in the record that we don't believe a lot of the

14  sealing has been necessary.  It has been requested.

15          But I do have one caveat on this particular case,

16  Judge.  I don't think we need to seal it.  However, as the

17  Court is aware, and I think you've already alluded to this,

18  there's some unique issues here.  You've raised questions, and

19  we have provided you avowals.  We have consulted with our

20  outside ethics counsel, Linda Shely, about how to best handle

21  and navigate all these issues involving potential privileges

22  and confidentiality issues and those things.  We do believe

23  that your questions need to be answered, should be answered.

24  And we put our avowals in --

25          THE COURT REPORTER:  Counsel, I'm sorry.  You'll need

1    to slow down a little.

2            MR. RICHARDS:  I apologize.

3            THE COURT REPORTER:  That's okay.

4            MR. RICHARDS:  I apologize.

5            We put our avowals in, Your Honor, to try to hit

6    those, we hope, straight on the head.

7            We are concerned about any questions that go beyond

8    that and understand it would be inappropriate to ask, like,

9    general questions about communications between counsel and

10   Ms. Sweet, those sorts of things, which could invade the

11   privilege of the confidentiality ethical obligations of

12   counsel.  So we are going to be probably be making some

13   objections, I imagine, along the way on those grounds.

14           I suppose if we have disagreed with your Court's --

15   with the Court's ruling on any of those, we may be concerned

16   that some sort of privileged information is getting out.  But I

17   will withhold any request for sealing until I -- I feel that

18   that's necessary.

19           I hope that --

20           THE COURT:  Well, yeah.  You know, I don't mean to

21   short-circuit things.  I realize counsel have perspectives that

22   I need to hear.

23           But I will tell you that I have reviewed the

24   additional declarations filed by Mr. Geragos and Mr. Meiselas.

25   And just so all counsel are aware, they go a long way towards

1   meeting my concerns, but they don't go all the way towards

2   meeting my concerns.

3          I think I've indicated -- and if you've read my

4   orders -- I think I've indicated that any settlement that takes

5   place in this matter is going to require a specific amount that

6   Ms. Sweet settles for on her own behalf, a specific amount that

7   she settles on behalf of her two children, a specific amount

8   that she settles on behalf on the estate, and any deductions

9   from those amounts by attorneys or anybody else.

10          Mr. Geragos and Mr. Meiselas have indicated in their

11   affidavits that they -- I think at least somewhat consistent --

12   you know, Ms. Shely will have told you that we worked together

13   -- we've worked together for many years before I went to the

14   bench on the ethics committee, and I may have my own view about

15   what the ethical requirements are.

16          But I guess I want you to hear this, Mr. Geragos, I

17   want Mr. Meiselas to understand it, even though he's out of the

18   courtroom, when we admit somebody pro hac vice, we don't have

19   the authority to go -- after a trial is over -- to the Bar and

20   say:  Investigate this activity.

21          So I have an approached the requirement that ethical

22   requirements be met with a little bit more heightened concern

23   as it pertains to maintaining pro hac vice status.

24          If it seems to me -- and I'm glad to have parties

25   focus on this -- if Mr. Geragos -- Geragos and Mr. Meiselas

1    wants to represent in open court, not only that they don't

2    expect any reimbursement from any of the plaintiffs, but they

3    will not accept any reimbursement from any of the plaintiffs

4    under any conditions or through any corporate maneuverings or

5    any other payments, then that goes a long way towards meeting

6    my concerns.

7            I don't know if you want to comment on that -- I'll

8    certainly allow all parties to be heard -- but that's where I

9    come down.  And you can think about that, you can counsel with

10   Mr. Meiselas.  If you have talk to about -- I don't know what

11   your partnership structure may be, but I expect that that is

12   what I will be requiring in order to maintain pro hac vice

13   status here.  It isn't my final word because I want to hear

14   what defense has to say.  But that's where I'm coming down, at

15   least initially.

16           MR. RICHARDS:  And, Your Honor, if I might be heard on

17   that, just as a housekeeping matter maybe and a procedural way

18   to handle this, I don't think any consultation has to be done

19   whatsoever between Mr. Geragos and Mr. Meiselas.  I think

20   Mr. Geragos is prepared to answer your questions right now, and

21   he's prepared to answer them however you want him to, as an

22   avowal of counsel or under oath --

23           THE COURT REPORTER:  Counsel, please slow down.

24           MR. RICHARDS:  I apologize again.

25           The -- as the avowals that we provided you indicated

1   and hopefully they were clear enough, Mr. Geragos and his firm

2   and Mr. Meiselas have made it clear to Ms. Sweet repeatedly,

3   verbally and in writing, that they are not going to expect,

4   require, or engage in any sort of manipulation of anything to

5   have any of those amounts that have been paid or extended or

6   advanced, repaid or reimbursed.  It's not going to be done

7   through an adjustment of fees that they may have, attorney's

8   fees that they may receive.  It's not going to be done through

9   our firm in any way --

10          THE COURT:  Or any other third party or entity or

11   anything.

12          MR. RICHARDS:  No, Your Honor.  None whatsoever.

13          THE COURT:  And I guess my only distinction to this

14   is, I don't want Ms. Sweet feeling like she's free to repay

15   them because she's grateful for their generosity.  I don't want

16   repayments, period, from Ms. Sweet, from anybody, to

17   Mr. Geragos and Mr. Meiselas and their firm, or whoever may

18   have been making the donations --

19          MR. RICHARDS:  Yes.

20          THE COURT:  -- for that generosity, because it has to

21   be, from inception, a gift.

22          MR. RICHARDS:  Yes.  And, Your Honor --

23          THE COURT:  And --

24          MR. RICHARDS:  I apologize, I didn't mean to

25   interrupt.

1            THE COURT:  That's all right.  I'll let you finish.

2    But I want to get on, because we've only got so much time

3    scheduled for this hearing.

4            MR. RICHARDS:  Yes.

5            Judge, she does not intend to do that, and I

6    believe --

7            THE COURT:  Again, I'm not interested in intent.  I'm

8    interested in an absolute guarantee.

9            MR. RICHARDS:  Right.  Well, and I think you can

10   receive a guarantee from Mr. Geragos that he -- and from

11   Mr. Meiselas -- that neither they nor their firm, nor anyone

12   they know, would ever accept such advancement or payment.

13           And, Your Honor, if I could add one other point that's

14   in Mr. Geragos's declaration, they've gone further than the

15   ethical rules would require.  As you alluded in your order, you

16   know, ethical rule 1.8 does allow reimbursement of certain

17   litigation-related expenses.  They have committed to Ms. Sweet

18   at the end of this, if, in fact, there is money available to

19   her, they are agreeing to waive -- have agreed already to waive

20   any of their incurred litigation expenses.  That will not be

21   somehow transferred back to our firm, Judge.  The only

22   litigation expenses that would be collected would be those of

23   our firm, you know, my prior firm and current firm.  That would

24   be it.  There would be no manipulation done of anything there

25   to, you know, try and transfer those expenses over to us.

1    They're there, they're done, they're over, they have been

2    waived.

3              And again, Your Honor, you don't need to hear that

4    from me because Mr. Geragos can -- can provide that information

5    to you directly, and I think that might be appropriate now.

6              THE COURT:  Well, thank you.  I'm actually -- I

7    appreciate it, Mr. Geragos.  I'm going to wait to hear from

8    you.

9              MR. GERAGOS:  Okay.

10             THE COURT:  Mr. Belanger?

11             MR. BELANGER:  On that point, Your Honor, or --

12             THE COURT:  On that point.

13             MR. BELANGER:  On that point.

14             I read, obviously, Mr. Geragos' -- and I apologize if

15   I pronounce his name wrong also -- declaration, but there's

16   been a substantial amount of litigation regarding this ethical

17   issue.  There's no question that pro hac vice are required to

18   be familiar with the local rules and they certify that they're

19   familiar with the local rules, and that they're familiar with

20   Arizona rules of professional responsibility.  We've litigated

21   this issue off and on for a year and half now.  I don't know

22   that Ms. Sweet should be charged for any expenses by any lawyer

23   because I don't think Mr. Geragos or Mr. Meiselas did any of

24   the drafting of pleadings in this case.  I think that should be

25   extended to any of the litigation expenses incurred by her or

1      by her firms in this case.

2              And I -- and I appreciate him waiving the expense.  I

3      don't think that obviates the ethical issues.

