**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Laney Sweet, | No. CV-17-00152-PHX-GMS |
| Plaintiff, | **ORDER** |
| v. | |
| City of Mesa, et al., | |
| Defendants. | |

Pending before the Court are multiple Motions for Summary Judgment against Plaintiff Laney Sweet, on behalf of E.S., N.S., and the Estate of Daniel Shaver ("Plaintiff"). (Docs. 265, 271, 379.)  Defendants City of Mesa, Bryan Cochran, Christopher Doane, Brian Elmore, and Richard Gomez ("the Mesa Defendants") seek summary judgment on all remaining claims.  (Doc. 265.)  Defendant Charles Langley also seeks summary judgment on all remaining claims.  (Doc. 271.)  Defendants Philip and Corrine Brailsford also move for summary judgment on Plaintiff's Section 1983 claim.  (Doc. 379.)  Finally, Plaintiff moves to strike several arguments raised in Defendant Brailsford's reply brief. (Doc. 416.)  In a prior order, (Doc. 339,) this Court granted in part and denied in part the Mesa Defendants' and Defendant Langley's motions for summary judgment, but deferred ruling on other claims until additional discovery was taken.  With discovery having closed, the parties submitted supplemental briefing on the outstanding issues. (Docs. 376, 384, 386, 606, 636, 637, 638, 639, 640.)  For the following reasons, the Court grants in part and denies in part the motions.

**BACKGROUND**

On January 18, 2016, Daniel Shaver, a resident of Texas, was visiting Arizona and staying at a La Quinta Inn & Suites in Mesa.  Mr. Shaver worked as a pest eradication specialist and was in Arizona on business.[1]  Mr. Shaver's job required him to carry pellet rifles.

That evening, hotel employee Leticia Jimenez was approached by two hotel guests. They informed her that they could see an individual holding what they thought was a rifle with a scope "pointed out towards the window." (Doc. 297 at ¶¶ 1, 2.)  The guests identified a room on the fifth floor, which hotel staff determined was Room 502, where Mr. Shaver was staying.  Ms. Jimenez indicated that she knew that Mr. Shaver was staying in that room.  She asked Jeremy Johnson, a La Quinta employee, to call the police, and then went upstairs to investigate.   Mr. Johnson placed a 911 call at 9:13 p.m., reporting that "somebody's pointing a rifle outside one of the windows in our building." (Doc. 266-5 at 3); (Doc. 266-12 at 2.)  He also relayed some information about Mr. Shaver to the police, including his approximate age and physical features.

When Ms. Jimenez arrived at Room 502, the door was open, and she could see Mr. Shaver standing in the room with two other individuals: Monique Portillo and Luis Nunez. (Doc. 297 at ¶¶ 16, 73.)  She saw Mr. Nunez and Mr. Shaver holding a rifle.  (Doc. 266-4 at 8.)  Mr. Nunez was telling Mr. Shaver how to put a scope on the rifle.  *Id.*  Mr. Shaver walked towards Ms. Jimenez, and as he did so, closed his rifle's case with his foot.  (Doc. 297-1 at 22.)  When he came to the door, Ms. Jimenez asked Mr. Shaver whether he had enjoyed the dinner he had ordered to his room.  She later testified that Mr. Shaver appeared confused as to why she was asking him this question.  (Doc. 297 at 6–7.)  Mr. Shaver told Ms. Jimenez that everything was fine and closed the door, and she went back downstairs.

By 9:18 p.m., several Mesa Police Department ("MPD") officers arrived on the scene.  These officers included Sergeant Charles Langley; and Officers Philip Brailsford,

---

[1] At least some of the hotel staff—including Jeremy Johnson, who made the 911 call—knew Mr. Shaver and were aware of his occupation.  (Doc. 262 at 15:5–7.)

1   Christopher Doane, Richard Gomez, Brian Elmore, and Bryan Cochran.  Officer Gomez

2   spoke with Ms. Jimenez and learned that she had seen the rifle in the room.  (Doc. 297-12

3   at 47.)  He did not ask, however, about what, if anything, the individuals in the room were

4   doing with the rifle.  *Id.*

5   Sergeant Langley was the commanding officer at the scene.  Without speaking to

6   the La Quinta employees, Sergeant Langley directed the MPD team to move up to Mr.

7   Shaver's room.  Before heading upstairs, the police officers secured Mr. Shaver's vehicle

8   and established a perimeter around the hotel—depriving Mr. Shaver of any flight path.

9   Officers Brailsford, Gomez, Cochran, Doane, and Elmore were all part of the team that

10  went upstairs.  Officer Brailsford was armed with an AR-15 and tasked with providing

11  lethal coverage.  Officers Doane and Elmore both had their weapons drawn initially, but

12  Officer Doane switched to a taser when Mr. Shaver exited the room.

13  Outside Room 502, Sergeant Langley announced the presence of the MPD team and

14  ordered "the female" to step out into the hallway.  (Doc. 266-21 at 8:15–17.)  After

15  receiving no response, he repeated his instructions.   At this time, Officer Cochran

16  suggested that MPD try calling Room 502 from the front desk.  Sergeant Langley sent

17  Officers Cochran and Gomez downstairs, and instructed Officer Gomez to return with a

18  key card.  Downstairs, Officer Cochran called Room 502 and told the occupants to exit the

19  room into the hallway.  Like Sergeant Langley, he informed the occupants of Room 502

20  that the female was to exit first, followed by Mr. Shaver.  (Doc. 297 at ¶ 67.)  At 9:38 p.m.,

21  Ms. Portillo exited the room, followed by Mr. Shaver.[2]  (Doc. 266-12 at 4.)  Mr. Shaver

22  was wearing a t-shirt and loose-fitting basketball shorts.

23  Sergeant Langley shouted to both Mr. Shaver and Ms. Portillo to "lay down on the

24  ground," since "apparently we have a failure for you to comprehend simple instructions."

25  (Doc. 266-21 at 12:11–13.)  He then said, "Alright, if you make another mistake, there's a

26  very severe possibility you're both going to get shot."  (Doc. 266-21 at 12:17–19.)  When

27  Mr. Shaver attempted to speak, Sergeant Langley said "This is—shut up. I'm not here to

28

---

[2] Mr. Nunez had left the room prior to MPD's arrival.

be tactful and diplomatic with you.  You listen, you obey." (Doc. 266-21 at 12–13.) Sergeant Langley then asked Mr. Shaver to place his hands on the back of his head and interlace his fingers.  Mr. Shaver did so.  Next, Sergeant Langley instructed Mr. Shaver to cross his left foot over his right foot.  Mr. Shaver did so.  Sergeant Langley told Mr. Shaver, "If you move, we're going to consider that a threat and we are going to deal with it and you may not survive it." (Doc. 266-21 at 14:11–13.)  Sergeant Langley then instructed Ms. Portillo to kneel with her hands in the air, and to crawl towards the officers.  While Sergeant Langley issued directions to Ms. Portillo, Mr. Shaver lay on the ground with his low riding shorts exposing the bare skin between his shirt and his shorts, revealing his entire lower back and the tops of his buttocks.  There was no weapon there.  As Ms. Portillo was taken into custody, Officer Brailsford's weapon and his body camera remained focused on the prone Mr. Shaver.  Once Ms. Portillo was in custody, Officer Doane's camera also plainly reveals Mr. Shaver on the hallway floor with the top of both buttocks exposed from his low-riding shorts.  A few minutes later, after Ms. Portillo was handcuffed, Sergeant Langley instructed Mr. Shaver to rise to a kneeling position while keeping his legs crossed.  As Mr. Shaver rose, his legs uncrossed.  Sergeant Langley shouted at him not to uncross his legs.  While Mr. Shaver was re-crossing his legs. he moved his arms behind his back.[3] In response, Sergeant Langley loudly commanded Shaver to keep his hands in the air, and told him, "You do that again and we're shooting you." (Doc. 266-21 at 16:17–18.)  Then, the following exchange took place:

> Mr. Shaver: No, please do not shoot me.  I'm - -
>
> Sergeant Langley: Then listen to my instruction - -
>
> Mr. Shaver: Okay. I'm just trying to do what you - -
>
> Sergeant Langley: Don't talk, listen.  Hands straight up in the air.  Do not put your hands down for any reason.  If you think you are going to fall, you're going to fall on your face.  If your

---

[3] Officers Brailsford and Doane were equipped with body cameras and both recordings have been provided to the Court.  (Doc. 266-8 (Brailsford); Doc. 227, Ex. 6 (Doane).)  Based on the video footage, it appears that Mr. Shaver's basketball shorts rode low, affording a view of his bare lower back, including both before and after he was shot.

hands go back into the small of your back or down, we are going to shoot you.  Do you understand me?

Mr. Shaver: Yes, sir

Sergeant Langley: Crawl towards me

(Doc. 266-21 at 16–17.)  During this exchange, Mr. Shaver was sobbing.  Mr. Shaver began to crawl towards the officers on his hands and knees.  As he did so, he moved his hand towards his back waistband, which he seemed to be correcting when Sergeant Langley shouted "Don't."  At Shaver's initial movement, however, Officer Brailsford fired five shots from his AR-15 and killed Mr. Shaver at approximately 9:43 p.m.

After the incident, Officer Brailsford was terminated from the MPD, and Sergeant Langley took an early retirement.  Officers Cochran, Doane, Elmore, and Gomez remain employed by MPD.

## DISCUSSION

## I.    Legal Standard

The purpose of summary judgment is "to isolate and dispose of factually unsupported claims."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323.  Parties opposing summary judgment are required to "cit[e] to particular parts of materials in the record" establishing a genuine dispute or "show[] that

1   the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P.

2   56(c)(1).   A district court has no independent duty "to scour the record in search of a

3   genuine issue of triable fact[.]" *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).