4              That's my position.

5              THE COURT:  Because?

6              MR. BELANGER:  I don't -- that I don't think it

7      obviates the ethical issues?

8              THE COURT:  Yes.

9              MR. BELANGER:  Because when you enter into a

10     debtor-creditor relationship with a client, you're obligated

11     under ER 1.8 to advise the client that she has a right to

12     independent counsel.  Ms. Sweet was not only acting on her

13     behalf, she was acting on behalf of her minor children, and she

14     was acting as a fiduciary of the estate.  And I don't believe

15     there's any indication whatsoever that she was ever advised

16     that she get independent counsel regarding her duties in terms

17     of allowing herself or having her lawyers enter into a

18     debtor-creditor relationship with her.  That -- I understand

19     the financial aspects of this and your concern regarding

20     ongoing payments.  The declarations don't talk about indirect

21     payments or contributions to GoFundMe accounts or contributions

22     that might be made to Ms. Sweet's mother.

23              But to me, even if you determine that as a factual

24     matter the funding ceased in February of 2020, not because they

25     brought it to your attention, but because they were basically

found out and then decided at that point:  We're going to turn

these into gifts.

        The more critical ethical issue is, in Arizona you are

obligated before you enter into a business transaction, or any

kind of pecuniary transaction with a client, to in writing

offer them the opportunity to get independent counsel so that

they can understand it, and then get a response from them in

writing that they either reject independent counsel or have

conferred and have made decisions based on the advice of

independent counsel.  There's no indication that was done in

this case.

        And frankly, I mean, again, you were -- you probably

know more about ethics than anybody in the room; right?  The

restatement in Arizona's rules of professional responsibility

specifically denigrate this kind of relationship because it

gives the creditor-lawyer undue influence over the resolution

of a case.

        All we want, and you've ruled on the publicity issues,

is a fair trial without any undue influence.  And I don't

believe under the circumstances here that has been done, and I

don't think the declarations obviate the ethical violations.

        THE COURT:  All right.  Thank you.

        Any other defense counsel want to be heard on this?

        MS. WIENEKE:  Your Honor, I would just point out --

Kathleen Wieneke for the City of Mesa and other defendants --

1    that this declaration -- these declarations that we received on

2    the eve of this evidentiary hearing, one of our questions is:

3    Why weren't these declarations provided a year-and-a-half ago?

4              In Ms. Sweet's deposition of October 2019 through

5    serendipity questions, we found out about this litigation loan

6    without any prior knowledge.  We didn't actually receive copies

7    of the loan until March of 2020 after a hearing with this

8    Court.  We had to wait that long, despite repeated requests for

9    the litigation loan documents.  And then we received the

10   promissory notes.

11             We took Ms. Sweet's deposition again just last month

12   on July 6th, 2021.  Her questions -- answers to my questions

13   were very equivocal:  Was it a loan; was it a gift?  And yet

14   now we're presented with a declaration of certainty about the

15   status of this.

16             So we have litigated this for a year-and-a-half, Your

17   Honor, when -- if this declaration -- these declarations

18   resolve the questions, why weren't they submitted sooner, and

19   why was Mr. Richards's office the one that was providing the

20   responses on behalf of Mr. Geragos all these times?  And so to

21   the extent that Mr. Geragos has agreed to waive these expenses,

22   so too should that offer be made by Mr. Richards' office, who

23   has incurred presumably substantial attorney's fees regarding

24   these issues.

25             THE COURT:  And why should Mr. Richards, if he has

UNITED STATES DISTRICT COURT

1     not -- if his office has made no loans at all to the client,

2     why should his office be included in this?

3              MS. WIENEKE:  Because, Your Honor, as local counsel

4     who has sponsored Mr. Geragos for his pro hac vice, it is his

5     obligation in ensuring that he is informed of the rules of this

6     Court, and Mr. Richards did not have to undertake to defend the

7     conduct of Mr. Geragos.  That was their choice internally.

8     Mr. Geragos could have either responded to this Court and

9     explained his own actions, as could Mr. Meiselas, or they could

10    have hired outside counsel to present their position.  That was

11    an internal decision of plaintiff's counsel of Mr. Richards to

12    do that, not borne by the defendants in this case.

13             But he -- it also raises the potential conflict of

14    whose interests are you serving; Ms. Sweet's or counsel,

15    Mr. Geragos, when you are litigating this issue?

16             THE COURT:  Thank you.

17             Do you have any questions for Mr. Geragos,

18    Mr. Belanger, that are related to how I'm framing these issues?

19             MR. BELANGER:  I think so, Your Honor.  And obviously

20    you will let me know if I go beyond the boundaries of what you

21    think is appropriate.  But, yes, I think I do.

22             THE COURT:  I am going to ask you to be pretty direct.

23             MR. BELANGER:  I will.  I absolutely will, Judge.

24             THE COURT:  Mr. Geragos?

25             MR. GERAGOS:  May I approach --

MARK GERAGOS - DIRECT EXAMINATION

1        THE COURT:  Yes.

2        MR. GERAGOS:  -- or do you want me to do it from here?

3        THE COURT:  No, no, you should approach.

4        Thank you.

5        No, it's on this side.  It's a little confusing.

6        COURTROOM DEPUTY:  It is over here.

7        THE WITNESS:  I thought it was by the Plexiglass.

8        THE COURT:  No, no.  I'm the one that's confused.

9        (MARK GERAGOS, defendants' witness, is sworn.)

10                   DIRECT EXAMINATION

11   BY MR. BELANGER:

12   Q.  Mr. Geragos, why don't you tell us your name and how it's

13   correctly pronounced.

14   A.  It's Mark Geragos.  And my late mother used to say it's the

15   only word in the English language that rhymes with "asparagus."

16   Q.  So it's Geragos?

17   A.  Geragos.

18   Q.  Other than this particular case right here in this Federal

19   District Court, what other matters have you been admitted pro

20   hac vice in the state of Arizona?

21   A.  I think only one other, and I'm not sure as I sit here.

22   Q.  So --

23   A.  I believe it was a criminal case, a criminal case years

24   ago.  But I -- I couldn't say.  I haven't thought about that.

25   Q.  So let me see if I can refresh your recollection.

UNITED STATES DISTRICT COURT

1            You've been admitted pro hac vice in this case in

2    front of Judge Snow.

3    A.   Correct.

4    Q.   You were admitted pro hac vice in Maricopa County Superior

5    Court on behalf of Ms. Sweet in the criminal case, or were you

6    not?

7    A.   I know I represented her there, but I don't know if I was

8    admitted pro hac, as I sit here.

9    Q.   Who was your local counsel in that matter?

10   A.   It would have been Mr. Richards, if I was admitted.

11   Q.   Does the name Eric Hill ring a bell to you?

12   A.   Not as I sit here.

13   Q.   Eric Hill was the -- was a -- the alleged victim in a

14   criminal case involving Mark Keefe and Marcus Morris.

15   A.   Oh, yes, yes.  I remember that case.

16   Q.   Were you admitted pro hac vice in either the -- in the

17   civil component of Mr. Hill's case against the Morris Brothers?

18   A.   I don't remember, as I sit here.

19   Q.   Who was your local counsel in that case?

20   A.   I don't remember, as I sit here.

21   Q.   Would it have been Mr. Richards?

22   A.   I don't -- I don't know.  I don't think so.

23   Q.   Did you have a similar arrangement with Mr. Hill where you

24   provided him with loans or expenses for his living expenses?