4   **II.   Analysis**

5       **A.   Section 1983 Claims[4]**

6           **1.   Officer Brailsford's Individual Liability**

7          A plaintiff maintaining an action under 42 U.S.C. § 1983 must establish that (1) "the

8   conduct complained of was committed by a person acting under the color of state law,"

9   and (2) "this conduct deprived them of rights, privileges, or immunities secured by the

10  Constitution or laws of the United States." *Pistor v. Garcia*, 791 F.3d 1104, 1114 (9th Cir.

11  2015) (quoting *Evans v. McKay*, 869 F.2d 1341, 1347 (9th Cir. 1989)); *see also West v.

12  Atkins*, 487 U.S. 42, 48 (1988).   The parties do not dispute that Officer Brailsford was

13  acting under color of state law at all relevant times in performing his duties as an MPD

14  officer. *See West*, 487 U.S. at 50 ("[A] public employee acts under color of state law while

15  acting in his official capacity or while exercising his responsibilities pursuant to state

16  law.").   On behalf of the Shaver Estate, Plaintiff asserts that Officer Brailsford violated Mr.

17  Shaver's Fourth Amendment right to be free from unreasonable searches and seizures when

18  he shot Mr. Shaver in the hallway.   (Doc. 53 at 47.)

19         Officer Brailsford claims that he is shielded from suit on grounds of qualified

20  immunity.   "The doctrine of qualified immunity protects government officials 'from

21  liability for civil damages insofar as their conduct does not violate clearly established

22  statutory or constitutional rights of which a reasonable person would have known.'"

23  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S.

24  800, 818 (1982)).   "In determining whether an officer is entitled to qualified immunity,

25  [courts] consider (1) whether there has been a violation of a constitutional right; and

26

27        [4] In its prior Order, the Court granted qualified immunity to Officers Cochran,

28  Doane, Elmore, and Gomez, as Plaintiffs had not met their burden to show that controlling Ninth Circuit precedent had clearly established their conduct was unlawful as of January 18, 2016.   (Doc. 339 at 9.)   The Court declines to disturb its ruling on this issue.

(2) whether that right was clearly established at the time of the officer's alleged misconduct." *Lal v. California*, 746 F.3d 1112, 1116 (9th Cir. 2014).  District courts have discretion as to which prong of the qualified immunity analysis should be considered first. *See Pearson*, 555 U.S. at 236.  The Court will first determine whether, taking the facts in the light most favorable to the Plaintiff, there has been a violation of Mr. Shaver's Fourth Amendment rights, before determining if that right was clearly established on January 18, 2016.

### a.   Violation of a Constitutional Right

The Fourth Amendment safeguards the "right of the people to be secure . . . , against unreasonable . . . seizures."  U.S. Const. amend. IV.  And "there can be no question that apprehension by the use of deadly force is a seizure." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985).  Therefore, the issue is whether Officer Brailsford's seizure of Mr. Shaver was unreasonable.[5]

A Fourth Amendment reasonableness inquiry asks whether a particular seizure was objectively reasonable from the perspective of a reasonable officer on the scene. *Graham v. Connor*, 490 U.S. 386, 396–97 (1989).  "When confronted with a videotape of the events in question, the Court must 'view[] the facts in the light depicted by the videotape.'"[6] *Diaz v. Cnty. of Ventura*, 512 F. Supp. 3d 1030, 1042 (C.D. Cal. 2021) (quoting *Scott v. Harris*, 550 U.S. 372, 380–81 (2007)).  Courts must balance "'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (quoting *Garner*, 471 U.S. at 8).  The governmental interests at stake are assessed through a non-exhaustive list of factors, including (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether he is actively

---

[5] Plaintiff also argues that Brailsford is liable under a failure to intervene theory. (Doc. 400 at 14.)  But Plaintiff explicitly exempted Officer Brailsford from this theory of liability in her First Amended Complaint.  (Doc. 53 at ¶¶ 217–18.)

[6] Since Officer Brailsford was equipped with an AXON body camera on the night of the incident, the Court relies primarily on the version of events depicted in the video footage.

resisting arrest or attempting to evade arrest by flight." *Id.* The Ninth Circuit has also considered (4) "the availability of less intrusive alternatives to the force employed," (5) "whether proper warnings were given," and (6) "whether it should have been apparent to officers that the person they used force against was emotionally disturbed." *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 947 (9th Cir. 2017) (internal citations omitted). However, "the most important factor . . . is whether the suspect posed an immediate threat to the safety of the officers or others." *Estate of Lopez by and through Lopez v. Gelhaus*, 871 F.3d 998, 1005 (9th Cir. 2017), *cert. denied sub nom Gelhaus v. Estate of Lopez ex rel. Lopez*, 138 S. Ct. 2680 (2018). "When an officer uses deadly force, this factor becomes a strict requirement: the officer must have 'probable cause to believe that the suspect poses a significant threat of death or serious physical injury.'" *Isayeva*, 872 F.3d at 947 (quoting *Garner*, 471 U.S. at 3).

Turning first to the "most important factor" and viewing the facts in the light most favorable to the Plaintiff, a reasonable jury could conclude that Mr. Shaver did not pose an immediate threat to Officer Brailsford or the other officers in the hallway. *Lopez*, 871 F.3d at 1005. When Officer Brailsford shot Mr. Shaver, he knew that Mr. Shaver had emerged from a room where guests had reported seeing a rifle. That report had occurred thirty minutes earlier. In the interim, Ms. Jimenez had spoken with Mr. Shaver, and informed the officers that there was a rifle in the room. Upon his exit, Officer Brailsford saw that Mr. Shaver was not carrying such a rifle when he emerged into the hallway. Neither Officer Brailsford, nor any of the police officers, claim to have viewed a weapon or anything that looked like a weapon in Mr. Shaver's possession at that time.

Officer Brailsford argues that Mr. Shaver posed an immediate threat because he brought one or both of his hands behind his back, suggesting that he was reaching for a weapon. If a suspect is "armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat." *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013). *But see Glenn v. Washington Cnty.*, 673 F.3d 864, 872 (9th Cir. 2011) (suspect's possession of a knife an important

consideration but not dispositive).  But when viewed in the context of the totality of the circumstances, a reasonable jury could conclude that Mr. Shaver nevertheless posed no threat to the officers.  The first moment of potential noncompliance came when Mr. Shaver exited the room immediately following Ms. Portillo.  When Ms. Portillo exited, Mr. Shaver came right behind her.  In response, Sergeant Langley ordered both individuals to "lay down on the ground," told them to "shut up" because he was "not here to be tactful and diplomatic," and warned Mr. Shaver that if he moved, he would be considered a threat and that "we are going to deal with it and you may not survive it."  (Doc. 266-21 at 11–13.)  Mr. Shaver proceeded to lie prone on the ground, with the fingers of his hands interlaced on his head and his legs crossed, for the next several minutes as the officers handcuffed and processed Ms. Portillo.  During that time, Officer Brailsford's rifle and his body camera were pointed directly at Mr. Shaver.  He had a clear view of Mr. Shaver.  Mr. Shaver's shorts rode low enough to allow Officer Brailsford an unobstructed view of his rear waist area for several minutes, demonstrating only bare flesh.

When Ms. Portillo was handcuffed, Sergeant Langley ordered Mr. Shaver to rise to a kneeling position.  As he did so, he momentarily uncrossed his legs and placed his hands behind his back.  *Id.* at 16.  In response, Sergeant Langley shouted at him to keep his hands in the air and that if he did that again he would be shot.  While Mr. Shaver tried to explain why he did so, Sergeant Langley made clear that he was uninterested in hearing any explanation for Mr. Shaver's actions or in answering any clarifying questions.  *Id.* at 16 ("I didn't say this was a conversation . . . . You do that again and we're shooting you, do you understand?).  "No, please do not shoot me," Mr. Shaver responded, sobbing.  Sergeant Langley instructed Mr. Shaver to crawl towards the officers.  (Doc. 266-21 at 17).  As Mr. Shaver was crawling on his hands and knees towards the officers, he momentarily reached towards his shorts.  Officer Brailsford then shot him five times.

A reasonable jury viewing the totality of the circumstances could conclude that when Mr. Shaver reached his hand up towards his back waist area, he could not have posed such an immediate threat to the officers in the hallway that his death was the only way to

assure their safety.  Officer Brailsford had a clear view of Mr. Shaver for several minutes while he lay prone.  He could see Mr. Shaver's rear waist, and could see the bare flesh there as well as the entire top of his buttocks.  Mr. Shaver was unarmed and no bulge evidenced the presence of a pistol anywhere on his person.  He certainly did not have possession of the rifle which had been the reason the officers were called.  Additionally, at the time he was shot, Mr. Shaver was crawling on his hands and knees at Sergeant Langley's direction.  His mobility in this pose was extremely limited.  Further, he was sobbing, he had no escape route, and was crawling towards five armed officers.

Second, the severity of the crime at issue weighs in Plaintiff's favor.  The hotel guests who expressed concern informed hotel employees that they could see an individual pointing what they thought was a rifle with a scope towards the window of a hotel room.  That report was made roughly thirty minutes before the confrontation in the hallway.  Between the report and the confrontation, Ms. Jimenez reported to the officers that she saw the weapon in the room, but did not tell them any other details.  Even if this description could provide a reasonable basis to believe that a crime had been committed, thirty minutes had elapsed between its commission and when Officer Brailsford shot Mr. Shaver.  *See Nehad v. Browder*, 929 F.3d 1125, 1136 (9th Cir. 2019) (holding that when the decedent had previously committed a serious crime prior to the defendant's arrival but was "indisputably not engaged in any such conduct" at the time of the shooting, a jury could reasonably find that the severity of his crimes did not render the use of deadly force reasonable).  Since Mr. Shaver was not committing a crime at the moment of his death, this factor weighs in Plaintiff's favor.