25   A.   I don't think so.

```
 1    Q.  Who in your law firm would be knowledgeable about that, if,
 2    in fact, that were the case?
 3            MR. RICHARDS:  Your Honor, again, we're getting into
 4    other loans with other clients.  It's way beyond the scope of
 5    what this hearing is about.
 6            THE COURT:  I'm going to sustain that objection.
 7            MR. BELANGER:  All right.
 8    BY MR. BELANGER:
 9    Q.  Prior to -- did -- did your fee agreement in this case with
10    Ms. Sweet, did it explain to her the treatment of expenses?
11    And when I stay "expense," I'm going to include loans.  Did it
12    explain to her or did it address expenses and loans, and how
13    they would be resolved by the Geragos law firm?
14    A.  "Geragos."  And I believe so, yes.
15    Q.  Geragos.
16            THE COURT REPORTER:  Counsel, excuse me.
17            I'm sorry, sir.  I couldn't understand what you said.
18            THE WITNESS:  I said "I believe so."
19            THE COURT:  Since you have the Plexiglass shield,
20    Mr. Geragos, you can take off your mask.
21            THE WITNESS:  Thank you, Your Honor.
22    BY MR. BELANGER:
23    Q.  The -- and you may not remember this, but I will avow to
24    you that the first promissory note with Ms. Sweet was entered
25    into in February of 2017.
```

1          Does that strike you as about correct?
2     A.  I -- if you're looking at something that I produced, I
3     would imagine it's correct.  I don't know, as I sit here.
4     Q.  That's fine.
5              MR. BELANGER:  Your Honor, one housekeeping matter.
6              All of the exhibits that were attached to our
7     pleadings on these various issues, they've not been objected to
8     in any of the responses or replies by counsel, and so I would
9     ask that those be all admitted and made part of this record.
10             THE COURT:  I have no idea or inclination to just
11    admit exhibits that I don't know what I'm talking about.  So if
12    you want to specify or have copies of them, that would be
13    helpful.
14             MR. BELANGER:  Okay.  The promissory notes were all
15    exhibited -- they were attached to document 457.  They were all
16    the promissory notes, I believe, in this case.
17             THE COURT:  Mr. Richards, do you know what
18    Mr. Beranger is talking about?
19             MR. RICHARDS:  I don't, Your Honor.  I do believe that
20    we -- we have produced all the promissory notes.  I'll accept
21    his avowal that that particular exhibit number is the
22    promissory notes and the full set that we produced.  And if
23    that's the case, I don't have any objection to that being
24    considered.  But I think you've already considered those, if
25    that's there, in -- in your consideration of the motions.

```
 1              THE COURT:  All right.

 2              So those -- so Mr. Beranger, that's docket --

 3              MR. BELANGER:  It's Belanger.

 4              THE COURT:  -- 457 -- let me finish, please.

 5              MR. BELANGER:  I'm sorry, Judge.

 6              THE COURT:  So docket 457 --

 7              MR. BELANGER:  Correct.

 8              THE COURT:  -- the promissory notes attached to docket

 9         457 are conditionally admitted.

10              Mr. Richards, I'll give you a day to object to any.

11              MR. RICHARDS:  Thank you.

12         BY MR. BELANGER:

13         Q.  Mr. Geragos, in February of 2020, your firm indicated that

14         as of that time, you would be treating any of the loans made to

15         Ms. Sweet as a gift.  Why did you do that?

16         A.  Because under the Arizona rules, which differ from

17         California rules, you can't make loans, apparently.

18         Q.  Had you not familiarized yourself with Arizona's rules

19         prior to that point?

20         A.  I had.

21         Q.  You had not?

22         A.  I had.

23         Q.  You had.

24         A.  With the rules.  I did not -- I was not familiar with that

25         rule, and I did not want her -- I did not want her going and
```

1    getting litigation funding at what I considered to be usurous

2    rates.

3    Q.  Prior to entering into those promissory notes, what kind of

4    due diligence did you do regarding Ms. Sweet's living expenses

5    in Texas?

6    A.  Well, I had not filed a lawsuit, I believe, at the time

7    that we first loaned her money.

8    Q.  And do you think that eliminates your duty under Arizona

9    law to comply with Arizona's rules of professional

10   responsibility?

11   A.  I do not.  I'm pro hac vice, which basically means I serve

12   at the pleasure of His Honor, and I understand my obligations.

13   And obviously, I'm to some degree mortified that I'm in this

14   position.  But that's one of the reasons that I went, I

15   thought, above and beyond and just waived all expenses so that

16   we wouldn't have to get into a situation where I would be

17   accused of manipulating expenses or anything else.  I waived

18   all expenses, whether they were connected to the litigation or

19   anything else.  I don't have any intention now or have I ever,

20   or would I, put at risk my bar license based on trying to

21   circumvent a court order or the ethical rules on the basis of

22   giving a widow money so that she could survive.  I did not want

23   her or the girls to be on the street.  And that's what

24   motivated me from the beginning, and to this day.  And I do not

25   have any intention whatsoever of adjusting or doing anything

1    else with any of these expenses.  That's why I've waived all

2    costs and expenses and have communicated that with the client

3    and with my cocounsel, my local counsel.

4    Q.  Okay.  Have you done that in writing?

5    A.  Yes.

6    Q.  Have you provided those writings as requested in discovery

7    in this case, and as ordered by this judge?

8    A.  I've done it by declaration, I've done it by email, I've

9    done it by text.  I'm not providing writings that I believe

10   are -- and I provided a declaration by Ms. Sweet, which was

11   filed with the Court as well.  And I've got -- I assume

12   Mr. Richards here to, and my plan was, if and when there is a

13   settlement, to have him administer it so that there's no

14   question about it.

15   Q.  Was Mr. Richards aware of the promissory notes that you

16   were entering into with Ms. Sweet?

17   A.  I doubt it.

18   Q.  Did you never confer with your local counsel regarding the

19   propriety of doing that?

20   A.  I don't believe he was my local counsel when it first

21   started.

22   Q.  My recollection is that Mr. Richards's first appearance in

23   this case was at a preliminary hearing in 2016.

24   A.  I -- that would strike me as probably correct, but I --

25   I -- I'm not looking at the dates.  I know that the criminal

1    case was in 2016.

2    Q.  What have you done -- what have you reviewed prior to

3    coming here for this hearing; what documents did you review?

4    A.  The judge's order -- two orders.  The -- I believe it was

5    12-page order and the secondary order that was in response to

6    the defense asking for clarification on evidence.

7    Q.  And you didn't review the promissory notes?

8    A.  No.

9    Q.  Didn't review any of the expenses that you forwarded to

10   Ms. Sweet?

11   A.  I've reviewed the expenses before.

12   Q.  Not before -- not before this hearing though?

13   A.  Not -- not within the last week, no.

14   Q.  Okay.  Have you ever funded Ms. Sweet's GoFundMe account?

15   A.  I don't believe I have, no.

16   Q.  If you don't know, who would know on your behalf?

17   A.  I don't know why I would fund her GoFundMe account.  If I

18   was going to -- at the time, if I was going to give her money,

19   I would have wired it, is what my -- I don't actually do the

20   wiring.  I have somebody who does that, and I -- they ask for

21   approval.  The buck stops with me.  I'm the one who gave

22   approval for these things.

23   Q.  So let me ask the question again.

24           If you don't know, who does know whether there's been

25   money that's provided to her GoFundMe account on your behalf?

MARK GERAGOS - DIRECT EXAMINATION

1   A.  I don't think there would be anybody else that would know.

2   Q.  Have you procured any -- or requested anybody else to

3   provide financial assistance to Ms. Sweet?

4   A.  Not that I can think of, as I'm sitting here.

5   Q.  Does -- does that mean, you know, the deposition question,

6   that there might be and you just can't remember right now,

7   or...

8   A.  I -- I --

9   Q.  Do you understand my question?

10  A.  I really don't.

11  Q.  Okay.  Let me ask it again.

12          Have you requested anybody else, other than yourself,

13  to fund Ms. Sweet via her GoFundMe account?

14  A.  My only hesitation is if somebody -- if I would have said

15  she has a GoFundMe account, if somebody asked about it.

16  Q.  So you don't know; is that what you're saying?  You don't

17  know?

18  A.  Well, you asked me if I funded it.  I don't have any memory

19  of funding her GoFundMe account.

20  Q.  So let me clarify.

21          I did ask you if you funded it; and then I asked you

22  if you had requested anybody else to fund her GoFundMe account.

23  A.  And I'm trying to give you a completely transparent answer

24  that somewhere along the line in the last five years, if she

25  had a GoFundMe account and I repeated the GoFundMe account,

1   whatever the location for it, that I suppose that could have

2   happened.

3   Q.  Okay.  Do -- well, okay.

4           Have you ever funded or provided any financing to

5   Ms. Sweet's mother, Marcy Sweet?

6   A.  Well -- no.

7   Q.  Okay.  Are you now familiar with ER 1.8 of the Arizona

8   rules of professional responsibility?

9   A.  I believe so.

10  Q.  Okay.  Tell me what you think it means, now that you've --

11  familiar with it.

12  A.  I believe that the rule says that you cannot loan clients

13  money, although there are exceptions.  You can gift clients

14  money in a certain limited circumstances that have to do with

15  situations.  The one ethical opinion I'm thinking about is

16  medical expenses, and I read an opinion that the -- where the

17  lawyer -- with "donative," I think was the term, intent had

18  given money to a client who had a -- what appeared to be a

19  severe medical situation.  And as long as it was given with, I

20  think the term they used is "donative" or "humanitarian

21  intent," that that was ruled to be acceptable.