Third, at the time of the seizure, Mr. Shaver was not actively resisting arrest or attempting to evade arrest by flight.  He was, in fact, at Sergeant Langley's direction crawling on his hands and knees towards the police.  *See Bryan v. MacPherson*, 630 F.3d 805, 830 (9th Cir. 2010) ("[W]hen we view the facts in the light most favorable to [the plaintiff], . . . his [failure to comply with an officer's order combined with his bizarre behavior] does not constitute resistance at all.").  Mr. Shaver largely complied with the

officers' directions and did not appear bellicose or otherwise unamenable to their orders. *Cf. Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005) (finding factor did little to justify use of force when plaintiff continually ignored officers' requests to remove his hands from pajamas and briefly physically resisted arrest, but was not "particularly bellicose," did not attack officers, and did not attempt to flee).

Fourth, a jury could find that the availability of less intrusive alternatives to deadly force made Officer Brailsford's use of force unreasonable. *See Nehad*, 929 F.3d at 1138. While police "need not employ the least intrusive means available," the presence of "'clear, reasonable, and less intrusive alternatives' to the force employed" militates against finding the use of deadly force reasonable. *Glenn*, 673 F.3d at 876 (quoting *Bryan*, 630 F.3d at 831). Of course, officers are not "required to attempt any of the purportedly less intrusive alternatives" to the force they ultimately employ. *Id.* at 878. "The available lesser alternatives are, however, relevant to ascertaining" the reasonableness of the officer's chosen method. *Id.* A jury could conclude Officer Brailsford had less intrusive alternatives at his immediate disposal. Officer Doane—standing close to Officer Brailsford—was equipped with a Taser, a form of non-lethal force. *Cf. Nehad*, 929 F.3d at 1138 (finding less intrusive options available when officer carried "a taser, mace, and a collapsible baton in addition to his firearm"). A jury could also find that Officer Brailsford could have refrained from discharging his weapon, since it is disputed whether Mr. Shaver posed any threat to the officers at all. Consequently, the availability of less intrusive alternatives to deadly force weighs against Officer Brailsford.

It is undisputed that Sergeant Langley warned Mr. Shaver several times that the officers were willing to use lethal force during the encounter. Therefore, this factor weighs in Officer Brailsford's favor.

Finally, while Mr. Shaver did exhibit some signs of emotional disturbance, namely crying, a jury could conclude that this factor is neutral at best. Mr. Shaver did not exhibit erratic behavior. In the moments before his death, a sobbing Mr. Shaver begged the officers not to shoot him, as he crawled towards them. But his sobbing is entirely understandable

in light of the video footage.  For, in the five minutes before Mr. Shaver's death, Sergeant Langley repeatedly warned him that any deviation from a series of orders, would result in Mr. Shaver getting shot.

Balancing the nature and quality of the intrusion into Mr. Shaver's Fourth Amendment interests against the governmental interests in such an intrusion, a reasonable jury could conclude that Officer Brailsford's use of deadly force in this situation was objectively unreasonable.  "The intrusiveness of a seizure by means of deadly force is unmatched," *Garner*, 471 U.S. at 9, and "implicates the highest level of Fourth Amendment interests." *A.K.H. by and through Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016).  But here, the governmental interests in using deadly force were slight: A jury could conclude that Mr. Shaver did not pose an immediate threat, was not actively resisting arrest or attempting to flee, and was not engaged in the commission of any serious crimes at the time of the encounter.  At most, Mr. Shaver failed to follow instructions in a stressful situation and was warned that he might get shot as a result.  There is, of course, a governmental interest in ensuring suspects in an investigation comply with an officer's orders.  But that governmental interest—standing alone—does not warrant the summary execution of an unarmed and nonthreatening suspect.  Our Constitution is clear as to that much.

The cases cited by Officer Brailsford are distinguishable.  In *Elliott*, the defendant officer shot and killed a man who was armed with a loaded gun and was pointing it directly at the defendant. *Elliott v. Mason Cnty.*, No. 17-6067 RJB, 2018 WL 6199002, at *6 (W.D. Wash. Nov. 28, 2018).  The decedent was shot just after saying "just shoot me." *Id.*  Here, Mr. Shaver was not armed and posed far less of an immediate threat to the officers' safety. Additionally, while the decedent in *Elliott* expressed thoughts consistent with a desire to be killed by police, Mr. Shaver explicitly and repeatedly expressed his desire not to be shot.

The second case is *Cruz v. City of Anaheim*, 765 F.3d 1076 (9th Cir. 2014).  There, the court noted in dicta that it would be "unquestionably reasonable for police to shoot a suspect in [the decedent's] position if he reaches for a gun in his waistband, or even if he

reaches there for some other reason." *Cruz*, 765 F.3d at 1078. But in *Cruz*, the police knew prior to the encounter that the decedent was armed with a nine-millimeter pistol that he kept in his waistband, had a prior felony conviction involving a firearm, was a gang member, and sold methamphetamine. *Id.* at 1077–78. A confidential informant had also told the police that the decedent "was not going back to prison." *Id.* at 1078. When officers attempted to surround the decedent's car following a traffic stop, he attempted to escape and backed his car into a patrol car. *Id.* Only then did he exit the vehicle, and the officers alleged he reached for his waistband. *Id.* While it might have been reasonable for the police to shoot an individual so described for reaching for his waistband during a police encounter, the instant facts are readily distinguishable. There is no evidence in the record to suggest that Officer Brailsford knew or believed Mr. Shaver had a criminal background, or that he was armed with the sort of pistol that could be stored in his waistband. Rather, the weapon that sparked this encounter was a rifle large enough to be noticed in a fifth-floor window from the ground floor. When Mr. Shaver exited the room, he was in a t-shirt and basketball shorts, and was not visibly armed, nor did he appear to be armed. In fact, his entire lower back and the tops of his buttocks were visible for several minutes while he lay on the ground before Officer Brailsford, while other officers were taking Ms. Portillo into custody.[7]

For the foregoing reasons, a reasonable jury could conclude that Officer Brailsford used excessive force when he shot and killed Mr. Shaver, violating his Fourth Amendment rights.

### b.   Clearly Established

The second prong of the qualified immunity test asks whether Mr. Shaver's Fourth

---

[7] Officer Brailsford's other cases are likewise distinguishable. *See Abuka v. City of El Cajon*, No. 17-cv-89-BAS-NLS, 2019 WL 1077495, at *6–7 (S.D. Cal. Mar. 7, 2019) (finding deadly force reasonable when decedent rapidly removed metal object from pocket and held object in a "shooting stance" aimed at officers); *A.G.1 by and through Uribe v. City of Fresno*, No. 16-cv-1914-LJO-SAB, 2018 WL 4042906, at *5-7 (E.D. Cal. Aug. 22, 2018) (finding deadly force reasonable when decedent fled from law enforcement while in possession of a firearm, attempted to throw the weapon, twice attempted to reach for the thrown weapon, and then reached for his waistband).

Amendment right to be free from unreasonable seizures was "clearly established at the time of the officer's alleged misconduct." *Estate of Lopez*, 871 F.3d at 1017 (quoting *C.V. by and through Villegas v. City of Anaheim*, 823 F.3d 1252, 1257 (9th Cir. 2016)). The "crux" of the inquiry is whether "officers have 'fair notice' that they are acting unconstitutionally." *Mullenix v. Luna*, 577 U.S. 7, 21 (2015) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)) (Sotomayor, J., dissenting). Given the fact-bound nature of the inquiry, while there need not be a case "directly on point, . . . existing precedent must have placed the . . . constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). "[S]pecificity is especially important in the Fourth Amendment context," because "[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix*, 577 U.S. at 12 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Therefore, cases that establish the law of excessive force at a high level, such as *Graham* and *Garner*, will not clearly establish the relevant law in situations other than an "obvious case." *Brousseau v. Haugen*, 543 U.S. 194, 199 (2004).

The Court must determine whether it was clearly established on January 18, 2016 that an officer would violate the Fourth Amendment if he used deadly force when responding to reports of a rifle pointed out a hotel window, against a suspect who was not armed, and did not appear to be armed; who failed to obey some officer commands but largely appeared to be compliant, expressed a desire not to be shot, and was in the process of turning himself in; and who raised his hand towards his back in his crawling position in the moments before he was shot. Such a right was clearly established at the time of Mr. Shaver's death.

There are times when "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful.'" *Hope*, 536 U.S. at 741 (quoting *United States v. Lanier*, 520 U.S. 259, 270–71 (1997)). The facts of *Garner* suggest as much here. "A police officer may not seize an unarmed, nondangerous

suspect by shooting him dead." *Garner*, 471 U.S. at 11.[8]  While the Supreme Court has cautioned against using *Garner* to clearly establish the law in factually distinguishable situations, *see, e.g.*, *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021), *Garner* is on all fours with the conduct depicted in the video at the heart of this case, and would have placed any reasonable officer on notice that it was constitutionally unreasonable to shoot Mr. Shaver.[9]  In *Garner*, two officers responded to reports of a burglary at a residential home. One officer went behind the home, "heard a door slam[,] and saw someone run across the backyard." *Id.* at 3.  The officer shone a light on that person—Mr. Garner—and ascertained that he was most likely unarmed because he saw no sign of a weapon.  *Id.*  The officer announced his presence and ordered Mr. Garner to halt, but he began to climb over a chain link fence at the edge of the backyard. *Id.* at 4.  Worried that Mr. Garner might escape, the officer shot him in the back of the head.  *Id.*  The Supreme Court held that the Tennessee statute authorizing the officer's actions was unconstitutional because "[w]here the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Id.* at 9.  *Garner* makes clear that when officers are confronted with unarmed, nondangerous individuals, it is plainly unconstitutional to seize them "by shooting [them] dead."  *Garner*, 471 U.S. at 11.

But even if Mr. Shaver's rights were not obviously established by *Garner* at the time of the shooting, controlling Ninth Circuit precedent at the time of Mr. Shaver's death clearly established his rights.  In *Espinosa v. City and Cnty. of San Francisco*, 598 F.3d 528 (9th Cir. 2010), the court denied qualified immunity to officers who shot and killed an unarmed individual, Asa Sullivan, who they found hiding in the attic of a suspected drug

---

[8] MPD training records indicate that their use-of-force trainings regularly cited *Garner* and this exact holding.  (Doc. 376-2 at 43, 124.)