22  Q.  So just to be clear, you're accepting responsibility.

23  You're -- you're admitting that you violated Arizona's rules of

24  professional responsibility in this instance.

25  A.  I'm admitting that I loaned money and I've forgiven the

1   money, and -- because I have -- they were given with the

2   humanitarian intent to begin with, and they were forgiven with

3   the humanitarian intent.  She was a widow with two young

4   children who could not -- whose sole bread winner was killed,

5   and I wasn't going to let her live on the street.

6   Q.  Understood.  I think that's beautiful.

7        Did you do anything to determine what her expenses

8   were when she was living in Texas?  For example, were you aware

9   of the fact that her rent was less than a thousand dollars a

10  month and she was collecting Social Security of just under

11  $4,000?

12  A.  I can't --

13       MR. RICHARDS:  Your Honor --

14       THE WITNESS:  -- answer these questions --

15       MR. RICHARDS:  Your Honor --

16       THE WITNESS:  -- this has gone into --

17       MR. RICHARDS:  Mark, before you answer --

18       THE WITNESS:  -- attorney-client --

19       MR. RICHARDS:  -- Your Honor, I'm sorry.  I have an

20  objection.

21       The Court's questions were very specific.  They were

22  about: had the monies all been forgiven; is there certainty to

23  that; what is the intent of the firm, can you obtain

24  confirmation of all of your concerns had been met.  What

25  Mr. Geragos did five years ago with respect to looking at what

MARK GERAGOS - DIRECT EXAMINATION

```
 1    her rent charges were or mortgage charges were, is completely
 2    irrelevant to all those things.  And --
 3              THE COURT:  Thank you.
 4              So anything -- any knowledge that you had prior to
 5    becoming Ms. Sweet's attorney, you need to answer.
 6              MR. BELANGER:  Prior to?
 7              THE COURT:  Yes, I said "prior to."
 8              MR. BELANGER:  Okay.  Then I'll move on, Your Honor.
 9    BY MR. BELANGER:
10    Q.  ER 1.8 also includes a requirement that you provide your
11    client with independent counsel regarding a debtor-creditor
12    relationship that's created between a lawyer and a client.
13              Did you provide Ms. Sweet with that opportunity?
14              MR. RICHARDS:  Your Honor, now we're -- I object, Your
15    Honor.  We're now getting into attorney-client privileged
16    information.  I don't believe that's also relevant to the
17    questions that you specifically asked us to be here for today,
18    and I do have to draw the line at that.
19              MR. BELANGER:  Well, if I may, Your Honor, you've
20    indicated that you are the final decision maker regarding
21    ethical violations because of the pro hac vice status of this
22    case.  It seems to me like information like that would want to
23    be known by the person that's going to decide the ethical
24    propriety of lawyers in front of them in terms of what they
25    did.  I think if --
```

```
 1              THE COURT:  Fine.
 2              Mr. Geragos, are you aware of anybody that was -- are
 3    you aware of any attorney that advised your client about
 4    entering into a debtor-creditor relationship with you?
 5              THE WITNESS:  I don't know that I can answer that
 6    without attorney-client -- without revealing attorney-client.
 7              THE COURT:  Well, I'm -- okay.  So I'm going to ask
 8    you:  Are you aware of anybody, other than yourself or your law
 9    firm, that advised your client about entering into a
10    debtor-creditor relationship with you or your law firm?
11              THE WITNESS:  I believe so.
12              THE COURT:  And who would that be?
13              THE WITNESS:  I believe her mother.
14              THE COURT:  Are you aware of any attorney?
15              THE WITNESS:  I don't know that I can answer that
16    without --
17              THE COURT:  Without -- I'm talking --
18              THE WITNESS:  Right.  I don't think I can answer that
19    without revealing attorney-client.
20              THE COURT:  Okay.  Does that answer your questions?
21              MR. BELANGER:  No, and I don't believe that's an
22    attorney-client privileged communication when you're
23    specifically obligated in a fee agreement to -- to provide your
24    client in writing with advice that she's supposed to be able to
25    obtain independent counsel.
```

1          THE COURT:  I get your point.

2          MR. BELANGER:  Okay.

3          THE COURT:  We got where we're getting.  Move on.

4          MR. BELANGER:  I'm sorry, Judge?

5          THE COURT:  So what are you doing?  Are you saying

6     that I need to assert that there's no attorney-client

7     relationship there?

8          MR. BELANGER:  No.  Your Honor, I think that there is

9     no attorney-client relationship in a fee agreement in regarding

10    whether or not somebody has instructed their client to get an

11    independent counsel.  That's -- that's not the -- that's --

12    I -- I don't believe that's privileged communication.  If you

13    disagree, then I'll move on.

14         THE COURT:  Do you have any authority to suggest it's

15    not?

16         MR. BELANGER:  Just the ERs, Your Honor.  Just the ERs

17    that says --

18         THE COURT:  Why don't you move on, and I'll consider

19    it.

20         MR. BELANGER:  Okay.

21    BY MR. BELANGER:

22    Q.  I don't believe this is in the promissory notes, Judge, but

23    there was a Texas transaction involving a house that Ms. Sweet

24    was attempting to buy and that Mr. Geragos guaranteed the

25    payment of.  That transaction fell through.  There was a

MARK GERAGOS - DIRECT EXAMINATION

1    resolution of that the transaction for -- I believe that

2    Mr. Geragos paid for the settlement, and I would ask the same

3    kinds of questions:  Was your client aware of the fact under

4    ER 1.8 that in a situation like that, she was entitled to be

5    advised by her lawyers that she have had a right to obtain

6    independent counsel?

7            And I would also say, Your Honor -- and again this is

8    whether or not you're going to give me leeway to go into

9    this -- at the time Ms. Sweet has testified in a deposition

10   that she was not really able to make decisions when this Texas

11   transaction went down because she was institutionalized for, I

12   believe, at least four days.

13           So my questions would be similarly:  Mr. Geragos,

14   separate and apart from the promissory notes, did you provide

15   any financial benefit to Ms. Sweet regarding the resolution of

16   a failed home purchase in Texas?

17   A.  Yes, I did.

18   Q.  How --

19   A.  And she was -- I don't remember the amount, but when you

20   mentioned she was institutionalized, she was in a -- and she

21   testified to it -- she was in a suicidal state.  I did not want

22   her to commit suicide.  Yes.

23           I was doing anything possible to keep her alive

24   because she was the sole remaining parent for two beautiful

25   little girls.

1    Q.  And you are familiar -- are you also familiar with the

2    testimony that she said she was -- an incredible amount of

3    stress was imposed upon her because of the debtor-creditor

4    relationship she had entered into with her lawyers?

5    A.  No.  She didn't say that.

6            MR. BELANGER:  I only have a couple more questions,

7    Judge --

8            THE COURT:  All right.

9            MR. BELANGER:  -- so you understand that.

10   BY MR. BELANGER:

11   Q.  Did you help draft the settlement agreement in the Texas

12   matter on behalf of Ms. Sweet?

13   A.  I don't remember.

14   Q.  Okay.  If you were asked to disclose those documents in

15   discovery, do you have any idea if you ever responded to that

16   request for disclosure?

17   A.  I don't know, as I sit here.

18   Q.  Did you review the requests for disclosure that are made in

19   this case?

20   A.  I have.

21   Q.  And this rings no bells to you?

22   A.  None.

23   Q.  Do you have a copy of the executed settlement agreement?

24   A.  I don't believe I do.

25   Q.  Who does?

1    A.  I would assume the lawyer who was handling it locally.

2    Q.  Okay.

3    A.  I don't know that for a fact.  I'm just speculating.  I

4    suppose I shouldn't.

5    Q.  And I'm assuming that, again, you did not follow the ER 1.8

6    questions with your client regarding advising her that she has

7    a right to independent counsel on financial debtor-creditor

8    transactions with her lawyer; is that fair?

9            MR. RICHARDS:  Your Honor, the same objections.

10           THE COURT:  That's fine.  That's fine.  Move along,

11   please.