[9] This conclusion is consistent with that of the Ninth Circuit, which affirmed this Court on Sergeant Langley's interlocutory appeal.  *See Sweet v. Langley*, 798 F. App'x 135, 136 (9th Cir. 2020) ("Philip Brailsford violated clearly established law when he shot Shaver.  'A police officer may not seize an unarmed, nondangerous suspect by shooting him dead.'" (quoting *Garner*, 471 U.S. at 11)).

house. *Id.* at 533. When the officers found Mr. Sullivan, he refused to show his hands, and "made disturbing statements, such as 'Kill me or I'll kill you' and 'Are you ready to shoot me?'" *Id.* at 538. Mr. Sullivan had no means of escape. *Id.* One officer testified that she shot because she saw Mr. Sullivan move his right arm and believed he would shoot her. The other testified that he saw something in Mr. Sullivan's hands that looked like a gun. *Id.* The court found that the use of deadly force was unreasonable. *Id.* Mr. Sullivan could not escape, did not cause the officers' forcible entry into the home, had not been accused of any crime, was not considered a threat to the public, and had not brandished or even mentioned a weapon. *Id.*

Nor was *Espinosa* an outlier case in 2016. In *Collender v. City of Brea*, 605 F. App'x 624 (9th Cir. 2015),[10] the Ninth Circuit held that a jury could find the defendant officer unreasonably used deadly force under similar circumstances. Earlier that day, the decedent, a teenager named Julian, allegedly committed an armed robbery with a handgun and threatened to kill the victim's family. *Id.* at 625. The defendant officer observed Julian's home from an unmarked vehicle. *Id.* at 626. He saw Julian leave his house, get into his car, and reach into the back seat. *Id.* Julian then drove off, turned around, parked, and got out of his car. *Id.* The officer exited his vehicle, pointed his rifle at Julian, and told him to freeze. *Id.* He instead ran across the street and faced the officer with his arms outstretched. He then lowered his left arm towards his left front pant pocket. *Id.* at 627. At that point, the officer shot Julian in the chest at close range. *Id.* at 627. The court held that a reasonable jury "could determine that Julian did not pose an immediate threat and that it was objectively unreasonable for [the officer] to use deadly force against him." *Id.* at 628. The officer did not see Julian with a gun or other bulge "that might have been a gun in [his] pocket," and Julian did not verbally or physically threaten the officer. *Id.* at 629.

In light of the admissible video tape and the undisputed facts, this is a case that fits

---

[10] "[U]npublished decisions can be considered in determining whether the law was clearly established." *Bahrampour v. Lampert*, 356 F.3d 969, 977 (9th Cir. 2004).

within the parameters of the above cases as clearly establishing Mr. Shaver's right to not be seized by deadly force. It is, in fact, arguably a stronger case than any of them. Like Mr. Garner and the juvenile Julian, he did not appear to be armed. But, unlike Mr. Garner or Julian, Mr. Shaver was not in the act of flight, and it is undisputed that he had no way to escape the hotel hallway. Unlike Mr. Sullivan or Julian, Mr. Shaver made no threats to officers or others. Unlike Mr. Sullivan, Mr. Shaver did not possess, or appear to possess, anything that looked like a gun, nor did he refuse to show the officer's his hands. In fact, unlike any of the decedents in any of the three cases, Mr. Shaver had—immediately before the shooting—been lying prone on the hallway floor just in front of the officers for several minutes with his hands laced over his head in their full observation wearing loose-fitting basketball shorts that exposed the flesh between his back and his shorts. Like Mr. Sullivan and Julian, Mr. Shaver made some motion towards his back, but unlike either of them, he was, at the direction of the officers, in the process of crawling on his hands and knees towards the officers when he did so.

By January 2016, the Ninth Circuit had twice held that it was constitutionally unreasonable for an officer to use deadly force against an individual who appeared unarmed, did not fully comply with all of the officer's commands, and made a sudden gesture with his hands immediately before the officer decided to fire. Further, in both of those cases, the officers had some subjective reason to fear for their safety that Officer Brailsford did not: In *Espinosa* due to Mr. Sullivan's remarks, and in *Collender* due to the allegations that Julian had committed an armed robbery earlier that day, threatened to kill the victim's family, and had reached into his car in the moments before the encounter. Combined, the two cases—wholly apart from *Garner*—make clear that Officer Brailsford was on notice that it was constitutionally unreasonable to shoot Mr. Shaver in the hallway of the La Quinta hotel in Mesa.[11] Since Mr. Shaver's Fourth Amendment right to be free

_____

[11] As discussed *supra*, *Cruz v. City of Anaheim* is factually distinguishable because the officers knew the decedent—a convicted felon—was carrying a nine-millimeter pistol in his waistband, "made it clear that 'he was not going back to prison,'" and attempted to avoid apprehension by backing his car into a patrol car. *Cruz*, 765 F.3d at 1078; *cf. Kisela*, 138 S. Ct. at 1153 (finding proper focus of inquiry is the "most analogous Circuit

from unreasonable seizures was clearly established, Officer Brailsford cannot claim qualified immunity.

### c.      Punitive Damages

"It is well established that a 'jury may award punitive damages under section 1983 either when a defendant's conduct was driven by evil motive or intent, or when it involved a reckless or callous indifference to the constitutional rights of others.'" *Morgan v. Woessner*, 997 F.2d 1244, 1255 (9th Cir. 1993) (quoting *Davis v. Mason Cnty.*, 927 F.2d 1473, 1485 (9th Cir. 1991), *superseded by statute on other grounds as stated in Paeste v. Gov't of Guam*, 624 F. App'x 488, 492 (9th Cir. 2015)).  Based on the conduct described above, a reasonable jury could find that even if Officer Brailsford's conduct was not driven by evil motive or intent, it involved a reckless or callous indifference to the constitutional rights of Mr. Shaver.  Therefore, Plaintiff's claim for punitive damages survives.

### 2.      Sergeant Langley's Individual Liability

### a.      Integral Participation

Sergeant Langley appealed the Court's denial of his motion to dismiss on qualified immunity grounds.  The Ninth Circuit affirmed.  *Sweet v. Langley*, 798 F. App'x 135 (9th Cir. 2020).   On summary judgment, he argues he should receive qualified immunity because he did not "effectively authorize[] his subordinates to use excessive force against [Mr.] Shaver,"  and that he cannot face liability as an integral participant in Mr. Shaver's death.  *Id.* at 136.

To face liability under Section 1983, "each public official must integrally participate in the unlawful seizure[]."  *Reynaga Hernandez v. Skinner*, 969 F.3d 930, 941 (9th Cir. 2020).  But "each officer's actions" need not "rise to the level of a constitutional violation." *Boyd v. Benton Cnty.*, 374 F.3d 773, 780 (9th Cir. 2004).  Liability may be imposed on "an

---

precedent").  Regardless, *Cruz* cannot clearly establish the law because its remark that it would be "unquestionably reasonable for police to shoot a suspect in [the decedent's] position if he reaches for a gun in his waistband, or even if he reaches there for some other reason" is dicta.  *Id.*; *see also al-Kidd*, 563 U.S. at 741–42 (finding dicta to fall short of clearly establishing the law).  The Ninth Circuit's ultimate holding in *Cruz* was that the district court erred in granting summary judgment for the officer defendants because of several material discrepancies that cast doubt on their testimony.  *Cruz*, 765 F.3d at 1080.

officer whose actions were 'instrumental' in effectuating a constitutional violation." *Reynaga Hernandez*, 969 F.3d at 941 (quoting *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n.12 (9th Cir. 2007)). The Ninth Circuit has "yet to define the minimum level of involvement," but has noted that "standards of causation under tort law" are relevant to the inquiry. *Id.* at 941–42 (finding that the defendant was an integral participant under either proximate cause or but-for causation).

While Sergeant Langley did not explicitly order Officer Brailsford to pull the trigger, he did instruct Mr. Shaver several times that he might be shot, that he was likely to be shot, or that he would be shot if he made certain movements, including moving his hands in the direction of his back waist. A reasonable jury could find that had it not been for his harsh and aggressive statements to Shaver that the officers would shoot him if he repeated his hand movements, Officer Brailsford would not have shot Mr. Shaver. Sergeant Langley was the leader of the MPD contingent present at the hotel. He was also the only officer who gave instructions to both Mr. Shaver and Ms. Portillo in the fifth-floor hallway. On three separate occasions, Sergeant Langley informed Mr. Shaver that officers might shoot him if he failed to comply with instructions. (Doc. 266-21 at 12, 14, 16.) When Mr. Shaver first put his hands behind his back, Sergeant Langley warned him, "[y]ou do that again and we're shooting you." (Doc. 266-21 at 16.) The next time Mr. Shaver reached to his side while he was crawling towards the officers at their instruction, Officer Brailsford shot him. While the shooting may have been in compliance with Sergeant Langley's warnings and instructions, there remain, at the least, substantial issues of fact as to whether the non-compliance gave the police any reasonable basis to believe that the use of deadly force was justified in response

Plaintiff has presented an expert whose report criticizes Sergeant Langley's demeanor during this encounter as aggressive and exceeding the bounds of what is appropriate police protocol in similar situations. (Doc. 266-33 at 7–8.) Plaintiff's expert report also discusses the "contagion effect," a psychological phenomenon that explains how the behavior of a positive role model may reduce an observer's inhibitions to perform

certain actions.  (*Id.* at 14.)  Applied to the hallway, the expert notes that Sergeant Langley was likely a positive role model because he was Officer Brailsford's superior officer, and Officer Brailsford was a relatively junior officer on the force.  (*Id.*)  According to Plaintiff's expert,

> "[i]t is easy to see how Langley's loud and aggressive interaction with Shaver would have caused Brailsford to set aside his own personal judgment and behavior restraints and simply follow Langley's direction without question, even if that direction included a warning to Shaver that he would be shot the next time he moved his hands behind him."