12           MR. BELANGER:  Okay.

13           Couple of questions regarding the publicity, Judge.

14   And then I'll --

15           THE COURT:  No.

16           MR. BELANGER:  Well --

17           THE COURT:  No.

18           MR. BELANGER:  Okay.

19           Well, I'd like to be heard on that, Judge, just to

20   make an offer.  And then I'll sit down.

21           I believe that Mr. Geragos has -- Geragos,

22   asparagus -- has a financial interest in the podcasts and has

23   the ability to limit the dissemination of that.  And so --

24           THE COURT:  Okay.  At some point that may become

25   relevant to me.  I'm not going to prohibit you from raising it.

```
 1              MR. BELANGER:  All right.

 2              THE COURT:  But when we don't have a trial date set

 3    for the reasons I've set forth, I just don't think it's

 4    compelling right at the moment.

 5              MR. BELANGER:  Okay.  Let me -- one question,

 6    Mr. Geragos, and then I'll be done -- Mr. Geragos -- I'll

 7    remember that -- asparagus -- at some point.

 8              I actually like asparagus.

 9    BY MR. BELANGER:

10    Q.  Would Mr. Meiselas have any greater information on the

11    questions that I've asked you, or are you the person that's

12    responsible for this?

13    A.  Mr. Meiselas would not have greater information.  In fact,

14    he'd have a fraction of my information.

15              MR. BELANGER:  No further questions, Judge.

16              THE COURT:  I have a few, Mr. Geragos, before I let

17    Mr. Richards.

18              It's my understanding that you are prepared to avow --

19    and I'm not saying this will resolve the issue, just so you

20    know -- but it's my understanding that you, Mr. Meiselas, and

21    both of you on behalf of your law firm, are prepared to avow to

22    this Court that in no way will you accept any reimbursement

23    from Ms. Sweet for any of the amounts that you've proffered

24    her, any of the services you provided her, or will provide her,

25    or have provided her in connection with this lawsuit, including
```

1    your legal fees.  Is that a correct understanding?

2    A.  I don't believe so.  I thought I said all costs and

3    expenses.  If you're asking if I'm doing the rest of the case

4    pro bono, I have not gone that far.

5              THE COURT:  Okay.  That was my understanding, so I'm

6    glad you clarified it.

7              So Mr. -- well, Mr. Belanger has asked you about

8    amounts you proffered in exchange to resolve this Texas housing

9    situation.

10             THE WITNESS:  Correct.

11             THE COURT:  We know about amounts that you've paid for

12   rent, we know about amounts that you've paid for

13   transportation.  All amounts that you have proffered to

14   Ms. Sweet, you or your law firm will accept no reimbursement at

15   all from Ms. Sweet for those amounts.

16             THE WITNESS:  None whatsoever.

17             THE COURT:  All right.

18             THE WITNESS:  And furthermore, there's going to be no

19   adjustment upwards by fees or anything else to try to

20   circumvent that.  There's no reason for us to do that.

21             THE COURT:  There will be no circumvention through

22   third parties through fee adjustment, through any other method.

23             THE WITNESS:  No other third parties, no other --

24   anybody else.  This was done so that she would not go the route

25   of litigation funding.  I have a -- litigation funding -- I

1    don't know how familiar the Court is with it -- but I've had

2    clients who have gotten on the hook for litigation funding for

3    $2,500, and by the time the case ended, they were on the hook

4    for 40,000 out of that 2500.  I did not want that to happen

5    with her.  I did not want her to go down that road.

6              THE COURT:  Okay.  Let me ask you one other question.

7              Have -- who has it been that has advanced these funds;

8    has it been you personally?

9              THE WITNESS:  No, it's been the firm.

10             THE COURT:  Has the firm adjusted its income tax

11   returns to reflect the gifts that it has made --

12             THE WITNESS:  It's going to, but we haven't filed the

13   2020 yet.  The 2020 is on extension.

14             THE COURT:  All right.

15             THE WITNESS:  And then that was also -- I also -- and

16   it's part of the public record.  They also asked her about her

17   gift tax returns and things of that nature, so I have to deal

18   with that as well for her.

19             THE COURT:  Okay.

20             Mr. Richards, any questions?

21             MR. RICHARDS:  No, Your Honor.  I don't have any

22   questions.

23             THE COURT:  All right.

24             You may step down.  Thank you, Mr. Geragos.

25             MS. WIENEKE:  Your Honor, may I be permitted to

42

```
 1    question?
 2              THE COURT:  How many questions do you have?
 3              MS. WIENEKE:  I just have some follow-up questions,
 4    Your Honor.
 5              THE COURT:  How many?
 6              MS. WIENEKE:  I did not count, but could I have 10
 7    minutes?
 8              THE COURT:  I don't know.  I'll let you -- I'll let
 9    you use them.  If I think you're being duplicative, I'll let
10    you know.
11              MS. WIENEKE:  Thank you, Your Honor.
12              THE COURT:  Go ahead, Ms. Wieneke.
13              MS. WIENEKE:  May I do it from here, Your Honor?
14              THE COURT:  You may.
15              MS. WIENEKE:  Thank you, sir.
16                         CROSS-EXAMINATION
17    BY MS. WIENEKE:
18    Q.  Mr. Ger -- now you've got me confused.
19              Geragos; correct?
20    A.  "Geragos."
21    Q.  Geragos, I apologize.
22              Mr. Geragos, you just mentioned that there was going
23    to be an internal adjustment to your 2020 tax return in light
24    of the fact that these payments started in 2017.
25              Will you be adjusting your tax return for 2017?
```

1    A.  No, I did -- the judge asked if we're going to make an

2    internal adjustment, and I said we haven't filed yet because

3    we're on extension and I will deal with it.

4    Q.  I apologize, sir.

5          My question was, are you going to adjust your 2017 tax

6    return in light of the fact that these loan payments have now

7    been converted to gifts?

8          MR. RICHARDS:  Your Honor, I don't know why we're

9    going into adjustment of tax returns.  It doesn't seem to be

10   germane to the questions the Court asked.

11         THE COURT:  Sustained.

12   BY MS. WIENEKE:

13   Q.  Mr. Geragos, referring to the promissory notes that started

14   in February of 2017 and ended in January -- on January 30th,

15   2020, the promissory note in the third paragraph says, quote:

16   This note may not be changed or terminated orally, but only an

17   agreement in writing signed by the party against whom

18   enforcement of any change, modification, termination, waiver,

19   or discharge is sought, close quote.

20         Has there been any written modification of any of the

21   promissory notes that your firm has with Ms. Sweet?

22   A.  I filed a declaration under penalty of perjury in this

23   case, my client filed a declaration of penalty -- under penalty

24   of perjury of this case, and that is -- and we also said that

25   we would amend the retainer agreement as well to make sure that

1   there would be no reimbursement of any costs or expense, either

2   retroactively or prospectively.

3           I'm under oath right now, and I'm stating the same

4   thing.

5   Q.  So to be clear, the promissory notes themselves have not

6   been amended in writing.  You are relying on the declaration;

7   correct?

8   A.  I've not formally reneged -- re -- I guess I have not

9   formally done what you've just asked, correct.

10  Q.  The declarations that were submitted last night to the

11  Court, did you write them?

12  A.  I had input.

13          THE COURT REPORTER:  I'm sorry?

14          THE WITNESS:  I had input.

15          MR. RICHARDS:  Your Honor, again, why this is

16  relevant?  We're also about to get into some attorney-client

17  privilege issues --

18          THE COURT:  I'm going to sustain it to the extent it

19  requests attorney-client.

20          MS. WIENEKE:  Okay.

21  BY MS. WIENEKE:

22  Q.  In paragraph 6 of the declaration, you declare under oath

23  that you and your firm and Mr. Meiselas have extended travel

24  costs, hotel costs, to Ms. Sweet and the minor children, and

25  those were gifts.

```
 1            Correct?
 2   A.   Correct.
 3   Q.   According to our records, the last disclosure regarding
 4   these types of costs were made with reference to expenses in
 5   2019.
 6            Just to be clear, have travel costs and hotel costs
 7   and the like been provided by you and your firm since 2019 to
 8   Ms. Sweet and her children?
 9   A.   Yes, I believe as recently as when we went to the
10   mediation.
11   Q.   And did you provide your private jet for transportation to
12   Ms. --
13   A.   I -- I picked her up and I stayed at the hotel with her,
14   and I got a room for her and the girls.
15   Q.   And I beg your pardon, sir, I wasn't finished.
16            Did you --
17   A.   Sorry.
18   Q.   Did you provide your private jet to transport Ms. Sweet to
19   the location of the mediation in Flagstaff?
20   A.   Yes.  I traveled from another court appearance, I stopped
21   there, I picked her up, and I took her to Flagstaff.
22   Q.   With respect to the -- the material in your declaration,
23   did you provide the assurances that you reference in that
24   declaration to Ms. Sweet prior to the date of the mediation
25   that was held in Flagstaff?
```

1   A.  I don't know that I can answer that without invading

2   attorney-client privilege.  I can tell you that I -- I can tell

3   you as a general matter I have told her that for over -- since

4   February of 2020, I mean -- and she's stated that in the

5   declaration.