(*Id.*)  Based on the foregoing, a reasonable jury could find Sergeant Langley was an integral participant in the shooting of Mr. Shaver.

The Court declines to disturb its earlier ruling that Mr. Shaver's Fourth Amendment rights were clearly established at the time of his death and that Sergeant Langley was on notice of those rights.[12]  Since a jury could find Sergeant Langley was an integral participant in the shooting of Mr. Shaver, summary judgment on this issue is denied.

### b.    Punitive Damages

Based on the conduct described above, a reasonable jury could find that even if Sergeant Langley's conduct was not driven by evil motive or intent, it involved a reckless or callous indifference to the constitutional rights of Mr. Shaver.  Therefore, Plaintiff's claim for punitive damages survives.

### 3.    City of Mesa's *Monell* Liability

The Court turns next to whether the City of Mesa faces liability for the death of Mr. Shaver.  "[M]unicipalities and other local government units" may be sued as persons under Section 1983.  *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 690 (1978).  But "a plaintiff must go beyond the respondeat superior theory of liability[,]" *Kirkpatrick v. Cnty. of Washoe*, 843 F.3d 784, 793 (9th Cir. 2016), because liability only attaches where "the

---

[12] While the Ninth Circuit's holding rested on the facts as alleged in the complaint, the Court finds that the video from Officer Brailsford and Officer Doane's body camera provides sufficient corroboration for the alleged facts that the conclusions of law reached by the Ninth Circuit need not be revisited.  *See Sweet*, 798 F. App'x at 136.

municipality *itself* causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (emphasis in original).  The elements of a municipal Section 1983 claim are (1) the deprivation of a constitutional right, which was (2) caused by a policy or custom of the local government unit, and (3) the policy or custom amounted to deliberate indifference to the plaintiff's constitutional rights.  *See Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1073–1077 (9th Cir. 2016).

In the absence of a policy "promulgated, adopted, or ratified by a local governmental entity's legislative body," *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1443 (9th Cir. 1989), *overruled on other grounds by Bull v. City & Cnty. of San Francisco*, 595 F.3d 964 (9th Cir. 2010), a plaintiff may establish *Monell* liability by demonstrating, *inter alia*, a municipal custom or practice which gave rise to the alleged violation, a municipality's failure to train its employees, or ratification of a subordinate's decisions.  *See, e.g.*, *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (custom or practice); *City of Canton*, 489 U.S. at 388–91 (failure to train); *Christie v. Iopa*, 176 F.3d 1231, 1238 (9th Cir. 1999) (ratification); *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 837 (9th Cir. 1996) (negligent hiring).[13]

### a.      Policy, Custom, or Practice

A municipal policy need not necessarily be adopted by a local legislative body to subject a municipality to liability.  "A policy is a deliberate choice to follow a course of action made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Brown v. Lynch*, 831 F.3d 1146, 1152 (9th Cir. 2016) (cleaned up); *see also City of St. Louis v. Prapotnik*, 485 U.S. 112, 127 (1988) (emphasizing that critical inquiry is whether official has final policymaking authority).

Absent an official policy, a custom or practice may give rise to *Monell* liability if it is so "'persistent and widespread' that it constitutes a 'permanent and well settled city

---

[13] In its prior Order, the Court found a genuine issue of material fact precluded granting summary judgment against the Plaintiffs on a failure to train theory.  (Doc. 339 at 12–13.)  The Court's prior ruling stands.

policy.'" *Trevino*, 99 F.3d at 918 (quoting *Monell*, 436 U.S. at 691).  Allegations of random acts or single instances of misconduct are insufficient to establish a municipal custom. *Navarro v. Block*, 72 F.3d 712, 714 (9th Cir. 1996); *Gordon v. Cnty. of Orange*, 6 F.4th 961, 974 (9th Cir. 2021).  Rather, liability "must be founded upon practices of sufficient duration, frequency, and consistency that the conduct has become a traditional method of carrying out policy." *Trevino*, 99 F.3d at 918.

Plaintiff first alleges that a training document from 2010 embodies a department-wide policy that "the life of the suspect is the suspect's responsibility." (Doc. 384-1 at 11.) However, for such a document to be considered a municipal policy under *Monell*, it must either have been adopted by a local legislative body, or otherwise adopted by an official responsible for establishing final policy with respect to the subject matter in question. Plaintiff has not established that the training document was adopted by a local legislative body.  Further, she has not established a dispute of material fact as to whether a city official with final policymaking authority approved the training.  Construing the evidence in Plaintiff's favor, a reasonable jury could conclude that the training document was developed by Officer Jeff Jacobs and approved by several officials at the Arizona Peace Officer Standards and Training Board ("AZPOST").  (Doc. 384-1 at 4.)  Plaintiff has not identified any portion of the record that could lead a reasonable jury to conclude either that an employee of the City with final policymaking authority approved the training, or that Officer Jacobs had final policymaking authority as to the police department's use of force standards.  In contrast, a 2012 document entitled "Use of Force Philosophy and Definitions" states that the Department was "committed above all to the sanctity and preservation of life, human rights, the dignity of every individual, and the Constitution of the United States and the State of Arizona.  An officer's responsibility for protecting life must include his or her own and those of his or her fellow officers and the general public." (Doc. 376-2 at 163.)  This document was approved by the Chief of Police and included in the Department Policy Manual, allowing a reasonable jury to conclude that it was municipal policy.  Absent any indication that the Chief of Police or another individual with

final policymaking authority approved the 2010 training, no reasonable jury could conclude that the document carries the force of municipal policy.

Plaintiff's argument that an unofficial custom or practice within the MPD sanctioned the use of excessive force among its officers also fails because there is no evidence that any such custom or practice was pervasive enough to give rise to *Monell* liability. Plaintiff relies on testimony from former MPD Chief Batista, several newspaper articles describing prior incidents of excessive force by MPD officers, an unauthenticated video purporting to show Officer Brailsford arresting an individual by throwing him to the ground, and adverse inferences they argue must be drawn from the repeated invocations of the Fifth Amendment by several of the individual officer Defendants in this case. But her evidence does not establish a genuine dispute of material fact that could lead a jury to conclude that this custom or practice was "founded upon practices of sufficient duration, frequency, and consistency that the conduct has become a traditional method of carrying out policy." *Trevino*, 99 F.3d at 918. For one, even if Plaintiff's newspaper articles could be presented in an admissible form at trial, *Larez v. City of Los Angeles*, 946 F.2d 630, 642 (9th Cir. 1991) (finding newspaper articles to be inadmissible hearsay); 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2722 (4th ed. 2021) (noting that "the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible"), they do not establish that such occurrences happened with enough regularity to establish a custom or practice. None of Plaintiff's other evidence shows that members of the MPD used excessive force with sufficient regularity on other occasions as to establish a custom or practice. Therefore, Plaintiff has failed to establish a genuine issue of material fact as to the existence of a custom or practice of using excessive force among the officers of the MPD.

Finally, the Court declines to draw the adverse inferences Plaintiff seeks. Defendants Brailsford, Langley, Doane, Elmore, Cochran, and Gomez all invoked the Fifth Amendment in response to deposition questions asking whether they were carrying out MPD policies and procedures on the night of Mr. Shaver's death. (Doc. 384-2 at 226.)

However, these invocations, and any adverse inferences this Court could draw from them, would not necessarily tend to establish the existence of a policy, custom, or practice of the MPD.  Rather, an officer's invocation of the Fifth Amendment in circumstances like these would suggest: that the officer was not following applicable policies at the time of Mr. Shaver's death.  Since *Monell* imposes liability on municipalities only for the actions of individual employees acting pursuant to policy, any adverse inferences this Court may draw from the Officers' repeated invocation of the Fifth Amendment cut against imposing liability on the City.

### b.    Ratification

In its earlier Order, the Court found that Plaintiff failed to establish a genuine issue of material fact on whether the City or any of its officials made a "conscious, affirmative choice," *Lassiter v. City of Bremerton*, 556 F.3d 1049, 1055 (9th Cir. 2009), to ratify Officer Brailsford's conduct on the night of March 18, 2016.  (Doc. 339 at 11.)  However, the Court deferred ruling on this issue until after the close of discovery, to allow Plaintiff to complete discovery on this claim.  (*Id.*)  Discovery having closed, Plaintiff has not presented any further evidence of ratification.  Therefore, summary judgment is granted on this issue.

### c.    Unconstitutional Hiring

Negligent hiring is a viable theory of liability under *Monell*.  *Van Ort*, 92 F.3d at 837.  However, Plaintiff has not identified any facts in the record on which a jury could conclude that the City of Mesa negligently hired Officer Brailsford, or that such negligent hiring was the proximate cause of Mr. Shaver's death.  Therefore, summary judgment is granted on this issue.

/ / /

/ / /

/ / /

/ / /

- 24 -

1

**B.     State Law Claims[14]**

2

**1.     Wrongful Death**

3

**a.     Standing**

4

An action for wrongful death under Arizona law is "purely statutory and . . . must

5

be brought in the names of the persons to whom the right is given by statute." *Solomon v.*

6

*Harman*, 107 Ariz. 426, 428, 489 P.2d 236, 238 (1971).  Arizona's wrongful death statute

7

provides that "[a]n action for wrongful death shall be brought by and in the name of the

8

surviving husband or wife, child, parent or guardian, or personal representative of the

9

deceased person."  A.R.S. § 12-612(A).  But the "right to maintain an action for wrongful

10

death must not be confused with the right to share in the distribution of the amount

11

recovered."  *Solomon*, 107 Ariz. at 429.  In Arizona, a surviving husband, wife, child, or

12

parent has a right to share in the distribution of the proceeds.  A.R.S. §12-612(A).  But a

13

personal representative of the estate may only recover if none of the other statutory

14

beneficiaries survive.  *Id.*  Consequently, the validity of Plaintiff's putative common-law

15

marriage to Mr. Shaver will determine whether she will personally be entitled to receive

16

any proceeds from the wrongful death claim.[15]

17

/ / /

18

/ / /

19

20

[14] Sergeant Langley has waived any affirmative defenses challenging the adequacy of Plaintiff's notice of claim.  *See City of Phoenix v. Fields*, 219 Ariz. 568, 575, 201 P.3d 529, 536 (2009) (finding waiver by conduct of preserved notice of claim defense when defendant first raised the defense in a motion filed more than four years after date of the original complaint, after extensive litigation, discovery, and motion practice on the merits of the underlying claim).