6           MS. WIENEKE:  Just to be clear, I'm asking, Your

7   Honor, about the date that the communication was had and

8   whether it was prior to and is the subject matter of the

9   declaration.

10          THE WITNESS:  Correct.

11          THE COURT:  I think I understand your question, but

12  I'm going to check Ms. Sweet's declaration.  I think I have it

13  right here.

14                  (Pause in proceedings.)

15          THE COURT:  Go ahead and restate your question.

16          MS. WIENEKE:  Yes, sir.

17  BY MS. WIENEKE:

18  Q.  So did you have these direct communications with Ms. Sweet

19  that you refer to in your declaration prior to the date of the

20  mediation?

21  A.  Correct.

22          MS. WIENEKE:  Your Honor, in defendants' joint notice

23  of California counsel's improper conduct, document 549, there

24  were numerous exhibits attached to that filing, and I just want

25  to follow up on a reference that Mr. Belanger made.

```
 1    BY MS. WIENEKE:
 2    Q.  This is plaintiff Sweet 024860, and Mr. Geragos this refers
 3    to the question that Mr. Belanger asked you about whether
 4    Ms. Sweet was under some stress relating to the Texas
 5    transaction regarding the house.
 6              Do you recall that question?
 7    A.  I do.
 8    Q.  And I want to refer you to an email that --
 9              MR. RICHARDS:  Do you have a copy, Counsel?
10              MS. WIENEKE:  It's -- I'm happy to share with you,
11    Mr. Richards.
12              Can you actually provide that to him?
13              THE COURT:  By the way, while we're -- is there any
14    reason to believe Mr. Meiselas is going to be called?
15              MS. WIENEKE:  In light of the time limitations, I
16    think we can probably ask him back in, Your Honor.
17              MR. BELANGER:  No, Your Honor.  We're not going to
18    call him.
19              THE COURT:  Please, if you care to, invite
20    Mr. Meiselas back in.
21              MS. WIENEKE:  We have a copy for Mr. Richards.  We're
22    happy to share that with him so he can read along.
23              THE COURT:  Okay.
24              MS. WIENEKE:  Would the Court -- with the Court's
25    permission and Mr. Richard's permission, if I could have him
```

1   read over my shoulder.  We've been in deposition together so

2   we've been --

3          THE COURT:  That's fine.  If he doesn't object, I

4   don't.

5          MS. WIENEKE:  Let me know when I can read.

6   BY MS. WIENEKE:

7   Q.  All right.  Mr. Geragos, I'm reading from an email sent by

8   Ms. Sweet to you on March 17th, 2017.

9          Quote:  This is stressing me out.  Can you please

10  explain why?  I just need to know that everything is going to

11  work out because I have my house packed up and my kids are

12  expecting to move soon.  My stress level is at 150 percent

13  today, and I can't take much more.  Close quote.

14         Thank you.  Laney Sweet.

15         Do you recall getting that email?

16  A.  I don't recall as I'm sitting here, but if you're reading

17  from an email and it says Mark Geragos dot com, I'm not going

18  to dispute it.

19  Q.  And then also in --

20  A.  I would point out -- I would point out, since you have that

21  email, her stress level was because of the transaction.  I do

22  remember that she was incredibly stressed, I remember that she

23  had to be institutionalized, and I was worried about whether or

24  not she was going to survive.

25  Q.  Mr. Belanger also asked you about a settlement agreement.

1   You recall that the transaction for the purchase agreement fell

2   through?

3   A.  I -- now that you have mentioned it, yes.

4   Q.  It was Ms. Sweet's name on the purchase agreement; correct?

5   A.  I don't remember, as I sit here.

6          MR. RICHARDS:  Your Honor, again, are we getting to

7   anything involving the Court's questions, or are we just going

8   to rehash details of the transaction that I believe they put

9   you on notice of with their filings?

10          THE COURT:  Where are we going with this?

11          MS. WIENEKE:  Your Honor, I just want to point out

12   that according to the email, Mr. Geragos's office prepared the

13   settlement agreement, paid for the settlement.  That settlement

14   agreement has been requested in this case and has never been

15   produced.

16          THE COURT:  Okay.  I'm not sure that you're not

17   entitled to the settlement agreement, but it's not really what

18   I'm focusing on here.

19          If you have a copy of the settlement agreement,

20   Mr. Geragos, do you have any objection to providing it?

21          THE WITNESS:  No, none whatsoever.

22          THE COURT:  All right.

23          MS. WIENEKE:  And then one more area, Your Honor.

24   BY MS. WIENEKE:

25   Q.  In 2017, in April, do you recall Ms. Sweet asking you for a

1    loan for payment for $15,000 worth of furniture to provide

2    furnishing for her new home?

3    A.  I do.

4    Q.  And -- and you gave her the funds for that with the

5    expectation that she would pay you back?

6    A.  I gave it because she was moving and I wanted her to have

7    furniture for her and the girls, yes.

8    Q.  And that was with the expectation that she would pay you

9    back; correct?

10   A.  Well, I was -- it's not like I was making interest or

11   anything.  I just wanted to help her out.  I, at that time, did

12   it for -- with the intent of helping her out.  I have waived

13   that.  I'm not -- I don't want it, I don't need it, and I have

14   no expectation or hope to ever get it back.  I don't care.  I

15   just cared about her and the girls, like I still do as I sit

16   here today.

17   Q.  One of the promissory notes that's part of the exhibit in

18   this case is for $15,000, the one dated April 6, 2017.

19   Correct?

20   A.  Correct.  Under California law, you have to do that.

21   That's why there were promissory notes.  Otherwise, I would

22   have just given her the money and been done with it, and it

23   would -- and never expected anything back.

24          MS. WIENEKE:  If I may, Your Honor, one last question.

25          You attended -- or one series of questions.

1    BY MS. WIENEKE:

2    Q.  You attended the deposition of Ms. Sweet taken in July of

3    2021; correct?

4    A.  Yes.  Here.

5    Q.  And you became aware that defendants at that -- on that

6    date became aware that Ms. Laney Sweet participated in a

7    podcast a couple of months prior?

8            MR. RICHARDS:  Your Honor, now we're getting into the

9    extrajudicial statements again --

10           THE COURT:  Yes.

11           MR. RICHARDS:  -- that you've already indicated are

12   not appropriate here.

13           MS. WIENEKE:  Your Honor, this goes to this exact

14   issue.  In that podcast, Ms. Sweet publicly stated that because

15   the City of Mesa terminated her financial loans, that this was

16   part of her financial stress and contributed to her damages.

17   And the plaintiffs in this case have indicated that Mesa's

18   litigation tactics have contributed to her stress and will be

19   made a part of this case.

20           We believe that is relevant to this inquiry.  This was

21   a statement made in May of 2021.

22           THE COURT:  Okay.  As it pertains to the ethical rule

23   that I'm principally focusing on -- and I'm not saying I won't

24   take a look at the subsidiary one raised by Mr. Belanger -- but

25   as it relates to the ethical rule, how does it apply?

1          MS. WIENEKE:  Your Honor, Ms. Sweet just presented a

2     declaration to Your Honor saying she clearly understood that

3     this was a loan --

4          THE COURT:  Well, you may choose to cross-examine her

5     at trial, but it doesn't seem to me that it's related here so

6     much.  I get your point, but it doesn't seem to me to be

7     related to this hearing.

8          MS. WIENEKE:  Well, if I may, Your Honor, it goes to

9     the adequacy of Mr. Geragos's explanation to his client, how

10    well she understood what was going on.

11         THE COURT:  All right.  So why don't you read it to

12    me.