21

22

23

24

[15] That Sweet is listed as Shaver's wife on Shaver's death certificate, is the personal representative of his estate, and was treated as his wife in the state court criminal proceeding does not preclude this court from independently determining whether a common-law marriage existed.  "Collateral estoppel or issue preclusion is applicable when the issue or fact to be litigated was actually litigated in a previous suit, a final judgment was entered, and the party against whom the doctrine is to be invoked had a full opportunity to litigate the matter and actually did litigate it, provided such issue or fact was essential to the prior judgment."  *Chaney Bldg. Co. v. City of Tucson*, 148 Ariz. 571, 573, 716 P.2d 28, 30 (1986).  Since Plaintiffs have not established that the common-law marriage issue was ever actually litigated in a previous suit, the Court is not bound by any prior proceeding on this issue.

25

26

27

28

- 25 -

Texas permits common-law marriages[16] on a showing that "the parties (1) agreed to be married, (2) lived together in Texas as husband and wife after the agreement, and (3) there presented to others that they were married." *Small v. McMaster*, 352 S.W.3d 280, 282 (Tex. App. 2011); *see also* Tex. Fam. Code § 2.401(a)(2). "A common-law marriage does not exist until the concurrence of all three elements." *Eris v. Phares*, 39 S.W.3d 708, 713 (Tex. App. 2001). "The existence of an informal marriage is a fact question, and the party seeking to establish existence of the marriage bears the burden of proving the three elements by a preponderance of the evidence." *Small*, 352 S.W.3d at 282–83. Each element may be established by either circumstantial or direct evidence. *Russel v. Russell*, 865 S.W.2d 929, 933 (Tex. 1993). "The elements of an informal marriage are determined on a case-by-case basis." *Bailey v. Thompson*, No. 14-11-00499-CV, 2012 WL 4883219, at *7 (Tex. App. Oct. 16, 2012). Here, the parties do not appear to dispute the second element but contest the first and third elements. The Court considers each in turn.

### i.     Agreement to be Married

An agreement to be married can be established by evidence that shows "the parties intended to have a present, immediate, and permanent marital relationship and that they did in fact agree to be husband and wife." *Eris*, 39 S.W.3d at 714. Testimony by one party to the putative marriage constitutes "some direct evidence that the parties agreed to be married." *Small*, 352 S.W.3d at 283; *see also Eris*, 39 S.W.3d at 714. Here, Plaintiff has produced a declaration asserting that she and Mr. Shaver "began living together as husband and wife in Nashville Tennessee" in 2008. (Doc. 258-1 (under seal) at 420.)[17] At the

---

[16] Texas law also refers to a common-law marriage as an "informal marriage." *See* Tex. Fam. Code § 2.401.

[17] While the Court originally allowed Docs. 257 and 258 to be filed under seal because they were non-dispositive motions subject to the good cause standard, *see Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003), they do not meet the "compelling reasons" standard required to override "the strong presumption of access to judicial records" that "applies fully to dispositive pleadings." *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006). Therefore, the Court will draw on these documents as appropriate to arrive at its ruling on the limited issue of whether a common-law marriage existed. However, the Court declines to otherwise disturb the sealed status of Docs. 257 and 258, given that other sensitive topics not discussed in this Order are raised therein.

summary judgment stage, this evidence is sufficient to establish a genuine issue of material fact as to whether an agreement to be married existed. *See Bailey*, 2012 WL 4883219, at *9 (finding evidence that wife represented herself as single on government documents during period of putative marriage did not negate existence of agreement, but rather went to the weight of the evidence); *In re Giessel*, 734 S.W.2d 27, 31–32 (Tex. App. 1987) (testimony of one party that they had agreed to be married "in God's eyes" was sufficient evidence of agreement to be married even when the party denied the marriage "in tax returns, social security, drivers' license, bank, and pay records").

### ii.  Presenting to Others

"The statutory requirement of 'presenting to others' is synonymous with the judicial requirement of 'holding out to the public.'" *Small*, 352 S.W.3d at 284–85 (quoting *Lee v. Lee*, 981 S.W.2d 903, 906 (Tex. App. 1998)).  This element may be "established by the conduct and actions of the parties," but "[o]ccasional introductions as husband and wife are not sufficient." *Id.* at 285.  The record reflects a genuine dispute of material fact as to whether Plaintiff and Mr. Shaver did hold themselves out as married, precluding summary judgment.  For one, Plaintiff provides a notarized affidavit by Mr. Shaver, dated January 11, 2015, in which he asserts that "I am married to Laney Sweet." (Doc. 258-3 (under seal) at 160.)  Plaintiff and Mr. Shaver also had a joint bank account and owned a car together. (Doc. 258-4 (under seal) at 2–3.)  Further, Mr. Shaver appears to have listed Plaintiff as his wife on a 2015 lease application.  (Doc. 258-5 (under seal) at 2.)  Plaintiff has also produced a vast amount of her social media posts where she refers to Mr. Shaver as her husband. (Doc. 640-2.)  Comments on these social media posts by individuals who appear to be "friends" of Plaintiff on Facebook also refer to Mr. Shaver as her husband.  (Doc. 640-2 at 6; 18.)  Finally, Mr. Shaver's mother testified that she saw him wearing a ring shortly before his death.  (Doc. 258-6 (under seal) at 4:7-8.)  On the other hand, Defendants have propounded evidence tending to suggest that Plaintiff and Mr. Shaver did not hold themselves out as married.  They point to several instances where Plaintiff indicated under penalty of perjury that she was single.  (Doc. 636 at 3.)  In addition, both of Mr. Shaver's

parents expressed doubts as to whether he believed he was married or wished to be married. (Doc. 257 (under seal) at 3–6.)  But it is not the Court's role at summary judgment to weigh competing pieces of evidence and determine which is more credible.  A reasonable jury could find for either party on this issue.

Plaintiff has met her burden to establish a genuine issue of material fact on all three elements required for a common-law marriage to exist under Texas law.  For this Order, the Court assumes Plaintiff has standing to bring the wrongful death claim on behalf of her children and herself.

**b.**   **Officers Cochran, Doane, Elmore, and Gomez**

Arizona's wrongful death statute provides that

> When death of a person is caused by wrongful act, neglect or default, and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action to recover damages in respect thereof, then, and in every such case, the person who or the corporation which would have been liable if death had not ensued shall be liable to an action for damages, notwithstanding the death of the person injured, and although the death was caused under such circumstances as amount in law to murder in the first or second degree or manslaughter

A.R.S. § 12-611.  Any negligence claim asserted under the statute "must be based on conduct independent of the intentional use of force." *Liberti v. City of Scottsdale*, 816 F. App'x. 89, 90 (9th Cir. 2020); *see also Ryan v. Napier*, 245 Ariz. 54, 62, 425 P.3d 230, 238 (2018).  Additionally, "[c]ommon law qualified immunity generally provides public officials, including police officers, limited protection from liability when 'performing an act that inherently requires judgment or discretion.'" *Spooner v. City of Phoenix*, 246 Ariz. 119, 123, 435 P.3d 462, 466 (Ct. App. 2018) (quoting *Chamberlain v. Mathis*, 151 Ariz. 551, 555, 558, 729 P.2d 905, 909, 912 (1986)).  "If qualified immunity applies, a public official performing a discretionary act 'within the scope of [her] public duties' may be liable only if she 'knew or should have known that [s]he was acting in violation of established law or acted in reckless disregard of whether h[er] activities would deprive another person of their rights.'" *Id.* at 124, 435 P.3d at 467 (quoting *Chamberlain*, 151

Ariz. at 558, 729 P.2d at 912).

Plaintiff asserts that Officers Cochran, Doane, Elmore, and Gomez's negligence contributed to Mr. Shaver's death. Her theory appears to be that Defendants "knew they could and should have interacted with Daniel far differently[,]" namely by using different tactics to investigate, ascertaining whether Mr. Shaver was armed, and deescalating the situation. (Doc. 384 at 8.) As Plaintiff concedes qualified immunity applies, (Doc. 384 at 7), the Court first turns to whether Officers Cochran, Doane, Elmore, and Gomez acted "in reckless disregard of whether [their] activities would deprive [Mr. Shaver] of [his] rights." *Spooner*, 246 Ariz. at 124. Reckless disregard requires a showing that an individual was aware of and consciously disregarded a substantial and unjustifiable risk that their conduct would result in the deprivation of the rights of another. *See* RAJI (Criminal) 5th § 1.0510(c); *see also* RAJI (Civil) 6th Defamation 4A.

On the record before the Court, Plaintiff has not identified any acts or failures to act taken by the individual officers that rise to the level of reckless disregard. Rather, the evidence suggests that all four officers actively took steps to reduce the risk of harm to Mr. Shaver.

Officer Cochran, on his own initiative and based on his prior experience, suggested to Sergeant Langley that he try to call Mr. Shaver from the lobby to open a line of communication with him. (Doc. 384-3 at 76.) After an aborted attempt, Officer Cochran made contact with Mr. Shaver and instructed him and Ms. Portillo how Sergeant Langley wanted them to exit the hotel room. (Doc. 297 at ¶¶ 65–66.) While both Officer Cochran and Plaintiff's expert acknowledge he could have gathered more intelligence on the call about whether Mr. Shaver was armed, (Doc. 297 at ¶¶ 187, 221), it is clear on the record that Defendant Cochran believed that directly calling Mr. Shaver would reduce the possibility of miscommunication. (Doc. 297 at ¶ 62.) When Officer Cochran returned to the fifth floor, he saw that officers had both lethal and nonlethal weapons ready and opted instead to prepare to handcuff Ms. Portillo and Mr. Shaver. (Doc. 297 at ¶ 78.) Officer Cochran's proactive attempts to minimize loss of life by opening channels of

communication do not amount to a reckless disregard for Mr. Shaver's rights.