13         MS. WIENEKE:  Yes, sir.

14         This is from the Blue Union podcast that occurred in

15    May 2021, starting at line 76, page 13:

16         Ms. Sweet:  Yeah, if I could just add a few more

17    things.  Because of my deposition this last year with the Mesa

18    Police Department, because I'm actually truthful in this case,

19    they found out I was borrowing money from my attorney to

20    survive and to stay afloat and to hold them accountable.  They

21    had that taken away from me.  They're actually trying to have

22    my attorney's license revoked because of that, because they

23    said it was an ethical violation.  So we have been put in a

24    financial position where we are really having a hard time.  We

25    are losing our house in less than a month.  I don't have a

MARK GERAGOS - CROSS-EXAMINATION

1    working vehicle, I don't have a car right now.  I haven't had

2    one since February.  So if you guys could go -- anybody who

3    feels inclined to, either donate or even just share our

4    GoFundMe, it's GoFundMe dot com, slash, relentless justice, and

5    also followed me on Facebook on Justice for Daniel.

6              THE COURT:  All right.  So what questions do you want

7    to ask that's relative to the -- or relevant to the ethical --

8    potential ethical violation?

9    BY MS. WIENEKE:

10   Q.  Mr. Geragos, were you aware that Ms. Sweet was

11   participating in the -- and let me correct the record.  It

12   wasn't the Blue Union podcast, it was called Unregistered

13   Podcast.

14             With that correction, Mr. Geragos, were you aware that

15   Ms. Sweet participated in the unregistered podcast in or around

16   May of 2021?

17             MR. RICHARDS:  Objection.  Relevance again, Your

18   Honor.

19             THE COURT:  You know, I think this is going pretty far

20   afield, but I'll allow it to be answered.

21             THE WITNESS:  I don't think so.

22   BY MS. WIENEKE:

23   Q.  When was the first time you became aware of Ms. Sweet's

24   participation in that podcast?

25   A.  I think when you played the tape at the depo.

1    Q.   Okay.

2              MS. WIENEKE:   Thank you for the indulgence, Your

3    Honor.

4              THE COURT:   Mr. Richards?

5              MR. RICHARDS:   Your Honor, I don't have any follow-up

6    questions.

7              I have two points, though, wrapping all this up.

8              THE COURT:   Can I let Mr. Geragos off the stand?

9              MR. RICHARDS:   Yes, you may.

10             THE WITNESS:   Thank you.

11             THE COURT:   Thank you.

12             All right.   So Mr. Belanger, do you want to be heard?

13   It's your motion.   You need -- you do need to make it quick.

14   I'm sorry.

15             MR. BELANGER:   Yeah.   No, Judge, that's fine.

16             The only thing I would ask is that because we've

17   raised issues that -- we're still under seal, we cannot make a

18   referral to the Bar -- but there are two items that we've

19   raised:   I would like for the Geragos law firm to preserve any

20   correspondence or documents related to the Laney Sweet loan

21   expenses and loans, and -- and things like that.   And also in

22   the matter involving -- that I mentioned earlier involving the

23   Morris Brothers, Eric Hill, I think they should preserve those

24   files as well.

25             THE COURT:   All right.   Mr. Richards?

1          MR. RICHARDS:  Yeah.

2          THE COURT:  Did you want to be heard, Ms. Wieneke?

3          MS. WIENEKE:  Your Honor, I just would add that

4     because of the Court's ruling on the attorney-client privilege,

5     we don't believe the name of the attorney is privileged, so we

6     would ask that -- that plaintiffs disclose the name of the

7     attorney consultant.

8          THE COURT:  You may have misheard, but I didn't hear

9     that there was any -- oh, you mean within Mr. Geragos's office?

10    I don't believe there was any such attorney identified.

11         MS. WIENEKE:  Okay.

12         Thank you, Your Honor.

13         THE COURT:  Mr. Richards?

14         MR. RICHARDS:  Yes.  Very quickly.

15         Number one, Judge, just a clarification.  I want to

16    make sure it's clear to the Court.  Eric Hill -- by the way,

17    the name doesn't sound quite right, but I know the case he's

18    referring to.  We did serve his local counsel on that case with

19    Mr. Geragos, just so you know.  Not aware of -- well, I'm not

20    going to get into anything about loans or anything there.

21         But, Your Honor, I want to address two things:  Number

22    one, we've provided you the avowals.  I believe you've now had

23    a chance to examine Mr. Geragos -- Geragos -- apologize -- and

24    determine whether or not he's credible on those things.  And

25    certainly I would offer that I'm sure he's available to make

1    whatever other avowals you would like to address, specifically

2    all those issues that you -- you're concerned about.  We

3    believe they have been addressed now.

4         And, Your Honor, I do want to make one point clear

5    though, and it's a point of concern to me, and I'm going to

6    admit that this is a point of concern to me because of some of

7    the -- I'm just going to call them the tactics that have been

8    used here.  But I heard for the first time today the suggestion

9    that somehow my firm, that my rights, my firm's rights to

10   recover expenses under our engagement agreement with Ms. Sweet

11   should somehow be ordered denied by the Court now, that there

12   was a suggestion that somehow I was involved in these payments

13   to Ms. Sweet, or my firm was involved, or someone from our firm

14   was involved in that.  And Your Honor, that's absolutely not

15   true.  We -- these are relationships between Mr. Geragos and

16   his firm and the client.

17        We have incurred expenses, litigation-related expenses

18   specifically, Judge, the kind that are specifically covered by

19   Rule 1.8, and there shoved be nothing wrong with us recovering

20   those expense as appropriate at the appropriate time.  And you

21   have every right to look at that as part of any settlement or

22   any other recovery that you have to approve.  And we'll provide

23   you invoices and details and all of those things to affirm that

24   those are our expenses, they were incurred by us, they were

25   paid by us.  They're not in any way somehow trying to

1   manipulate things to get things back to Mr. Geragos, he's not
2   sending us his invoices and we're putting them in our books.
3   There's none of that going on.  And frankly, Your Honor, the
4   suggestion otherwise is -- is insulting to me.
5           But I -- I don't -- I probably didn't need to make
6   that personal point, Judge.
7           But Mr. Geragos has made it clear that his firm will
8   not be recovering any litigation-related expenses or other
9   expenses, the ones that are the subject of this hearing, from
10  Ms. Sweet, that they will not manipulate anything to obtain
11  those, and they will not accept them even if they were offered
12  voluntarily.
13          I think that ends that issue.
14          Your Honor, if I could make one other point, that --
15  just a housekeeping matter.
16          Last time we were with you -- it can't remember if it
17  was Zoom or telephonic or in person, but you made a point about
18  your priority for this case, because it's been dragging on for
19  so long, about this case moving, and you set very explicit
20  deadlines, and we very much appreciate that.
21          We've now finished the discovery phase.  We now have
22  our final limited additional supplemental summary judgment
23  filings due the end of this month, limited only to the new
24  information that's been discovered since the Court's orders on
25  that.  And that will end -- it should end the filings by the

1     parties.

2          Now, Your Honor, I don't want to impose on you any

3     deadlines specifically for resolving all those outstanding

4     issues, but the point being I think we're very near the end.   I

5     think you've accomplished a lot of your objective.   And that a

6     number of these issue, whether they're pretrial publicity,

7     extrajudicial statements, these issues, they're all addressed

8     in part by making sure that we get a trial date, if you keep

9     the case alive, that we get a trial date as soon as possible.

10    And I think that's in the Court's control.   And certainly I

11    just want you to know from the plaintiff's perspective, we

12    would appreciate that, and we do think that that would help

13    everybody involved, including the Court, in avoiding many of

14    those issues and allowing them to all percolate into some other

15    form.

16          That's all I have.

17          THE COURT:  So do you want me to set a trial date now?

18          MR. RICHARDS:  Judge, I'd love a trial date now.

19          THE COURT:  How long is it going to take you to try

20    your case?

21          MR. RICHARDS:  Your Honor, I think this is about a

22    three-week trial.

23          THE COURT:  How long is it going to take you to try

24    your case?