The same is true for Officers Doane, Elmore, and Gomez. The undisputed facts show that Officer Doane switched from his firearm to his Taser when Mr. Shaver exited his room because he noticed that while several officers were ready with lethal coverage, it did not appear that any officers had less lethal weapons out. (Doc. 297 at ¶ 140.) Plaintiff points to no conduct by Officer Doane that suggests he consciously disregarded a substantial risk to Mr. Shaver's rights. Instead, opting to provide less-than lethal coverage suggests Officer Doane was attentive to the prospect of apprehending both suspects without using lethal force. Officer Elmore was one of the other officers tasked with providing lethal coverage at the hotel. However, he testified that he did not shoot Mr. Shaver because he never lost sight of Mr. Shaver's right hand. (Doc. 266-20 at 16.) Likewise, absent other facts, such conduct cannot amount to a reckless disregard for Mr. Shaver's rights. Plaintiffs also fail to create a dispute of material fact around Officer Gomez's conduct that evening. The undisputed facts show Officer Gomez was on handcuffing duties and did not draw his weapon. (Doc. 297 at ¶ 159.) Finally, Plaintiffs' attempt to hold Officers Cochran, Doane, Elmore, and Gomez liable for any failures to investigate falls flat because the undisputed facts show that Sergeant Langley was responsible for determining the scope of the investigation and the tactics used by the responding officers. (Doc. 262 at 125:16–19.) The facts before this Court suggest all four officers acted with relative restraint, and on their own initiative made decisions that were calculated to reduce the overall likelihood of an unconstitutional seizure of Mr. Shaver and Ms. Portillo. Such conduct does not amount to reckless disregard of Mr. Shaver's constitutional rights.

However, even if Plaintiff's allegations regarding the failure of these officers to act were undisputed, the conduct described would not rise to the level of reckless disregard.[18]

---

[18] While the question of qualified immunity as to the state law claims is not governed by federal law, the test for qualified immunity under Arizona law is similar to the test for punitive damages under 42 U.S.C. § 1983. *Compare Spooner*, 246 Ariz. at 124, 435 P.3d at 467 ("If qualified immunity applies, a public official performing a discretionary act "within the scope of [her] public duties" may be liable only if she "knew or should have known that [s]he was acting in violation of established law or acted in reckless disregard of whether h[er] activities would deprive another person of their rights.") *with Morgan*,

Plaintiff presents no case where officers have been found to act with reckless disregard for a failure to act. By contrast, the court in *Macareno v. Thomas*, 378 F. Supp. 3d 933 (W.D. Wash. 2019), found an officer did not act with reckless disregard as a matter of law when he was present at the scene and aided in handcuffing the plaintiff, but otherwise had "limited verbal or physical interaction with Plaintiff." *Id.* at 945. However, the court held that a jury could find that other officers present—who acted with apparent racial animus in violation of the plaintiff's constitutional rights—were eligible for punitive damages. *Id.* at 946. Much like the bystander officer in *Macareno*, the individual officers here are alleged to have failed to take actions to deescalate the situation that—Plaintiff claims— would have prevented Mr. Shaver's death. But like in *Macareno*, the individual officers had "limited verbal or physical interaction with" Mr. Shaver. *Id.* at 945. Sergeant Langley was the only officer who spoke with Mr. Shaver, and Officer Brailsford was the only officer who shot Mr. Shaver. Nor do they offer any reason for these officers to believe that, under the circumstances, Officer Brailsford would wrongfully shoot Mr. Shaver if they did not act. Therefore, the conduct of Officers Cochran, Doane, Elmore, and Gomez does not rise to the level of evincing a reckless disregard for Mr. Shaver's rights. As Plaintiff has failed to overcome state-law qualified immunity, summary judgment is granted as to her wrongful death claim against Officers Cochran, Doane, Elmore, and Gomez.

### c.   City of Mesa

In its prior order, the Court denied summary judgment on Plaintiff's wrongful death claim against the City of Mesa on a failure to train theory because Plaintiff "identified facts from which a jury could infer that a lack of training as to de-escalation and waistband inspection contributed to Mr. Shaver's death." (Doc. 339 at 18.) The Court deferred ruling on Plaintiff's negligent hiring and supervision theories pending the conclusion of discovery. *Id.* However, as discussed above, *see supra* Section II.A.3, Plaintiff has not

---

997 F.2d at 1255 ("It is well established that a "jury may award punitive damages under section 1983 either when a defendant's conduct was driven by evil motive or intent, or when it involved a reckless or callous indifference to the constitutional rights of others."). Given the relatively sparse Arizona caselaw on this issue, the Court informs its analysis (but does not consider itself bound) by considering appropriate federal cases as well.

1    proffered any additional evidence to support these theories, and therefore has not

2    established a genuine dispute of material fact.  Plaintiff's wrongful death claim against the

3    City of Mesa may proceed, but only on a failure to train basis.

### 2.    IIED

5          In Arizona, there are three elements in an Intentional Infliction of Emotional

6    Distress ("IIED") claim: "*first*, the conduct by the defendant must be 'extreme' and

7    'outrageous'; *second*, the defendant must either intend to cause emotional distress or

8    recklessly disregard the near certainty that such distress will result from his conduct; and

9    *third*, severe emotional distress must indeed occur as a result of the defendant's conduct."

10   *Ford v. Revlon, Inc.*, 153 Ariz. 38, 43, 734 P.2d 580, 585 (Ariz. 1987).  Plaintiff asserts

11   three distinct IIED theories, applicable to distinct sets of defendants.  Against the City of

12   Mesa, she claims its failure to provide her a next of kin notification and its failure to release

13   the AXON body camera footage both give rise to liability.  She also claims that the

14   individual officers conspired to falsify police reports to omit details of Mr. Shaver's

15   demeanor at the time of his death, and that the false reporting caused her emotional distress.

### a.    City of Mesa

17        Plaintiff's IIED claim against the City of Mesa fails because the City's conduct was

18   not extreme and outrageous under either theory asserted.  Conduct is extreme and

19   outrageous under Arizona law when it goes "beyond all possible bounds of decency, and

20   to be regarded as atrocious, and utterly intolerable in a civilized community . . . in which . . .

21   an average member of the community would . . . exclaim, 'Outrageous!'"  *Ford*, 153 Ariz.

22   at 43, 734 P.2d at 585 (quoting Restatement (Second) of Torts § 46 cmt. d).  The "conduct

23   necessary to sustain an intentional infliction claim falls at the very extreme edge of the

24   spectrum of possible conduct."  *Watts v. Golden Age Nursing Home*, 127 Ariz. 255, 258,

25   619 P.2d 1032, 1035 (1980).  It is the duty of the Court to determine whether "the

26   defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit

27   recovery."  *Id.* (quoting Restatement (Second) of Torts § 46 cmt. h).  "[A]s the terms

28   'outrageous conduct' and 'severe emotional distress' are not readily capable of precise

legal definition, a case-by-case analysis is required." *Lucchesi v. Frederic N. Stimmell, M.D., Ltd.*, 149 Ariz. 76, 79, 716 P.2d 1013, 1016 (1986).

As to the failure to notify theory, Plaintiff faults the City for notifying Mr. Shaver's parents, but not notifying her. (Doc. 266 at ¶ 189; Doc. 303 at 41–42.) Plaintiff claims she was Mr. Shaver's common-law wife under the law of Texas. However, the defining characteristic of a common-law marriage is that it is informal in nature. There are no government records of a common-law marriage unless the spouses choose to create one. *See* Tex. Fam. Code. § 2.402 (providing that parties to a common-law marriage may submit a "declaration of informal marriage" to a county clerk). Since the very existence of Plaintiff and Mr. Shaver's putative common-law marriage is at issue in this case, it is clear no formal records establishing their marriage exist. Therefore, assuming for the purpose of this section that Plaintiff and Mr. Shaver had a common-law marriage, Plaintiff does not explain how the City would have known that Plaintiff was Mr. Shaver's wife when ascertaining his next-of-kin. If the City did not know Plaintiff was married to Mr. Shaver, it would not have known she was possibly entitled to a next of kin notification. Regardless, the City did deliver a next-of-kin notification to Mr. Shaver's parents, who agreed to pass the news on to Plaintiff. Plaintiff has failed to present any evidence showing that the City's decision to contact Mr. Shaver's parents was undertaken in bad faith, or that the City knew Plaintiff was married to Mr. Shaver at the time and deliberately chose not to contact her. *See Guerra v. State*, 234 Ariz. 482, 491, 323 P.3d 765, 774 (Ct. App. 2014) (finding failure to present evidence "illustrating the officers acted in anything other than good faith . . . in attempting to provide the NOK notification" warranted summary judgment on IIED claim), *vacated on other grounds by* 237 Ariz. 183, 348 P.3d 423 (2015). Therefore, Plaintiff's first IIED theory fails because the City's conduct was not extreme and outrageous.

Plaintiff also faults the City for failing to release the AXON body camera footage until after Officer Brailsford's criminal trial concluded. However, the relevant footage had been sealed pursuant to court order during the pendency of Officer Brailsford's trial.

1    (Doc. 266 at ¶¶ 190–94.)[19]  The City's decision to comply with a facially valid court order

2    is not extreme and outrageous and cannot give rise to IIED liability.

3                              **b.    Individual Officers**

4           As a preliminary matter, the individual officers are not entitled to absolute immunity

5    for the contents of their police reports.  In Arizona, "putative crime victims . . . are entitled

6    to absolute immunity when they complain to the police."  *Ledvina v. Cerasani*, 213 Ariz.

7    569, 574, 146 P.3d 70, 75 (Ct. App. 2006).  The same immunity attaches to complaints

8    made by third parties to authorities in anticipation of judicial proceedings.  *See, e.g.*, *Sobol*

9    *v. Alarcon*, 212 Ariz. 315, 318, 131 P.3d 487, 490 (Ct. App. 2006) (non-victim attorney

10   reporting unauthorized practice of law).  Absolute immunity attaches in both situations to

11   encourage "free and unfettered reporting to law enforcement authorities to assist the

12   detection and prosecution of criminal activity."  *Ledvina*, 213 Ariz. at 573, 146 P.3d at 74.

13   The Court is not persuaded that under Arizona law, reports drafted by police officers are

14   shielded by the same absolute immunity.  The policy behind *Ledvina* and its sister cases is

15   clear: Absent such an immunity, victims and third parties might not come forward to the

16   authorities.  Such a policy applies with far less force to the individual officer defendants in

17   this case, who were required by the City to draft a report whenever an officer "uses force."

18   (Doc. 314-1 at 4.)  Unlike civilians, the officers did not have a choice whether to come

19   forward.   And unlike complaints by crime victims and witnesses, who alert law

20   enforcement in the first instance to potentially illegal activity, reports drafted by police

21   officers serve to memorialize and summarize actions already taken by law enforcement.

22   *See Lisker v. City of Los Angeles*, 780 F.3d 1237, 1242 (9th Cir. 2015) (declining to apply

23   absolute immunity to the contents of police investigatory reports because they "'comprise

24   part of the documentary record before the prosecution and defense' and affect charging

25   decisions, plea bargaining, and cross-examination of the investigating officers").  Absent

26

27         [19] Plaintiff asserts that the state court order was procured through some collusive
     process designed to thwart her access to the AXON footage.  (Doc. 303 at 40.)  But she
28   does not provide any evidence to support her theory, nor does she show that she sought to
     view the AXON footage prior to the sealing order.  (Doc. 297 at ¶¶ 190–95.)

binding authority from an Arizona state court, the Court declines to grant absolute immunity to the individual officers as to the contents of their reports.

However, the individual officers are entitled to summary judgment on Plaintiff's IIED claim because their conduct did not rise to the "egregious level needed for an IIED claim." *Norton v. Arpaio*, No. CV-15-00087-PHX-SPL, 2019 WL 1409536, at *11 (D. Ariz. 2019). Plaintiff alleges that the individual officers omitted key details from their reports, namely that Mr. Shaver appeared to be crying and begging for his life in the moments before his death. (Doc. 292 at 16). Plaintiff further alleges that the officers conspired to omit such details, because none of the officers' reports include these details. *Id.* at 17.

Even if the officers did omit such details from their individual reports, the police report that Plaintiff received accurately described Mr. Shaver's demeanor in the moments before his death. Plaintiff, relying on the trial testimony of Detective Paul Sipe, claims that the individual officers all omitted information "that he was crying, that he was begging. Any type of information like that that – that mitigated his behavior was omitted." (Doc. 297 at ¶ 115).[20] All individual officer police reports were dated February 1, 2016, are labeled as supplements, and have a header identifying the reports as part of an "Incident/Investigation Report" and listing the case number. (Doc. 297-3 at 5.) However, Plaintiff has also produced portions of a Mesa PD "Incident/Investigation Report" dated February 8, 2016, with the same case number that explicitly contains the information Plaintiff alleges to be missing from the police reports: that Mr. Shaver's "voice appeared to be panicked," that he told the officers, "please don't shoot me," and that he could "be audibly heard sobbing" at several points. (Doc. 297-3 at 8.) Plaintiff testified that she

---

[20] Plaintiff has not provided the Court with the full police reports in question. Plaintiff produced the first page of Sergeant Langley's report, the first page of Officer Doane's report, the first page of Officer Cochran's report, and the first page of Officer Elmore's report. (Doc. 297-3 at 2–5.) They do not appear to have produced any portion of Officer Gomez's report. None of the portions of the above-mentioned reports produced by Plaintiff describes any events after the handcuffing of Ms. Portillo. In a response, Sergeant Langley produced his full report, which is consistent with Detective Sipe's account. (Doc. 314-2 at 2–3.)

received the full Mesa investigatory file several months after Mr. Shaver's death, and that she spent a week "going through all of it." (Doc. 376-2 at 15). Therefore, even if the individual officers did omit the descriptions of Mr. Shaver's demeanor, the full report that she received accurately reflects the events as they transpired and cannot form the basis for an IIED claim.

### C.   Motion to Strike

Finally, Plaintiff moves to strike several arguments raised by Officer Brailsford for the first time in his reply brief to his Motion for Summary Judgment. (Doc. 416.) These arguments include (1) that A.R.S. § 13-413 precluded civil liability because he was acquitted in a separate criminal trial, (2) that his now-concluded bankruptcy proceeding precluded an award of punitive damages, (3) that Plaintiff's IIED claims cannot succeed, and (4) that his criminal acquittal has issue preclusive effect and compels a finding that he was justified in shooting Mr. Shaver. "Arguments raised for the first time in [the] reply brief are deemed waived," *Delgadillo v. Woodford*, 527 F.3d 919, 930 n.4 (9th Cir. 2008), and the Court "does not consider" them. *Nat'l Fire Ins. Co. of Hartford v. Lewis*, 898 F. Supp. 2d 1132 1147 n.11 (D. Ariz. 2012), *vacated in part on other grounds by* 2012 WL 13026916, at *1 (D. Ariz. 2012). Officer Brailsford's Motion, (Doc. 379,) did not raise any of these legal issues. Nor was his incorporation by reference of all arguments raised by his co-Defendants in their respective Motions for Summary Judgment and supplements sufficient to put Plaintiff on notice as to his arguments. The Court will not consider Officer Brailsford's new arguments, to the extent they raise issues not already considered by the Court in this Order.[21] Therefore, the Court grants Plaintiff's Motion to Strike but declines to award reasonable attorneys' fees at this time.[22]

---

[21] Since Plaintiff's IIED claim against Officer Brailsford is based on the same theory the Court rejected above, the Court finds it fails for the same reasons. *See supra* Section II.B.2.b.

[22] Plaintiff previously sought additional time to conduct discovery pursuant to Federal Rule of Civil Procedure 56(d). (Doc. 303 at 45.) In its prior summary judgment Order, the Court reopened the discovery period for ninety days to allow the parties to obtain discovery they had sought prior to Officer Brailsford's declaration of bankruptcy. (Doc. 339 at 5.) The Court also allowed the parties to submit supplemental briefing on the issues

**CONCLUSION**

**IT IS THEREFORE ORDERED** that Sergeant Langley's Motion for Summary Judgment on all State Law Claims Asserted by Sweet Plaintiffs; Joinder in City Defendants' Motion for Summary Judgment (Doc. 271) is **GRANTED IN PART AND DENIED IN PART AS FOLLOWS:**

1.    As stated in Doc. 339, as to Plaintiff's wrongful death claim (Count I), summary judgment is **DENIED.**

2.    Summary Judgment as to whether Sergeant Langley was an integral participant in the seizure of Mr. Shaver under Section 1983 (Count III) is **DENIED.**

3.    Summary Judgment as to Plaintiff's IIED claim (Count VI) is **GRANTED.**

**IT IS FURTHER ORDERED** that Defendant Brailsford's Motion for Partial Summary Judgment on Qualified Immunity (Doc. 379) is **GRANTED IN PART AND DENIED IN PART AS FOLLOWS:**

1.    Summary Judgement as to Plaintiff's wrongful death claim (Count I) is **DENIED.**

2.    Summary Judgment as to Plaintiff's Section 1983 claim (Count III) is **DENIED.**

3.    Summary Judgment as to Plaintiff's IIED claim (Count VI) is **GRANTED.**

**IT IS FURTHER ORDERED** that Defendant City of Mesa, Brian Elmore, Christopher Doane, Bryan Cochran, and Richard Gomez's Motion to for Summary Judgment on the Sweet Plaintiffs' Complaint (Doc. 265) is **GRANTED IN PART AND DENIED IN PART AS FOLLOWS:**

1.    Summary Judgment as to Plaintiff's wrongful death claim (Count I) against the City of Mesa on a failure to train theory is **DENIED**, but **GRANTED** as to all other theories of liability.

---

that remained open after its Order. *Id.* The Court subsequently extended the fact discovery deadline through July 30, 2021, and allowed Plaintiff to conduct several additional depositions. (Doc. 513.) Because Plaintiff has not raised any Rule 56(d) objections since the first round of briefing on this motion—and she has received the relief she requested—to the extent her Rule 56(d) motion remains outstanding, it is denied as moot.

2.   Summary Judgment as to Plaintiff's wrongful death claims (Count I) against the individual officer Defendants is **GRANTED.**

3.   Summary Judgement as to Plaintiff's Section 1983 claim (Count III) against the City on a failure to train theory is **DENIED**, but **GRANTED** as to all other theories of liability.

4.   Summary Judgment as to Plaintiff's IIED claims on all theories (Count VI) is **GRANTED.**

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Strike or Not Consider New Arguments in the Brailsford Defendants' Reply in Support of Partial Motion for Summary Judgment and Request for Reasonable Award of Attorneys' Fees (Doc. 416) is **GRANTED IN PART AND DENIED IN PART AS FOLLOWS:**

1.   Plaintiff's Motion to Strike is **GRANTED.**

2.   Plaintiff's request for attorneys' fees is **DENIED.**

**IT IS FURTHER ORDERED** that the Mesa Defendants' Motion for Summary Judgment on the Shaver Plaintiffs' Claims (Doc. 273) and Defendant Langley's Motion for Summary Judgment re Shaver Plaintiffs' Claims (Doc. 270) are **DENIED** as moot.

Dated this 2nd day of February, 2022.

G. Murray Snow
G. Murray Snow
Chief United States District Judge