25          MR. RICHARDS:  Our case, Your Honor, I think would be

```
 1    about -- would probably be a little over a week-and-a-half, two
 2    weeks.
 3              THE COURT:  How many days?
 4              MR. RICHARDS:  Oh.  Great question.  Judge, I
 5    apologize.  In terms of -- if you only have four trial days per
 6    week, it probably bleeds over into a fourth week then.
 7              THE COURT:  How many days?
 8              MR. RICHARDS:  Fifteen --
 9              THE COURT:  How many days?
10              MR. RICHARDS:  Fifteen, Judge.
11              THE COURT:  How many days for defense counsel?
12              MR. GERAGOS:  May I approach cocounsel, Your Honor?
13              MR. RICHARDS:  Oh.
14              THE COURT:  Yes.
15              MS. WIENEKE:  Is it to us, Your Honor?
16              THE COURT:  Yes.
17              MS. WIENEKE:  I hate to say "it depends," Your Honor,
18    but I don't know if plaintiff is going to call all our
19    witnesses in their case.  That will depend.  Otherwise, we've
20    got dispositive motions.  I'm going to advise the Court we are
21    likely going to file a motion to bifurcate, a couple motions to
22    bifurcate.
23              THE COURT:  What would the motions -- what would the
24    motions to bifurcate be; bifurcate what from what?
25              MS. WIENEKE:  Well, one will be on Monell, and one
```

| | |
|---|---|
| 1 | will be on the issue of the common law marriage, which we |
| 2 | believe, given the new evidence we've disclosed, needs to be |
| 3 | tried separately, probably in two days. |
| 4 | And so -- but if we're going -- |
| 5 | THE COURT:  Well, I will tell you, you're not likely |
| 6 | to win on the Monell bifurcation.  I will look a little closer |
| 7 | at the common law marriage to see if there's any issues of fact |
| 8 | or whether I decide it as a matter of law.  But I'll look more |
| 9 | carefully at that. |
| 10 | I can't -- here is -- here is the honest:  I would |
| 11 | like your best estimate of days, and I'll go start looking. |
| 12 | But I really can't give you the number of days, because I never |
| 13 | give counsel the number of days they want, because they never |
| 14 | need it.  And if you think you're going to keep a jury here -- |
| 15 | I mean, as interesting as this -- and tragic -- as this case |
| 16 | is, and I think all parties would agree that it's a tragic |
| 17 | case -- as tragic as it is, you are going to lose a jury if you |
| 18 | keep them here very long.  And I also agree with the |
| 19 | implication of Ms. Wieneke that if we're going to call |
| 20 | witnesses, it is my strong inclination to call them once, and I |
| 21 | think that involves some real efficiencies to witnesses, which |
| 22 | they appreciate and the jury appreciates it as well. |
| 23 | So what I -- what I propose to do is this, |
| 24 | Mr. Richards.  I'm going to have dispositive motions; start |
| 25 | briefing at the end of the month, you said; right? |

```
 1             MR. RICHARDS:  (Nods head in the affirmative.)

 2             THE COURT:  So by mid October I ought to have all the

 3    briefing done; right?

 4             MR. RICHARDS:  Probably before then, Judge, but, yes.

 5             THE COURT:  As soon as I get it, because I -- because

 6    of my fault, as I said before, I delayed this case.  As soon as

 7    I get it, I'll move it to the top of my list.  I'll decide it.

 8    As soon as I issue the motion for summary judgment rulings, if

 9    a trial is left, I will schedule a scheduling conference and

10    we'll set trial.  But I'm going to require you then, before I

11    do that, to give me a pretrial -- to do a final pretrial

12    statement so I can see what witnesses you're really going to

13    call, what witnesses the defense is really going to call,

14    figure out what kind of time savings will be made.  But I will

15    give you that expedited deal so we can get to trial.  And as

16    you may know, we have huge back-ups right now, assuming that we

17    can resume some sort of a trial schedule, which we're hoping.

18             MR. RICHARDS:  Yeah.

19             THE COURT:  But, you know, the time doesn't look

20    great.

21             But anyway, we can do that.

22             So Ms. Wieneke, just so that we can start looking way

23    out there, assuming that there is some overlap, how many days

24    does the defense want?

25             MS. WIENEKE:  Fifteen.
```

```
 1              THE COURT:  Fifteen?

 2              MS. WIENEKE:  Yes, sir.

 3              THE COURT:  So when I look at 31 trial days, I say:

 4    Ha-ha, ha-ha, it ain't gonna happen.  And if I had to look for

 5    31 trial days, what you're asking me to do is set aside more

 6    than two whole months of actual -- this trial's calendar.

 7              So I can tell you what you're more likely to get in a

 8    reduced way is not more than 12 days, which means at most, if

 9    we push the jury really hard, about 65 hours to divide between

10    the sides.  You may convince me that I need to give you a

11    little bit more, but that's what we're really looking at.

12              MR. RICHARDS:  Appreciate that, Judge.  We'll do

13    whatever is in the Court's interests and the interests of your

14    schedule.

15              I also will tell you that we do plan to call, I

16    believe, every one of the defendants, and we also plan to call

17    several other Mesa officials, the former chief of police and

18    assistant chief.

19              THE COURT:  Well, why don't you start talking with all

20    the parties now --

21              MR. RICHARDS:  Yes.

22              THE COURT:  -- figure out the witnesses you're really

23    going to call, figure out if you really want to reserve the

24    right to call them in your case in chief and tell me why -- I

25    mean defendants -- in your case in chief if you want to call
```

1    them separately and tell me why.

2         Let's start whittling this case down.

3         Ms. Wieneke, I'm more interested, perhaps, in terms of

4    bifurcation of the common law marriage issue and sort of

5    dealing with that than I am with the Monell issue.  I'll look

6    at that.

7         MR. RICHARDS:  We'll start that conversation, Judge.

8         THE COURT:  All right.

9         MR. RICHARDS:  Great.  Thank you.

10        MS. WIENEKE:  Oh.  I was --

11        THE COURT:  So I'm going to take this -- I'm going

12   to -- I am going to consider what the evidence is today, and I

13   am going to make some sort of a ruling after I consider it.  If

14   I determine that I need any sort of supplementary evidence or

15   issues, or declaration, I'm just going to tell you,

16   Mr. Meiselas, that Mr. Geragos represented on behalf of your

17   law firm and on behalf of him individually and I assume you

18   individually and all other partners and interest holders, that

19   you will accept -- not only will you not expect, but you will

20   not accept in any method, through increasing fees, through

21   third parties, or any other way, you will not accept any

22   repayment of any of the fees or costs that your firm has

23   advanced on behalf of Laney Sweet.

24        Do you disagree with that at all?

25        MR. MEISELAS:  Confirmed.

```
 1              THE COURT:  I'm sorry, sir.  Speed loudly.

 2              MR. MEISELAS:  Confirmed.

 3              THE COURT:  All right.

 4         I do not know, as I told Mr. Geragos, that that

 5    resolves the issues.  There seems to me to still be some issues

 6    that I have to consider.  But that avowal does mean something,

 7    and it's made -- I think it was made by Mr. Geragos under oath.

 8    And even though you didn't make it under oath, you represented

 9    it to me in open court.  And if you violated that, I think you

10    would share your responsibility for it.

11         Mr. Geragos?

12              MR. GERAGOS:  I affirm that under oath, Your Honor.

13              THE COURT:  Okay.

14              MR. GERAGOS:  I was sworn earlier, so -- and I already

15    did it under the declaration, and I will represent that again

16    on behalf of myself, the firm, and Mr. Meiselas.

17              THE COURT:  Yeah.  It may be a little bit much on my

18    part, but the declaration left out one thing that I think I've

19    added, and I want to make clear.  The declaration said you

20    would expect no repayment, and I'm adding to it that you will

21    accept no repayment.

22              MR. GERAGOS:  Completely understood, Your Honor.

23              THE COURT:  All right.

24         Anything else that needs to be discussed today?

25              MR. RICHARDS:  Nothing from plaintiffs, Judge.
```

UNITED STATES DISTRICT COURT

1          MR. BELANGER:  No, Your Honor.

2          MR. O'CONNOR:  No, Your Honor.

3          MS. WIENEKE:  No, thank you, Your Honor.

4          THE COURT:  All right.  Thank you all.

5          MR. RICHARDS:  Thank you.

6               (Proceedings in recess at 2:28 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1
<u>C E R T I F I C A T E</u>

2

3        I, CHARLOTTE A. POWERS, do hereby certify that I am

4   duly appointed and qualified to act as Official Court Reporter

5   for the United States District Court for the District of

6   Arizona.

7        I FURTHER CERTIFY that the foregoing pages constitute

8   a full, true, and accurate transcript of all of that portion of

9   the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control.

12        DATED at Phoenix, Arizona, this 16th day of August,

13   2021.

14

15                        s/Charlotte A. Powers
                          _____
16                        Charlotte A. Powers, RMR, FCRR

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT